IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

JAMES RICHARD DUDLEY,

v.

(FNU) WARREN, KANSAS DEPARTMENT OF CORRECTIONS, EL DORADO CORRECTIONAL FACILITY, and all interested parties are all sued in their official capacity.

Case No. 5:22-CV-03188-JWL-JPO

— MOTION TO SUPPLEMENT COMPLAINT —

Jurisdiction.

1. "Unless good reason exist for denying leave, such as prejudice to the defendants, leave to supplement a complaint is to be liberally granted." All West Pet Supply Co. v. Hill's Pet Products Div., Colgate-Palmolive Co., 152 F.R.D. 202, 204 (D. Kan. 1993); "A supplemental complaint can add new parties." Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 227, 84 S. Ct. 1226 (1964).

Nature of Case.

2. This is a civil rights complaint filed by plaintiff James R. Dudley, a prisoner in the custody of the Kansas Department of corrections and who currently resides at El Dorado Correctional facility, alleging the excessive use of force in violation of his Eighth Amendment right to the United States of America Constitution.

3. Plaintiff now supplements his complaint to include claims of retaliation in violation of his First Amendment right of the United States of America Constitution and under Section V of the Americans with Disabilities Act and violation of his Due Process Rights

in violation of the Fourteenth Amendment of the United States of America Constitution. Plaintiff also supplements his complaint by adding the torts of Battery, assault, conspiracy to interfer with constitutional rights. [See Trujillo v. Goodman, 825, F.2d 1453, 1459-60 (10th cir.); U. S. V. Serrata #25 F.3d 886, 895-96 (10th Cir. 2005); Jackson v. Austin, 241 F. supp. 2d 1313, 1322-23 (D. Kan. 2003),

## SUPPLEMENTED COMPLAINT.

4. JAMES RICHARD DUDLEY, plaintiff now supplements his complaint to include the following claims:

a) Retaliation (KDOC has retaliated on plaintiff for legally attacking their officers and Administration with grievances, litigation and ADA accomodation request.

5. ADA Title V sec. 503, prohibits retaliation by defendants and Coercion by defendants.

6. Defendants (KDOC) have been using plaintiffs Anxiety and ADHD as a weapon against plaintiff. (See Huard case.)

7. Plaintiff is and has been for the past 2 years been held in unconstitutional conditions of confinement by Defendants undistinguishable from those in the U.S. of A.

8. Plaintiff has attached as exhibits prior filings that were ignored by Sam Crow.

9. Plaintiff is out of paper and defendants have taken all his money unlawfully in an effort to hinder, thwart and delay plaintiff.

10. Plaintiff ask the court for liberal review of this motion and attached exhibits please.

11. Plaintiff just got beat up by his celly for trying to give KDOC what they claim to want and try and get along with inmates in segregation.

12. KDOC denied plaintiff Protective custody.

13. Plaintiff now has serious injury to his left eye and mouth now. (stitches, bruising, busted left eyeball, two broken teeth... etc.)

Respectfully,

James R. Dudley
#0091359
KDOC
EDCF
P.O. Box 311
El Dorado, KS 67042



IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

EXHIBIT #1

JAMES RICHARD DUDLEY,

VS.,

State of Kansas et al.,

JRD

Case No. 5-21-cv-03287-SAC

— <u>Motion For Preliminary Injunctive Relief (R.65)</u> —

1. Plaintiff, JAMES RICHARD DUDLEY is being held hostage by the Kansas Government threw the Kansas Department of Corrections under inhumane, unconstitutional, in violation of Federal law and Human Rights law for no other reason but the Plaintiff, JAMES RICHARD DUDLEY being <u>born</u>.

2. Plaintiff, James Richard Dudley is being held in Administrative Segregation solely because of his Disability ADHD-#1 and for filing Civil complaints for excessive force used on him by KDOC officers and in retaliation for pursuing his ADA claim against the State of Kansas.

3. Plaintiff has a life long diagnosis of ADHD-#1-<u>Severe</u> and has deliberately been refused (100%) all treatment for his disability for No reason at all but for just being born and hated by the Kansas Government.

4. Plaintiff has essentially been lobotomized (lobotomy) by the Kansas Department of Corrections by then deliberately denying James Richard Dudley his treatment for his ADHD-H1-Severe genetic disability.

5. Plaintiff James Richard Dudley is constantly harrassed by prison guards at the direction of KDOC unknown administrative officials in an effort to make plaintiff lose control and severely hurt or kill someone (officer?) in an effort to prevent plaintiff James Richard Dudley from being civilly committed to the Larned State Hospital and to lock him up for the rest of my life just for being born with ADHD-H1-Severe and to avoid liability.

6. Plaintiff James Richard Dudley's life is in imminent danger and possibly the lives of others as well Right Now and as such is Begging this Court to do its Duty and step in and intervene and save Plaintiff James Richard Dudley from the physical and psychological torture he is being subjected to by the State of Kansas threw the KDOC administration.

7. Plaintiff James Richard Dudley is <u>Begging</u> this court for an preliminary Injunction Relief in the form of an immediate transfer to Larned State Hospital and treatment for his <u>ADHD-HI</u> and <u>PTSD.</u>

## — JURISDICTION —

Schrier v. University of Colorado, 427 F. 3d 1253, 1258 (10th Cir. 2005)

   1. "Irreparable injury"(A violation of a constitutional Right is sufficient to establish irreparable injury.) Plaintiff has been denied (100%) treatment for his ADHD-HI-severe, diliberately not informed of his disabilities in anyway other than the fact that he had ADHD, and punished severly with prison sentences and Administrative segregation threw out the duration of these prison sentences, has been beaten, Starved, separated from his family has had all his money taken and is even <u>NOW</u> being punished with short food rations and placed around other prisoners who have stabbed him and has just got liquid feces thrown all over him by the same prisoner after 2 weeks of verbal abuse on the tier in which the prison officials were 100% aware of. Plaintiff is diliberately provoked by prison officials <u>on camera</u> and then placed on MRA status in which he is placed/stripped naked and <u>all his constitutional Rights</u> are taken from him for 3 days at a time.

Plaintiff is then written false disciplinary reports for "battery" on officers and he is then denied (100%) all due process on the disciplinary hearings by the Hearing officers (at the direction of KDOC administration) are held in "absentia" for being a "security risk" if let out the cell for the hearings. (This argument fails completely because Plaintiff is allowed to go to yard, visits and showers, and do to the fact that the hearing officers can just do the hearings at his cell door.) The other 2 facts that completely destroy any defense the defendants may attempt is that a.) Plaintiff has a celly and does not batter him and b) KDOC cannot point out anytime that Plaintiff "battered" any officer in General population and Plaintiff has had only a handfull of fights in his entire 15 year stay in prison with other prisoners.

— Complete denial of treatment for ADHD was determined to be held unconstitutional in Anderson v. Colorado 887, F. Supp. 2d 1137. / Prisoners held in Administrative Segregation solely for their mental illness when placement in a hospital that could "cure" their mental illness with continued treatment and removal from the harmful environment (i.e. prison) was also held unconstitutional in Jones'El v. Berge, 164 F. Supp. 2d 1096, 1116-25 (W.D. Wis. 2001);
Madrid v. Gomez, 889 F. Supp. 1146, 1263-65 (N.D. Cal. 1995);
Morales Feliciano v. Romero Barcelo, 672 F. Supp. 591, 619-20 (D.P.R. 1986);
Jackson v. Austin, 241 F. Supp. 2d 1313, 1322-23 (D. Kan. 2003);
Ruiz v. Estelle, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999);
Coleman v. Wilson, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995);

5

Plantiff also offers direct and uncontroverted scientific evidence 100% in his favor for the defendant effectively lobotimizing/lobotomy him for failure to treat his ADHD-HI. (See Exhibit #1)

To sum up Plantiff's James Richard Dudley's "irreparable injury...." This court simply cannot allow defendants to subject Plaintiff James Richard Dudley to a continued "sudolobotomy" and endless severe punishment for his ADHD-HI-Severe disability behaviors. This is Satans work and this Evilness <u>must</u> be stopped!

2. Plantiff ~~James~~ James Richard Dudley will (and is) suffer more than defendants if this injunction is not granted. [Defendants are not being Lobotomized/Lobotomy and then being severely punished for their disabilities.] <u>obviously!</u>

3. The ADA and U.S. Constitution <u>IS</u> the Publics best interest. You cannot deny us disabled our treatments and punish us Severly. This is cannon sense in the U.S of A.

4. There is no possible defense the defendants can raise. They have the duty to provide me my

ADHD treatment and to prevent others from punishing me for my disability. Common sense in the U.S. of A.

## — ConClusion —

Plantiff James Richard Dudley Begs this court for injunctive relief (preliminary Injunctive Relief) in the form of an immediate transfer to Larned State Hospital. A motion for Mental Examination is filed herewith Plantiff's Motion for Preliminary Injunctive Relief also.

## Please Help Me!

s/
James R Dudley
James R Dudley
KDOC
Lansing Correctional facility
P.O. Box 2
Lansing - KS 66043

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

JAMES RICHARD DUDLEY,
　　　　Plaintiff/Appellant,

v.



STATE OF ~~Kansas, et al.~~,
　　　　Defendants/Appellees.

Case No: 21-3287-SAC

## MOTION TO AMEND AND FOR RECONSIDERATION OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTIVE RELIEF (Doc. 22)

1. COMES NOW Plaintiff/Appellant JAMES RICHARD DUDLEY and hereby moves this Court for a Temporary Restraining Order and/or Preliminary Injunctive Relief.

2. This motion is subject to the "collateral order" review as mandated in Lauro Lines s.r.l. v. Chasser, 490 U.S. 495, 498-99, 109 S. Ct. 1976 (1989). (Defendant(s) [KDOC/LCF] continued retaliation and harassment of Plaintiff is continuing in nature and cannot be addressed on appeal as Plaintiff is continually having his constitutional Rights and Federal Rights violated.)

3. CAUSE OF ACTION: JURISDICTION; Schrier v. University of of Colorado, 427 F.3d 1253, 1258 (10th Cir. 2005); ~~they~~ Winter v. Natural Resources Defense Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008)

　　　"Plaintiff/Appellant is continually being retaliated on and harrassed by KDOC employees (officers, medical staff, and mental health staff) on the daily. James Richard Dudley has

Never had so many problems in his life. The list of problems is as follows: a) James Richard Dudley is being held hostage in administrative segregation without due process [No notice of why he was placed in Administrative Segregation to begin with stating the security reasons for such placement and his continued placement in Administrative Segregation and the security reasons for it.] Defendant(s) [KDOC- Jeff Zmuda and interested parties HCF and LCF] have flat out refused to allow Plaintiff/ Appellant James Richard Dudley to go to Administrative Segregation review and refuse to provide him with a document stating the reasons why he was placed in Administrative Segregation and his the reasons for his continued placement in admin. Seg. (See attached Exhibit # 1

b) James Richard Dudley is being denied his hygiene and money on his inmate bank account. [KDOC contracts with Butler and Associates and has them freeze prisoners bank accounts with bogus debts garnishments] this is what is happening with Plaintiff.

c) James Richard Dudley is being denied medical care and dental treatment and is in constant pain for his back and broken tooth. Defendants will not allow him to been seen or treated by medical staff or dental staff and keep saying Plaintiff is refusing medical and dental treatment,

d) Mental health staff are refusing to acknowledge Jones Richard Dudley's life long disability of ADHD and constantly refuse to evaluate him for treatment. Again, Mental health staff are claiming Plaintiff is refusing to cooperate.

e) Defendants (KDOC-interested parties prison guards) are paying other prisoners to verbally abuse and throw shit on Plaintiff and threaten Plaintiffs life to try and "scare" Plaintiff from coming out his cell, and are also trying to get Plaintiff to do "drugs" (K-2 and street meth).

f) Defendants (KDOC-interested parties LCF prison guards and officials) keep Plaintiff in his cell 24 hours a day 5 days a week or 4 days a week on a "good" week.

g) Defendants (KDOC) retaliate on other KDOC employees who try and help Plaintiff and remove them from the cellhouse and do not allow them in the cellhouse.

h) Plaintiffs pelvic bone has been injured by prison guards and his left arm injured by prison guards and is being denied all medical evaluation and treatment. Again, KDOC employees are claiming Plaintiff is refusing medical evaluation and treatment but this is not true. They are just trying to prevent the evidence from reaching the court and are trying to manufacture their own legal argument defense.

I) Defendant(s) (KDOC interested party unit team has stolen Plaintiffs personal property ADHD books and will not give them back.

3 of 6

4. Therefore Plaintiff/Appellant James Richard Dudley is requesting the following Temporary Restraining Order be issued:

A. Plaintiff/Appellant James Richard Dudley's interactions with KDOC employees and medical and mental health staff are to be <u>audio</u> and video recorded until a hearing can be had and/or the determination of Plaintiffs Appeal to the 10th cir. is decided.

B. Plaintiff/Appellant is to be provided with 5 hours of out of cell and outside yard recreation time, 1 hour every day 5 days a week.

5. Or Plaintiff/Appellant James Richard Dudley is requesting Preliminary Injunctive Relief for the duration of his appeal in the 10th cir. Court of Appeals as follows:

A. Plaintiff/Appellant be transferred to Larned State Hospital for evaluation for treatment for his ADHD and other medical and dental issues so that defendants (KDOC) cannot interfer and harass Plaintiff. (See attached EXHIBIT #2)

6. Plaintiff/Appellant James Richard Dudley asks the court to

11

please consider that James Richard Dudley is being 100% honest. I am not lying about any of this and I am not the behavior problem KDOC is trying to "force on me."

All this retaliation will be resolved with a transfer of Plaintiff/Appellant to Larned State Hospital. These police are just mad because they have the unwritten policy that the prisoner never wins no matter what. I am a good person and these Police are seriously mad and are being very hatefull and evil towards me.

7. In fact, I challenge KDOC to prosecute on all of these alleged batteries they are claiming I have committed since I began my lawsuits against them.

8. I have done nothing wrong and am just being an American and fighting for my life, liberty, freedom and Rights that I am being denied just because I am ADHD. I am not an evil person and I will not give KDOC what it whants and become a criminal, drug addict homosexual. KDOC will not infect me with hate in my heart.

I declare under penalty of perjury that the above is true and correct. August 25th, 2022. /s/ James R. Dudley
James R. Dudley

12

s/ James R Dudley

James Richard Dudley (Prose)
Kansas Department of Corrections
Lansing Correctional Facility
P.O. Box 3??
Lansing, Kansas 67042

I hereby declare under penalty of perjury that the above is true and correct. October 12th, 2022

James R Dudley
James Richard Dudley

15

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF KANSAS

JAMES RICHARD DUDLEY,

Plaintiff/Appellant,

VS.,

STATE OF KANSAS et al.,

Defendants/Appellees.



## MOTION FOR TEMPORARY RESTRAINING ORDER

1. Plaintiff was placed in segregation by defendants(s)(KDOC) on June 6th, 2021 for having an anxiety attack. see (Doc. 1-5 pg. 17-20)

2. Plaintiff was approved by the Segregation Review Board to return back to general population on August 13th, 2021. (Doc. 1-5 pg. 17-20)

3. Unit Team Pettijohn came to Plaintiff's cell door on August 13th, 2021 and told plaintiff, "their fucking with you" and said I'm not going to population.

5. Plaintiff has not been provided with an administrative Segregation Report stating the security reasons why he was placed on Other Security Risk (OSR)(Administrative Segregation) and when he asks why he is simply just told "Your behavior" with no specifics.

6. Plaintiff has been in Administrative Segregation for 16 months now and has had all his money, property taken from him by the Defendants (KDOC) and The state of Kansas.

1 of 7

7. Plaintiff has been beaten, Pepper sprayed and starved by defendants since his placement in Administrative Segregation.

8. The Record that defendants have manufactured against Plaintiff for the past 16 months does not even match Plaintiff's prior 15 year prison records or for his entire life for that matter. [See (KASPER) doc.ks. gov.]

9. Plaintiff began persuing legal action and administrative relief for the 100% complete denial of treatment (in any form) for his ADHD and anxiety in 2021 and also for excessive forces against Plaintiff's person by officers in 2021.

10. Plaintiff is stating the claim that defendants placed the Plaintiff James Richard Dudley in administrative segregation in Retaliation for pursuing these legal actions and administrative reliefs stated.

11. Defendants (KDOC) refused Plaintiff his Segregation Review on September 13th, 2022 claiming "he was not on the list." (They had 2 refusals from other prisoners that Plaintiff heard and saw with his own eyes and ears.) (This is all on video (A-2 cellhouse LCF)

12. Plaintiff begged the officers and unit team manager Oblinger to add Plaintiff to the list for segregation Review since 2 people had refused and plaintoff has not been seen for Segregation Review for 7 months and still does not and has not been told why he was Kept in Administrative Segregation.

13. Plaintiff was told by staff (McCurrie) that Mrs. Oblinger said I was not going to be added to the list and that "Dudley



is not getting what he wants."

14. Unit Team Manager Oblinger told Plaintiff to his face that "You ain't got shit coming!"

15. Defendants (KDOC) have made Plaintiffs life a living hell for the past 16 months and have not stated their reasons for placing Plaintiff in Administrative Segregation to begin with.

16. Plaintiff has a due process Right to be free from administrative Segregation and a Right to know why he is in Administrative Segregation. See Wilkinson v. Austin, 545 U.S. 209, 226, 125 S. Ct. 2384 (2005); Hewitt v. Helms, 459 U.S. 460, 476, 103 S. Ct. 864 (1983)

17. Plaintiff has a Right to request release from Administrative Segregation in this ADA proceeding as his ADA includes violations of his 8th Amendment Right to be free from cruel and unusual punishment and 14th Amendment Right to due process and equal protection of the law.

18. The Americans With Disabilities Act provides broad relief and does include an order to be released from Administrative Segregation. See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S. Ct. 1952 (1998); Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 486 (7th Cir. 1997) ("Rights against discrimination are among the few rights that prisoners do not park at the prison gates"; prisoners "have the same interest in access to the programs, services, and activities available to free people.")

19. Defendants are also subjected to the Rehabilitation Act as LCF receives federal funding and as such has a Right to



16

Rehabilitation programs in general population. (See Harris v. Thigpen, 941 F.3d 1495, 1522 n.41 (11th Cir. 1991); Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988); Sites v. McKenzie, 423 F. Supp. 1190, 1197 (N.D.W.Va. 1976)

20. Plaintiff James Richard Dudley meets the standard for a Retaliation Claim on defendants; A. A retaliation claim essentially entails three elements: (1) the plaintiff engaged in a protected activity (Plaintiff was actively pursuing his ADA accomodation claim and excessive force claims); (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct (Plaintiff has been robbed of all his money by defendants False disciplinary charges in administrative segregation, has been robbed of all his property, is being denied contact with his family and is being subjected to daily verbal abuse by the prisoners that Plaintiff James Richard Dudley IS NOT subjected to in general population. Also, through out Plaintiffs 16 year prison sentence he has always lost all his money in segregation and put in financial debt in Administrative Segregation then released back to general population in financial debt which makes it impossible for plaintiff to have any priviledges like everyone else does because defendants just take all of Plaintiff's money. Also, plaintiff is now having to pay hundreds of dollars to the courts that plaintiff just does not have just to "get defendants off his neck so he can breath" so he can Rehabilitate and go home to his family.; and (3) there is a causual connection between elements one and two — that is the adverse action was motivated at least in part by the plaintiff's protected conduct. See Crawford-El v. Britton, 523 U.S. 574, 588 n.10, 118 S. Ct. 1584 (1998).

plaintiff was doing so good in population in 2021 that he went 7 months straight in general population for the first time ever in his life and even had a couple jobs for the first time ever in his 15 years in prison. Then Plaintiff began his lawsuits and all of a sudden Defendants are making Plaintiff out to be a Terrorist.

## REQUEST FOR RELIEF

21. Plaintiff Request of the Court to order the following relief in a Temporary Restraining Order against Defendants(s)(KDOC), et al;

A) Produce the initial "Other Security Risk Administrative Segregation Report" for Keeping Plaintiff in Administrative Segregation after the date of August 13th, 2022, to the Plaintiff and the Court.

B) If Defendants(s)(KDOC) are unable to produce the initial "Other Security Risk Administrative Segregation Report" stating valid Security reasons for keeping Plaintiff James Richard Dudley in Administrative Segregation past August 13th, 2022, for behaviors of Plaintiff while in general population prior to June 6th, 2022, then to Release Plaintiff from Administrative Segregation to an in patient mental health care facility such as Larned State Hospital or Osawattamie State Hospital.

22. Plaintiff points out that since Defendants cannot prove or show any real valid security reasons for placing Plaintiff in Administrative Segregation to begin with then all this retaliation and provoking of Plaintiff into rage attacks

5 of 7

cannot be used to keep plaintiff in segregation. If the court allowed defendants to do this it is allowing them to manufacture there own criminal reasons to keep plaintiff in segregation and would only amount to the court supporting Defendants Retaliation against Plaintiff.

23. Defendants just don't like the fact of the Plaintiff "Winning." This is not a valid penological interest. All of Plaintiffs past lawsuits and current lawsuits have been valid and not an abuse of the legal system.

24. Plaintiff is calling the Court out on its failure to do its duty and protect Plaintiff from all the abuse he has suffered in the past 16 months for refusing to intervene on plaintiffs behalf. These Prison officials and police act the way they do because they do not face any punishment for their unlawful and animalistic actions/behaviors. They now believe they are the law, that they make the law, that they do not have to follow the law and that they are Gods and I am just a Robot to play with.

25. Nobody wants to work at the prison no more because the standards of decency of society have evolved and the new employees at KDOC are always quitting because they do not want to be around, contribute or agree with what is going

19

in here in prison.

26. Prison administration is just flat out _preventing_ Plaintiff from rehabilitating. That is not a valid penological interest.

Respectfully,

s/ James Dudley

James Richard Dudley (Pro se)
(#0091354)

~~LCF~~
~~P.O. Box 2~~
~~Lansing, KS-66043~~

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

JAMES RICHARD DUDLEY,
        Plaintiff/Appellant,

STATE OF KANSAS, et al.,
        Defendant(s)/Appellees.

Case No. 21-cv-63287

## NOTICE TO COURT

1. Plaintiff James Richard Dudley is still being retaliated on by Defendant(s)(KDOC).

2. Plaintiff turned in his motion for Reconsideration (Doc.32) and Motion to Supplement (Doc.33) to be filed on September 5th, 2022 and Defendant(s) KDOC did not file it until September 9th, 2022.

3. Defendant(s) refused Plaintiff his ADHD evaluation with mental health and told mental health they are not pulling me out to do the evaluation on September 9th 2022.

4. Defendant(s)(KDOC) have now taken away Plaintiffs visits, phone rights, yard rights and tablet as of September 9th, 2022.

5. Plaintiff is refused 100% all treatment for his PTSD and ADHD and is kept in his cell 24 hours a day.

6. Plaintiff has had _Zero_ altercations with anyone for 3 months (Plaintiff has not "battered" anyone for 3 months)

7. Plaintiff is denied 100% to participate in a meaningful manner in his Disciplinary Hearings. (Plaintiff _is_ denied due process).

1 of 4

23

his Rights to access to the courts and refuse Plaintiff all his
Property (what little of it there is anyways).

19. Defendants (KDOC) obviously have a complete disregard for the law,
their own rules and regulations and and plaintiffs constitutional, Federal,
and human Rights.

20. Defendants (KDOC) have no made Plaintiffs conditions of confinement
evenmore restrictive and unconstitutional than those in which the
federal courts ruled were unconstitutional in (Jones'El v. Berge, 164
F. Supp. 2d 1096) and in which those Plaintiffs were granted preliminary
injunctive relief for transfers to in patient mental health care
facilities.

21. Plaintiff is again requesting a transfer to Larned State Hospital.

Respectfully,

/s/ James Richard Dudley

James Richard Dudley (Prose)
(#0091359)
KDOC
~~[illegible]~~

04/13/2016  16:55  6202854955  LSH LEGAL  PAGE  01/02

EXHIBIT #2

Larned State Hospital
1301 Kansas Hwy 264
Larned, KS 67550

Timothy Keck, Interim Secretary
Clint Madison, Interim Superintendent



**Kansas**
Department for Aging
and Disability Services

Phone (620) 285-2151
www.kdads.ks.gov
www.kdads.ks.gov

Sam Brownback, Governor

# FAX

**TO:**     Butler County District Court, El Dorado, Kansas

**FAX:**    316-321-9486

**TO:**     Joseph Penney, Asst. Butler County District Attorney, El Dorado, Kansas

**FAX:**    316-321-4120

**TO:**     Joshua S. Andrews, Attorney for Defendant, Augusta, Kansas

**FAX:**    316-775-5810

**FROM:**   Elaine Salmans, Legal Assistant
            Larned State Hospital Legal Services
            Phone 620-285-4596 Fax: 620-285-4579

**DATE:**   April 13, 2016

**SUBJECT:** Written Notice to the Court of Change of Status

**NOTES:**

**TOTAL NUMBER OF PAGES INCLUDING COVER:**  2

Facsimile Confidentiality Statement: The information transmitted by this fax is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon their information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability. If you receive this communication in error, please contact the sender.

2

**Kansas**
Department for Aging
and Disability Services

Sam Brownback, Governor

Larned State Hospital
1301 Kansas Hwy 264
Larned, KS 67550

Timothy Keck, Interim Secretary
Bill Rein, Acting Superintendent

Phone: (620) 285-2131
www.larned@kdads.ks.gov
www.kdads.ks.gov

March 31, 2016

The Honorable Jan Satterfield
Butler County District Court
201 W. Pine
El Dorado, KS 67042

RE:   DUDLEY, James Richard
       #48,850 (Butler County Case No. 14-CR-230)

Dear Judge Satterfield:

Mr. James Richard Dudley was admitted to Larned State Security Hospital on March 3, 2016, by
order of the Butler County District Court for an evaluation pursuant to K.S.A. 22-3429.

The evaluation procedures have been completed and a report has been prepared as ordered.
That report is included herein. Mr. Dudley will be returned to Butler County for further legal
disposition.

Sincerely,

William C. Rein, JD
Acting Superintendent
Commissioner of Behavioral Health Services

WCR/ems

cc:   Joseph Penney, Asst. Butler County District Attorney, 201 W. Pine, El Dorado, KS 67042
       Joshua S. Andrews, Attorney at Law, 526 State Street, Augusta, KS 67010

3

Apr. 7. 2016 10:02AM   Volunteer                                                    No. 3568   P. 1/15

Larned State Hospital
1301 Kansas Hwy 264
Larned, KS 67550

Timothy Keck, Interim Secretary
Bill Rein, Acting Superintendent

**Kansas**
Department for Aging
and Disability Services

**RECEIVED**
APR 07 2016

Butler Co. Attorney
Phone (620) 285-6231
wayne@bluelock.gov
www.bluelock.gov

Sam Brownback, Governor

# FAX

TO:     Judge Jan Satterfield, Butler County District Court, El Dorado, Kansas

FAX:    316-321-9486

TO:     Joseph Penney, Asst. Butler County District Attorney, El Dorado, Kansas

FAX:    316-321-4120

TO:     Joshua S. Andrews, Attorney for Defendant, Augusta, Kansas

FAX:    316-775-5810

FROM:   Elaine Salmans, Legal Assistant
        Larned State Hospital Legal Services
        Phone: 620-285-4596 Fax: 620-285-4579

DATE:   April 7, 2016

SUBJECT: Forensic Report

TOTAL NUMBER OF PAGES INCLUDING COVER:  ___15___ .

NOTES:



Facsimile Confidentiality Statement: The information transmitted by this fax is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon their information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability. If you receive this communication in error, please contact the sender.

Apr. 7, 2016  0:09AM   Valentless                                     No. 3568   P. 3/15

# CONFIDENTIAL

## FORENSIC EVALUATION REPORT

**Name:** DUDLEY, James Richard
**LSH Case Number:** 48850
**Referral County:** Butler
**Court Case Number:** 2014-CR-230
**Date:** March 30, 2016

### I. Identifying Information

Mr. James Richard Dudley is a 27-year-old (D.O.B. 08/01/1988), separated, Bi-Racial (African American and Euro American) male who was admitted to Larned State Security Hospital (LSSH) for the third time on 03/03/2016. Mr. Dudley was ordered by the District Court of Butler County under the legal provisions of K.S.A. 22-3429, a Presentence Evaluation after being convicted of Solicitation to Commit Arson (Severity Level 10, Nonperson Felony).

### II. Notification of Limits of Confidentiality

Mr. Dudley was informed the usual hospital/patient relationship did not exist and this report would be written for the court. Furthermore, he was informed the hospital cannot dictate what the court does with this report, but beyond the court order, usual hospital confidentiality applies. His responses indicated he understood the nature and purpose of this evaluation. Mr. Dudley was further informed both verbally and in writing of Dr. DiRubbo's credentials and that this writer is working under the direct clinical supervision of Lynette Ellis, Psy.D., LCP.

### III. Current Legal Situation

As per the Information Sheet (filed 5/22/2014), Mr. Dudley was charged with one count of Aggravated Arson (Severity Level 6, Person Felony). However, the Amended Information Sheet (filed 08/24/2015) reduced Mr. Dudley's charge to one count of Solicitation to Commit Arson (Severity Level 10, Non-Person Felony) and stated:

COUNT ONE: On or about the 8th day of January, 2014 in Butler County, Kansas, James R. Dudley, did, pursuant to K.S.A. 21-5303, command, encourage or request another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the following felony: unlawfully and knowingly by means of fire or explosive, damage a building or property which is not a dwelling, to-wit: ignitable material in the El Dorado Correctional Facility, in which another person has an interest, without the consent of such other person, to wit: El Dorado Correctional Facility, in violation of K.S.A. 21-5812(a)(1)(C) – Solicitation to Commit Arson, a Level 10 Non-Person Felony.

### IV. Assessment Techniques
☐ Forensic Interview, dated 03/21/2016 for 70 minutes
☐ Assessments
  o Mini-Mental State Examination, Second Edition (MMSE-2), administered by Christine N.

Apr. 7 2016 10:03AM   Printer   No. 3566   P. 4/75

DiRubbo, Psy.D., T-LP on 03/21/2016 for 5 minutes
o Wide Range Achievement Test, Fourth Edition (WRAT4), administered by Christine N. DiRubbo, Psy.D., T-LP on 03/23/2016 for 25 minutes
o Personality Assessment Inventory (PAI) administered by Christine N. DiRubbo, Psy.D., T-LP, on 03/22/2016, for 65 minutes
o Psychopathic Personality Inventory-Revised (PPI-R) administered by Christine N. DiRubbo, Psy.D., T-LP, on 03/22/2016, for 30 minutes

□ Review of available LSSH records including:
o Face Sheet, dated 03/04/2016
o Preadmission Information, dated 03/01/2016
o Initial Biopsychosocial Assessment, dated 03/07/2016
o Comprehensive Integrated Treatment Plan (CITP), dated 03/08/2016
o Physical and Neurological Exam, dated 03/03/2016
o Medical Admission Intake Assessment, dated 03/03/2016
o Nursing Admission Intake Assessment, dated 03/03/2016
o Suicide Assessment Checklist, dated 03/03/2016
o Medication List, reviewed on 03/15/2016
o Forensic Evaluation Report, by Rebecca Farr, Psy.D., T-LP, dated 11/28/2011
o Data Action Response (DAR) Notes dated 3/12/2016, 3/13/2016, 03/19/2016; 03/24/2016; 03/26/2016; 03/27/2016, and 03 28/2016
o Psychology Subjective Objective Assessment Plan (SOAP) Note, by Rebecca Farr, Psy.D., T-LP on 03/09/2016

□ Review records from Osawatomie State Hospital
o Psychiatric Admission Evaluation, dated 06/22/2007
o Discharge Summary, dated 08/03/2007

□ Review of records from Ozanam
o Psychiatric Evaluation, dated 08/12/1999
o Intake Evaluation Summary, dated 08/27/1999
o Quarterly Re-Assessment and Progress Report, dated 03/06/2000

□ Review of records provided by Mr. Dudley:
o Letter to Warden James Heimgartner, dated 10/09/2015
o Letter from Mr. Dudley regarding fines and restitution, dated 11/27/2015
o Letter to Mr. Dudley regarding fines, fees and restitution, dated 12/01/2015 and 12/03/2015
o Health Services Request Form, dated 10/25/2015, 11/10/2015
o Page 2 of 3 for Disciplinary Reports dated, 12/09/2009 and 05/24/2010
o Inmate Request to Staff Member dated, 10/09/2015, 11/28/2015, 11/30/2015, 12/10/2015, 12/15/2015, 12/31/2015, 01/07/2016, 01/12/2016, 01/13/2016, 01/14/2016, 01/15/2016
o Current Bank Status, dated 12/01/2016
o Inmate Bank Statement and Past Encumbrances, dated 01/04/2016

□ Review of materials provided by the Butler County District Attorney's Office including:
o Information Sheet, filed 05/22/2014
o Amended Information Sheet, filed 08/24/2015
o Affidavit, dated 04/10/2014

□ Review of Kansas Adult Supervised Population Electronic Repository (KASPER) accessed on 03/15/2016 by this writer

Page 2 of 13

Document ID: 472351

Apr. 7, 2016 10:09AM   Volunteer                                          No. 3366   P. 5/13

## V. Relevant History

### A. Social History

Mr. Dudley was born in Lawrence, Kansas. He was raised by his mother and stepfather, but also was placed in treatment facilities throughout his childhood. He reported having "two brothers and six sisters" but grew up with "two sisters and one brother." He further said he was the middle child, and his brother is currently in "Osawatomie [State Hospital] right now." Mr. Dudley endorsed physical, emotional, or sexual abuse during childhood.

Mr. Dudley reported his current support system is "me and me." Mr. Dudley described his relationship status as "separated for eight years" and has only been married once. He reported having one child, but he is "unsure though." Mr. Dudley reported his recent contact with his father occurred at Lansing Correctional Facility, when they were both housed. He also said his father is serving a 60 year prison sentence for Attempted Murder.

Prior to his transfer to LSSH, Mr. Dudley was serving a prison sentence at Lansed Correctional Mental Health Facility, with an earliest possible release date of 01/05/2034, as noted on the Kansas Adult Supervised Population Electronic Repository (KASPER, accessed 03/15/2016).

Mr. Dudley reported he was "secluded in a special classroom because of how others seen me. They see me as different, not human. They thought I was an alien like with antennas, but just not like them). They couldn't understand how I saw things. [Can you give me an example?] If someone does something wrong I would prevent others from doing something wrong." I was in everyone's business and did not to." Mr. Dudley reported first getting "violent" and "into trouble" at the age of 10 because he would see people as threatening others. Mr. Dudley stated, "They say I finished 10th grade. I have been fighting for a GED [General Education Development] with DOC [Department of Corrections] but they don't want to give it to me." Mr. Dudley denied having any learning difficulties and required special education program "just for behavior issues."

Mr. Dudley reported working the following types of jobs: industrious, landscape, drywall, roofing, laundry, and at Wendy's. He reported his longest held job was "one and a half months." Although Mr. Dudley attempted to join the military on a few occasions, he was unable to due to convictions for felony offenses. Mr. Dudley reported receiving training for "welding, animation, and robotics."

### B. Psychiatric History

According to the Psychiatric Evaluation (8/12/1999), Mr. Dudley was identified as a "behavior disordered student" in preschool and began special education services in first grade. Mr. Dudley had a previous psychiatric evaluation in 1997 due to his setting, impulsivity, aggression, assaultive behavior, theft, lying, and an inability to control his anger; he also required two psychiatric hospitalizations in 1998 for similar behaviors. Mr. Dudley was expelled from social groups specifically, the Boys and Girls Club and a church group, and suspended from school for violence. The Psychiatric Evaluation (8/12/1999) from Ozanam reported Mr. Dudley was admitted at the age of 11 (on 07/30/1999) for "severe behavior problems, including defiance of the rules, volatile and unstable mood, aggressive behaviors toward others, and in general being out of control." During childhood and adolescence Mr. Dudley had reported symptoms of anxiety that involved physical complaints (i.e. shortness of breath, heat sensation, headaches, vomiting, and nausea) as noted in the Psychiatric Evaluation (8/12/1999). Prior to the age of 11 Mr. Dudley's symptoms were attempted to be

Page 3 of 13

Document ID:   472660

Apr. 7. 2016 10:09AM   Volunteer                                    No. 3362    P. 6/15

treated with "Lithium, Depakote, Haldol, Trazodone, Tenex, Risperdal, Lorazapam, and Benadryl," as noted in the Psychiatric Evaluation (08/12/1999). Mr. Dudley was described as "fidgety, restless ... intrusive ...very easily distracted... very guarded... and manipulative" when interviewed in August 1999. Diagnoses at that time included "Oppositional Defiant Disorder, Severe; R/O Conduct Disorder; Possible Latent Bipolar Disorder; Possible Borderline Personality-Traits (diagnosed at Menegar); Hyperthyroidism, Hypertension, Reported Hepatitis, and Obesity." The Intake Evaluation Summary (08/27/1999) noted he had symptoms of "severe ADHD," had attempted to set off fireworks "at a friend," and his behavioral symptoms began at the age of "five." Mr. Dudley reported he began taking medications at age "10."

While in treatment as a child, the Discharge Summary (03/22/2000) reported Mr. Dudley was "defiant and resistive to following directions," "physically aggressive with staff," "antagonistic to his peers," "low frustration tolerance," and was discharged due to increasing concerns about self-injurious behaviors and "not complying with the multiple programs put in place..." During the Quarterly Re-Assessment and Progress Report (03/06/2000) Mr. Dudley reported putting objects in his ears to "get over 'with staff who 'get on my nerves.'"

The Forensic Evaluation Report (FER) (11/28/2011) reported Mr. Dudley was admitted to Osawatomie State Hospital, for one week, in June 2007, after feelings of "losing control and having an urge to 'stab' his uncle. He also reported a sleep disorder since early childhood including nightmares of falling off the edge of a volcano and insomnia on a nightly basis. At that time, Mr. Dudley was diagnosed with Mood Disorder, Not Otherwise Specified, and Cannabis Abuse. In 2011 Mr. Dudley reported previous diagnoses of "Intermittent Explosive Disorder, Mood Disorder, Depression, and Antisocial [Personality] Disorder." Mr. Dudley reported he went "bat shit crazy in seg [segregation]; it was going on one year in segregation because I refused to lock down. They're mad because I'm filing Habeas Corpus and won that one by the way."

Upon admission to LSSH, Mr. Dudley was diagnosed with Antisocial Personality Disorder, Cannabis Use Disorder, In a Controlled Environment, Severe; Alcohol Use Disorder, In a Controlled Environment, Moderate (Provisional); and Problems Related to Other Legal Circumstances.

C. Substance History
The FER (11/28/2011) stated the following:

Mr. Dudley admitted to a past history of illicit substance and alcohol use. He stated, "I've used marijuana (age 13-21). That was my drug of choice...every day about a quarter ounce at a time. (Wait?) Yeah, a lot of times...too many to count. I also used LSD tabs (age 17)...took them like five times. I've also used PCP (age 16-19) all the time every day, like six sticks a day. I've used meth (age 16-19) once or twice a week...about a gram at a time. I've used ecstasy (age 16-19) once a week...two hits at a time. I've used cocaine (age 16-19) almost every day, about three and a half grams a day. (Huffing?) Yeah, I've huffed some air duster...like for a whole week one time (laughs)." When asked about prescription drug abuse, Mr. Dudley stated, "I have, but not that often. Like about 15 times probably." When asked about alcohol, Mr. Dudley admitted to first drinking at the age of 13 and last drank while he was incarcerated at the age of 22. He recounted, "I made hooch in a bag using my legal envelope." When asked how he was able to support his illicit drug and alcohol use, Mr. Dudley smiled and

Page 4 of 13

Document ID: 4723891

Apr. 7. 2016 10:09AM   Valarier                                    No. 3368   P. 7/15

replied, "I got around (laughs). I sold drugs a little bit." He denied ever receiving drug or alcohol treatment.

During the current evaluation, Mr. Dudley reported using cannabis daily in prison, and used "K2" if he was unable to obtain marijuana while incarcerated. He stated the only time he did not use illicit substances was when he could not obtain them, which typically occurred while placed in Administrative Segregation. Mr. Dudley also said he was an "occasional" drinker in prison and "likes to get shitfaced once or twice a year." He also reported "PCP" was his drug of choice and would "smoke wet four, five, or six sticks per day." Mr. Dudley reported he "tried meth [methamphetamine], but it doesn't work. It just got me calm and focused." Mr. Dudley denied attending any substance use treatment, he reported, "I am always able to back away when it's time to back away." He described it being "time to back away" when "I have no money, I'm fucked up, I want to steal shit or act fucked up toward my family, or when I wake up and all I want to do is get high."

D. Medical History
Mr. Dudley's current medical diagnoses in the CITP (Comprehensive Integrated Treatment Plan; 03/06/2015) listed Personal History of Methicillin Resistant Staphylococcus Aureus Infection (MRSA), Carrier or Suspected Carrier of MRSA, and History of Seizure Disorder (2007) According to the Medication List (reviewed on 03/15/2016), Mr. Dudley has an allergy to Depakote, but there were no known adverse drug reactions. Mr. Dudley reported, "Depakote shuts my thyroid down." He reported a door falling on his head at the age of nine years old and experienced a "headache for three or four days." Mr. Dudley showed this evaluator an observable scar on his head and denied requiring going to the hospital because the wound "healed on its own." Mr. Dudley stated, "I started getting violent after that. I had MRI [Magnetic Resonance Imaging] done and it didn't say anything."

E. Legal History
According to a LSH FER(12/22/2010), as documented in the FER 11/28/2011, "Mr. Dudley reported that as a juvenile he was convicted of Sexual Battery, Battery on Law Enforcement Officer, Battery on a school official, possession of drugs, and terrorist threats. Prior to the age of eleven, Mr. Dudley had "four juvenile placements for battery against teachers and one juvenile placement for illegal use of fireworks." As noted in the Intake Evaluation Summary (08/27/1999) reportedly most of his charges were in 2006 when he was between seventeen and eighteen years old." The FER (11/28/2011) stated the following in regards to Mr. Dudley's legal history prior to the age of 18:

... Mr. Dudley laughed and replied, "Battery." He further commented, "I was terrible. First time I was 10-years-old...it was battery on a school employee...I think I hit her in the face. I've had like maybe three Battery charges, one drug possession for marijuana, and problems with authority figures like the police and teachers...I was on probation too." When asked how many times he had been arrested as an adolescent, Mr. Dudley replied, "I can't count. At least 40 times." When asked about his incarceration history as an adolescent, Mr. Dudley stated, "I was in Juvenile for two years, from age 13 to 14, and then from age 15 to 16. I was at Atchison Juvenile Correctional Facility] in Topeka, Kansas."

Mr. Dudley reported being arrested for "Aggravated Battery" using a "wrench" at the age of sixteen and "selling pills [Adderall] at school," and a "probation violation [failed Urine Analysis]"

9

Apr. 7. 2016 10:49AM    Velnotion                                    No. 3365   P. 8/15

while he was a juvenile. He reported spending "eighteen months" in a juvenile detention facility. Mr. Dudley further reported he was charged with "Burglary" at the age of seventeen (but was charged as an adult) and "Possession of a Firearm" (simultaneous cases) for which he went to prison in "Hutch" for one year and five months. According to KASPER (accessed on 03/15/2016), as an adult, Mr. Dudley has previously been convicted of Aggravated Battery – Intentional, Great Bodily Harm (Severity Level 4, Person Felony); and two counts of Battery on a City or County Employee (Severity Level 5, Person Felony) on 04/04/2008; Battery on a State Corrections Officer or Employee (Severity Level 5, Person Felony) on 02/27/2012; and Aggravated Battery – Bodily Harm in a Deadly Manner (Severity Level 9, Person Felony) on 05/21/2012.

According to KASPER (accessed on 03/15/2016), Mr. Dudley has over 130 Disciplinary Reports (DRs) spanning over eight years (2008 to 2016). These DRs have included: Arson x 3; Battery x 7; Assault x 4; Threatening or Intimidating Any Person x 12; Dangerous Contraband x 3; Less Dangerous Contraband x 2; Misuse of State Property x 6; Insubordination/Disrespect of Officer/Other x 13; Disobeying Orders x 38; Interfering with Official Duties x 9; Violation of Published Order x 8; Throwing Trash x 1; Theft x 2; Responsibility for Counts x 2; Misusing Meds x 1; Avoiding an Officer x 1; Being Drunk, Intoxicated, or Altered Consciousness x 1; Interference with Cell Operation/Visibility x 10; Disruptive Behavior x 4; Gambling and Bookmaking x 1; Interference with Restraints x 2; Refused UA [Urine Analysis] x 1; Lying x 1; Noise; and Fighting x 1. Mr. Dudley said he is now a "defensive fighter," which changed in 2010 due to "fear of [more] prison time."

VI. Course of Hospitalization

Mr. Dudley was admitted to the LSSH on 03/03/2016 by the District Court of Butler County under legal provision K.S.A. 22-3429, for a Presentence Evaluation. He was placed on the East Three Unit of SSP where individuals in need of forensic evaluations reside. He went through standard admission procedures and was placed on regular safety and security precautions. The Preadmission Information Sheet (03/01/2016) identified Mr. Dudley as an "elopement risk" and "dangerous."

Upon admission to LSSH, Mr. Dudley was assessed by the admitting psychiatrist. According to the Medical Admission Intake Assessment (03/02/2016), Mr. Dudley was placed on the "reasonable" and "cooperative." His speech was within normal limits. Mr. Dudley displayed a "euthymic" mood and his affect was "congruent with mood." His thought processes were considered "logical and organized" and "coherent and relevant." His impulse control was also noted as "appropriate." His thought content was "normal." Mr. Dudley denied any perceptual disturbances; (i.e. auditory and/or visual hallucinations). He was oriented to time, place, and person, and his immediate, recent, and remote memory were "intact." Mr. Dudley was noted to have "average" intelligence, "fair" insight, and "fair" judgment.

The Suicide Assessment Checklist (03/03/2016) yielded a score of five indicating Mr. Dudley is at a Low risk for suicide due to having denied any current or previous suicidal ideation or suicide attempts. Due to his lack of previous suicide attempts or gestures, he was not placed on suicide precautions upon admission.

Since his admission to LSSH, Mr. Dudley has engaged in violent and threatening behavior. Mr. Dudley was noted to be "rude and demanding" on 03/04/2016. Then on 03/05/2016 Mr. Dudley made statements such as "you cunt, I could break you [sic] nose, I can smash your

Document ID: 472531

Apr. 7. 2016 10:09AM   Kirkland                    No 3368   P. 9/15

face" and "you are to listen to me. I don't have to listen to you." He stated, "I'm not just gonna [sic] hit her I'm gonna [sic] kill her to make it worth my wild [sic]" on 03/07/2016. On 03/12/2016, he became verbally aggressive, threatened, and lunged toward a female staff member. Mr. Dudley stated, "You are a fucking fool for pushing me. None of these mother fuckers in here have your back. This is the third weekend that you have done this to me" on 03/19/2016. On 03/24/2016 Mr. Dudley made verbal threats, which resulted in a restriction to the unit. On 03/26/2016 Mr. Dudley ripped off his shirt, yelled "It's on" and began assaulting a peer in the cafeteria and choking a staff member. After Mr. Dudley returned to the unit he was provided PRN medication and threatened security staff. He began hitting security officers, biting one's arm, and spitting on the officers. Mr. Dudley required the use of a restraint chair due to continued fighting and threatening to "get more charges." On 03/27/2016, Mr. Dudley came out of his room and charged at two peers and became involved in another physical altercation. Later that day, Mr. Dudley refused to allow his food pass door to be shut. In the evening, on 03/27/2016 Mr. Dudley repeatedly kicked his door and bent the locked door that it broke open and he began engaging in another physical altercation with peers. On 03/28/2016 Mr. Dudley was provided PRN medication per his request, but refused to take it and attempted to trade his unused pills for staff's keys to get out of his room. Mr. Dudley was then discharged on 03/28/2016 to Larned Correctional Mental Health Facility due to his level of dangerousness and multiple assaults on patients and staff during his evaluation at LSSH.

As of 03/15/2016, Mr. Dudley was prescribed the following medications: Zyrtec 10mg PO at 08:00 for Seasonal Allergies and Seroquel 100mg PO at 20:00 for Mood Stabilizer.

VII. Assessment Results
A.   Assessments
Mini-Mental State Examination, Second Edition (MMSE-2)
The Mini-Mental State Examination, Second Edition (MMSE-2) is a valid and reliable, thirty question, brief assessment used to determine a test taker's level of cognitive impairment. The MMSE-2 assesses for orientation to time and place, recall, attention and calculation, naming, repetition, comprehension, reading, writing, and drawing. Mr. Dudley scored 27 out of 30 on the MMSE-2, indicating no gross cognitive impairment. He displayed some difficulty with short term recall.

Wide Range Achievement Test Fourth Edition (WRAT4)
The WRAT4 is an academic achievement test that measures the basic education skills of Word Reading, Sentence Comprehension, Spelling, and Math Computation; the WRAT4 also yields an overall Reading Composite. These skills are measured independently of each other. Mr. Dudley was administered the Word Reading and Sentence Comprehension subtests to ensure he has an adequate reading level to participate in further assessments. The Word Reading and Sentence Comprehension subtests yielded grade equivalences of 10.2 and 11.5 respectively.

Psychopathic Personality Inventory-Revised (PPI-R)
The PPI-R is a 154 self-report assessment measure for individuals ages 18-86 who have at least a fourth grade reading level to assess traits of psychopathy. There are three validity scales: Inconsistent Responding (IR), Virtuous Responding (VR), and Deviant Responding (DR). Based on the IR scale, Mr. Dudley was either randomly responding or deliberately

Document ID: 4725394



attempting to sabotage the test; thus the results were considered invalid and unable to be interpreted.

Personality Assessment Inventory (PAI)
The PAI is a self-administered, 344 question multiple-choice, objective personality test designed to provide an in-depth interpretation of a wide variety of clinical constructs. The PAI test has four Validity Scales, eleven Clinical Scales, five Treatment Scales, and two Interpersonal Scales. In regards to validity, the elevation on the Inconsistency scale suggested Mr. Dudley may have not read the items carefully, or randomly responded. Moreover, his profile suggested he may have attempted to portray himself in a consistently negative or pathological manner and may over represent clinical symptoms. Specifically, on the Negative Impression Management Scale, Mr. Dudley's T-Score of 8T; (1.32 Standard Deviations (SD) above the mean) exemplified a more pathological self-report than observed during the evaluation. Additionally, his slight elevation (T-Score of 7T) on the Infrequency Scale identified an atypical response style, as it is a primary measure for careless responding. However, Mr. Dudley's profile is considered valid, but was interpreted with caution.

Mr. Dudley's clinical profile showed multiple elevations. As a result, it appears he has a significant amount of difficulty concentrating (inconsistent with observations during the interview), as well as, significant hostility, resentment, and suspiciousness. These characteristics can result in difficulty establishing close relationships, including the ability to work with a therapist. Mr. Dudley can become anxious or threatened by close interpersonal relationships. Due to his hypervigilance, hostility, mistrust and resentment toward others, his working relationships are likely strained, despite others' efforts to provide support and assistance to Mr. Dudley.

Additionally, Mr. Dudley endorsed an unusually high level of psychotic symptoms, even when [compared to clinical samples]. His self-report of psychotic symptoms and impairment in reality testing were inconsistent with objective observations during the current evaluation. However, Mr. Dudley's endorsement of suspiciousness and mistrust seems relevant as he has lacked close interpersonal relationships and has been incarcerated most of his life.

While responding to questions on the PAI, Mr. Dudley endorsed numerous personality traits similar to individuals who display characteristics of Borderline Personality Disorder. Specifically, he endorsed items regarding emotional liability, intense and rapid mood swings, poor anger control, and fear of abandonment or rejection by others. Additionally, Mr. Dudley endorsed symptoms of impulsivity and self-destructive behaviors (i.e. spending, sex, substance abuse). Mr. Dudley's profile also noted significant dependence of illicit substances. Along with endorsing Borderline traits, Mr. Dudley also reported significant antisocial features including irresponsibility, little success in social and occupational functioning, criminal acts, aggression toward others, lack of remorse, little regard for others, and may take advantage of others to satisfy his own impulses.

In addition, Mr. Dudley endorsed items related to heightened energy, irritability, racing thoughts, and unrealistic expectations. Mr. Dudley had also endorsed rigidity and inflexibility in following his own personal guidelines. He also experiences a great deal of anxiety and tension equating to difficulty relaxing and possibly having physical signs of anxiety (i.e. sweaty palms, irregular heartbeats, shortness of breath, etc.)

12

A review of behaviors and personality characteristics that might complicate motivation for treatment were identified. Mr. Dudley's temperament and aggressive behavior may hinder or interfere with his treatment as his response suggested he is easily angered and has difficulty controlling his anger. Furthermore, Mr. Dudley endorsed items suggesting he displays anger or verbal aggression if confronted, which could escalate to property damage or physical harm to others. Due to Mr. Dudley's defensiveness and reluctance to discuss personal problems he is at risk for early treatment termination, as well, as having difficulty seeing the treating professional as an authority figure and may react to the therapist in a hostile or derogatory manner.

Lastly, Mr. Dudley also reported intense and recurrent suicidal thoughts and these thoughts are likely to increase in the presence of situational stress, poor impulse control, lack of social support. As such, Mr. Dudley should be frequently assessed to determine his level of suicidal thoughts and potential for suicidal behavior.

B. Mental Status/Behavioral Observations

Mr. Dudley presented in the psychology office on the East Three Unit in a t-shirt and shorts. Mr. Dudley's grooming and hygiene were adequate. He displayed adequate eye contact, but had difficulty sitting still during the interview (i.e. he shook his leg throughout the whole interview). He was alert and responsive; Mr. Dudley was oriented to person, date, and place. Mr. Dudley was pleasant and cooperative; he spoke at an even volume and rate and his speech was clear and coherent. His concentration and focus did not vary, and he was able to follow along with the conversation. Mr. Dudley did not display any significant deficits in his short or long-term memory. He had an adequate fund of knowledge as evidenced by being able to name the current and past president along with knowing the location of the White House is Mr. Dudley was also able to identify three large American cities. He exhibited limited abstract reasoning skills as evidenced by stating "it's always better in the future" when asked [what people mean when they say "an ounce of prevention is worth a pound of cure"]. Mr. Dudley had rudimentary to fair practical reasoning skills as evidenced by stating we refrigerate foods to "to keep it cold" reading newspapers because "I don't know." They got the internet," but newspapers were originally used to obtain "information."

He reported being "stressed" for the past three to four weeks and said "I came here and got really stressed out." Mr. Dudley has coped with this stress via PRN medication and he "feels great" for two or three days." Mr. Dudley reported having a PRN combination of "Benadryl, Ativan, and Haldol." Mr. Dudley reported typically sleeping "three or four hours tops" and "flopping" all night. Mr. Dudley reported no appetite changes. Mr. Dudley reported feeling hopeless "a little bit" and described hopelessness as "stuff out of my control. I can't handle being dependent and needing something." Mr. Dudley denied any current suicidal thought at this time. He reported worrying about "my case, my life I've been fighting for seven years." He reported feeling hyperactive, has a decreased need for sleep, experiencing racing thoughts, and an increased self-esteem/grandiosity. Mr. Dudley described his temper as "I don't want it, it gets me into too much trouble." When asked about thoughts of hurting others Mr. Dudley said he thinks about harming others "a lot. I want to do very violent things to them and really hurt them." Mr. Dudley did not have an identifiable victim, but said there are "certain people that do and say things and act in a certain way, conscious and unconscious things."

Apr. 7. 2016 10:18AM   No. 2027   PG 2358   P. 12/15

## C. Forensic Interview

Mr. Dudley was ordered to LSSH for a Presentence Evaluation. Mr. Dudley began the interview by stating he is "serious about treatment" and stated he was denied Ritalin in prison because "they think I'm trying to get high, but it slows my thoughts." He also reported previously being prescribed Wellbutrin in 2012 or 2013.

He reported attempting to talk to doctors at Lansing but "can't get treatment," there were Health Service Requests documented on 10/25/2015 and 11/10/2015. Mr. Dudley also reported, "I got kicked out of El Dorado." He further said, "I was put in a situation where anger rules me and I have to do a lot of nasty things to survive. There's a good me and an evil me; and the evil guy, I don't like that guy." He reported what helped was "using cannabis daily in prison," and his last use being in "general population" when incarcerated. Mr. Dudley also reported using "K2" when he could not get cannabis while incarcerated because it "gets rid of stress" and he has "thoughts going a million different directions." Mr. Dudley reported, "It's not fair that the Bipolars and Schizophrenics get their psychotropics, but I can't get my medication. Mr. Dudley reported believing that others can control his thoughts because "there are people that are manipulative, that's being part of a person, especially those who know you and make you think something." He described a female staff on the unit and said:

"I can hear her think. She's Satan, she's evil. She's red on the unit here with me. I told her she's not worth 122 months. I told her you're a fool for pushing my button. You don't mess with fire. She had control over me and I couldn't shake her unless I said 'back the fuck up.' I get like that and people at DOC would stay clear of me."

When asked if he experiences any auditory hallucinations Mr. Dudley stated "I don't know if I hear voices. They tell me something I have to do sometimes; it just pops up. They [voices] tell me to get more paper or something bad is going to happen" and said that the voices have "conversations back and forth." During the interview, Mr. Dudley denied current auditory hallucinations and also reported, "I used to hear a female's voice, but she's gone. That was probably because of drug use and because of smoking a lot of K2." He reported hearing a "very familiar voice and described it as the "other side of me and he's crazy."

While incarcerated, Mr. Dudley reported going on "crisis level because they feel I'm a danger to others." He reported previous diagnoses of "ADHD, Mood Disorder, Antisocial but I like to socialize, Bipolar, Depression." Mr. Dudley showed his arms, which had superficial cuts on his left arm, and stated he engaged in self-harm in "2010." Mr. Dudley reported being scared of "suicidal thoughts" that occur "once or twice a month." He reported, "Sometimes" having a suicidal plan, but "I think I don't give a fuck because I'll be gone." He denied attending previous individual or group counseling. Mr. Dudley further denied ever attending an alcohol or drug rehabilitation programs.

Mr. Dudley acknowledged his prior juvenile and adult convictions. Mr. Dudley stated, "I was caught with weed as well" when he was a juvenile. Mr. Dudley reported while incarcerated "a lot [of inmates] don't like me. I get along good and go about my business. There's not too many that want to have an issue [with me]. I can react bad. [Why do you get mad?] I'm unsure." He said "there's 122 months looking at me. My hands are tied behind my back." He also recalled physically harming others and provided an example of a victim requiring a "plate in his face" after the incident occurred. Mr. Dudley also said "I'm good at thinking and know how to fuck a dude up."

In terms of behavior on the unit, Mr. Dudley stated, "I fought for this yellow band. I am trying to do as much as I can." Mr. Dudley indicated he believes he is in need of treatment. When asked what sort of treatment he is expecting, he said "I don't know." When asked about previous treatment while incarcerated, he said, "I did anger management consistent with metal health. Communication skills and anger control. I literally lose it and can't stop it. It gets its own mind." He recalled doing "good" on the unit and "this structure is helping." I had to bite my tongue a lot. Prison is a very fucked up world. I am used to always being this close to having to defend myself." Furthermore, Mr. Dudley reported he is currently appealing his previous conviction as he was denied a defense of "mental disease or defect. I told him I wanted it and he didn't pursue it."

Although Mr. Dudley previously reported symptoms of ADHD, has self-reported intense mood swings, and reported some auditory hallucinations, he generally functions well on the unit. Mr. Dudley does not suffer from a psychotic disorder that would significantly impair his ability to make rational decisions. Instead, Mr. Dudley's aggression and antisocial acts are attributable to a diagnosis of Antisocial Personality Disorder. Mr. Dudley reported having homicidal ideations, and based on previous treatment records suggest longstanding thoughts. Moreover, Mr. Dudley lacks insight and the desire to amend his behavior at this time. Based on the results from the PAI, Mr. Dudley's personality characteristics suggest mistrust and resentment toward others; which can impact his ability to form a therapeutic relationship with a treatment provider. Also, as demonstrated by his repeated aggressive behavior and lack of compliance with rules at LSSH and while incarcerated, Mr. Dudley will likely be easily angered when challenged in treatment.

Moreover, Mr. Dudley is capable of independently attending to his activities of daily living, following a group schedule, participating in activities, and weighing the risks, benefits, and consequences of his behavior. Based on his previous treatment records, Mr. Dudley has not benefited from psychological treatment despite receiving treatment on intensive psychiatric units. Mr. Dudley is also capable of writing requests to communicate his needs with mental health professionals and other staff in prison. As such, Mr. Dudley appears to be functioning at an adequate degree to serve his sentence in a facility other than a state hospital.

VIII. Diagnoses
Mr. Dudley appears to have met the criteria for a diagnosis of Conduct Disorder. During his childhood and adolescence years, he had a significant legal history, difficulty with following rules in school, physical altercations, a sexual conviction, impulsivity, homicidal ideation, and reckless disregard for the safety of himself and others. Since then, Mr. Dudley has continued to display a failure to conform to social norms as evidenced by multiple convictions and DRCs, numerous physical assaults; impulsive behavior, deceitfulness, consistent irresponsibility, and a lack of remorse. Moreover, as identified in the PAI as well as DAR history, Mr. Dudley experiences intense mood swings, poor anger control, and engages in self-destructive behaviors, exemplifying traits of Borderline Personality Disorder. As such, Mr. Dudley meets the DSM-5 criteria for diagnosis of Antisocial Personality Disorder, with Borderline Traits.

Mr. Dudley has had a longstanding diagnosis of ADHD, Severe. During the current evaluation, Mr. Dudley was observed to fidget and tap his hand throughout the interview and testing; he appeared restless and even stated "let's go" while he was being asked if he needed a break. Additionally, Mr. Dudley talks excessively, has difficulty waiting his turn, and interrupts and

15

intrudes on others. Mr. Dudley has previously been prescribed stimulants during his adolescence, but reported having difficulty receiving any psychotropic medication to help control his impulsivity and hyperactivity at that time. As, such Mr. Dudley continues to meet the DSM-5 diagnosis of Attention-Deficit/Hyperactivity Disorder, Predominantly Hyperactive/Impulsive Presentation, Moderate.

Furthermore, Mr. Dudley displays symptoms consistent with DSM-5 diagnoses of Cannabis Use Disorder, In a Controlled Environment, Severe and Alcohol Use Disorder, In a Controlled Environment, Mild. Specifically, Mr. Dudley continues to use cannabis and K-2 on a daily basis (in general population) while incarcerated and will binge drink alcohol "once or twice" a year. Mr. Dudley has a longstanding use of these substances since the age of 13. He continues to use these substances despite it being against the rules in prison, which has resulted in some DRs related to this behavior. The use of these substances also exacerbates Mr. Dudley's current mental health issues.

The invalid results of the PPI-R, inconsistencies between content scales and clinical observations, and elevated validity scales on the PAI indicated an exaggeration of symptoms, which typically warrant further testing to determine if the person is potentially malingering. However, due to the significant instances of aggression and harm to staff and peers during his evaluation period, this evaluator could not administer tests to determine if Mr. Dudley was malingering psychotic symptoms. Should further treatment providers suspect Mr. Dudley is feigning symptoms, further testing should be provided to determine whether Mr. Dudley is malingering.

Mr. Dudley also received a V-Code of Imprisonment or Other Incarceration, as he is currently serving a prison sentence at LCMHF for Aggravated Battery, Bodily Harm in a Deadly Manner (Level 8, Person Felony) and was recently convicted of one count, of Solicitation to Commit Arson (Level 10, Non-Person Felony).

Diagnoses (DSM-5):
F60.2 Antisocial Personality Disorder, with Borderline Traits
F90.1 Attention-Deficit/Hyperactivity Disorder, Predominately Hyperactive/Impulsive Presentation, Moderate
F12.20 Cannabis Use Disorder, In a Controlled Environment, Moderate
F10.10 Alcohol Use Disorder, In a Controlled Environment, Mild
Z65.1 Imprisonment or Other Incarceration

IX. Opinion
Mr. Dudley is diagnosed with the following: Antisocial Personality Disorder, with Borderline Traits; Attention-Deficit/Hyperactivity Disorder, Predominately Hyperactive/Impulsive Presentation, Moderate; Cannabis Use Disorder, In a Controlled Environment, Moderate; Alcohol Use Disorder, and In a Controlled Environment, Mild; Imprisonment or Other Incarceration. He has a longstanding history of previous incarcerations and treatment in intensive units. Previous treatment has been unsuccessful for Mr. Dudley and he has continued to escalate in his aggressive behaviors. Mr. Dudley also continues to have homicidal ideations towards others in general and has attacked peers and staff unpromptedly. Due to the severity of his personality disorder, Mr. Dudley does not have the insight or ability to

16

Apr. 7. 2016 10:11AM    Polgeier                                            No. 3368    P. 15/15

benefit from treatment in a psychiatric hospital at this time. His aggression, impulsivity, ability to follow established rules, manipulation, and willingness to engage in treatment will need to be addressed before any therapeutic treatment will be effective. Moreover, Mr. Dudley is able to receive psychotropic medication and mental health classes to address his aforementioned diagnoses within in a correctional setting.

It seems that Mr. Dudley could benefit from learning anger management techniques, accepting positive and negative feedback from others, respecting authority figures, following established rules, and complying with social norms, which are available resources in both psychiatric hospitalization and prison settings. Based on LSSH records, Mr. Dudley is able to independently complete the activities of daily living, participate in treatment team meetings, and participate in activities on the unit. According to his CRTP, Mr. Dudley's strengths include: the ability to make his needs known, capable of following directions, schedules, and programs; and capable of understanding explanation and instruction. Furthermore, his CRTP reported assets of being young, having a supportive mother, and familiarity with a mental health center and correctional system. Mr. Dudley has not required any suicidal interventions while at LSSH. Lastly, Mr. Dudley historically has not displayed psychiatric difficulties that were not managed in a correctional setting as a juvenile or as an adult. Individuals with diagnoses similar to Mr. Dudley have not been precluded from participating in the legal system. Thus, it is recommended that he receive routine legal disposition based upon his charges.

Respectfully submitted,

Christine N. DiRubbo, Psy.D., TLP
Christine N. DiRubbo, Psy.D., TLP-0330/2016 12:16:23 (07165040)
3/30/2016
Date

Lynelle Ellis, Psy.D, LCP
Lynelle Ellis, Psy.D, LCP-0330/2016 16:23:44 (07165470)
3/30/2016

17

Apr. 24. 2008 1:44PM   Tish Medical Records   No. 4265   P. 6

# PSYCHIATRIC ADMISSION EVALUATION

**Osawatomie State Hospital**
Osawatomie, KS 66064-0500

Name: DUDLEY, James

Case #: 602426

Ward: CSU

Admission ☒  Review ☐  (check one)     **Date of Admission:** June 21, 2007

**Sex:** M     **Age:** 18     **County:** Douglas

**Referral Source:** Bert Nash Mental Health Center/North Memorial Hospital ER

**Legal Status:** Emergency

## I. REASON FOR CURRENT ADMISSION
As per screening, patient states that he was losing control.

## II. HISTORY OF PRESENT ILLNESS (HPI)
As per record, patient lived with his uncle for 6 months, and currently he has the urge of hurting his uncle by stabbing him. Patient also had severe conflictual relationship with his mother who has nothing to do with him. Currently, patient is heavily sedated and is unable to remain alert and provide any other information. Per record, patient has been involved in multiple fights. Patient has reported feeling angry, with poor sleeping and also presented very hostile and aggressive as per record.

## III. SIGNIFICANT PAST PSYCHIATRIC HISTORY (PPH)
As per record, patient has a history of ADHD with poor impulse control. He has been on Depakote and Ritalin, but cannot recall anything else per record.

## IV. MEDICAL HISTORY
As per record, patient has no seizure, no high blood pressure, no asthma, no history of head injury, and no history of surgery.

## V. ALLERGIES AND MANIFESTATIONS / DRUG SIDE EFFECTS
Unknown

## VI. MEDICATIONS
Over-the-counter meds, herbal medicine and vitamin use is unknown.

## VII. GROWTH AND DEVELOPMENT
Unknown

## VIII. PERTINENT PSYCHOSOCIAL HISTORY
Unknown

## IX. RELEVANT FAMILY HISTORY
No information available.

## X. DRUG USE
Patient's primary drug is marijuana.

## XI. ALCOHOL USE
No information available.

/

18

Apr. 24. 2008 1:44PM   USH Medical Records                No. 4265   P. 7

## PSYCHIATRIC ADMISSION EVALUATION

Name: DUDLEY, James

Case #: 602426

**Osawatomie State Hospital**
Osawatomie, KS 66064-0500

Ward: CSU

### XII. TOBACCO USE/CAFFEINE USE
No information available.

**MENTAL STATUS EXAMINATION:**   Initial ☒   Update ☐   (check one)

### I. GENERAL DESCRIPTION:
**a. Appearance**
This is a Caucasian male observed lying down in his bed, unable to provide any additional information, but he is casually dressed with poor personal hygiene, poorly groomed and looks his stated age. He is otherwise not alert while doing the interview. He is very sleepy and he is not cooperative either.

**b. Overt Behavior and Psychomotor Activity**
Not assessed.

### II. SPEECH
Not assessed.

### III. MOOD AND AFFECT
As per record, he is angry and hostile.

### IV. THOUGHT CONTENT
Not assessed.

### V. THOUGHT PROCESS
Not assessed.

### VI. SUICIDAL IDEATION
Not assessed.

### VII. HOMICIDAL IDEATION
As per record, patient feels like hurting his uncle by stabbing him.

### VIII. SENSORIUM AND COGNITION - Not assessed because patient is very sleepy and not cooperative.

### IX. JUDGMENT
Not assessed.

### X. INSIGHT
Not assessed.

### XI. RELIABILITY
Not assessed.

### XII. ASSETS AND STRENGTHS
Patient appears to be in good health.

19



## PSYCHIATRIC ADMISSION EVALUATION

**Osawatomie State Hospital**
Osawatomie, KS 66064-0500

Name:  DUDLEY, James

Case #:  602426

Ward:  CSU

### XIII. ASSESSMENT
This is an 18 year old Caucasian male, sleeping in his bed, uncooperative but with suicidal and homicidal ideation according to record. Patient is very hostile and aggressive involving civil fights. No other history, but the drug of choice is marijuana.

### XIV. DIAGNOSES

Axis I - 1st:  Mood Disorder, NOS
          2nd:  Marijuana Abuse

Axis II - None

Axis III - None

Axis IV -.                                                    Specify;
  1.  Problems with primary support group:        No primary support group.
  2.  Problems related to the social environment:
  3.  Educational problems:
  4.  Occupational problems:                       Unemployed
  5.  Housing problems:
  6.  Economic problems:
  7.  Problems with access to health care services:
  8.  Problems related to interaction with the legal system:
  9.  Other psychosocial and environmental problems:    Marijuana abuse

Axis V - Current GAF: 25.

### XV. PRELIMINARY TREATMENT PLAN
The patient is admitted to CSU. No medication to be reconciled. More collaborative information is needed for a better treatment plan. The patient is put on unit observation. Diagnostic tests are ordered. Patient will be encouraged to attend groups and individual therapy and currently, because of his aggressiveness, fighting and hostility and anger, patient is put on carbamazepine 600 mg p.o. b.i.d. Patient is also put on clonazepam 2 mg p.o. bid and also put on citalopram 20 mg p.o. every 8 a.m. in that his behavior could be a manifestation of depression in young people. Now, the patient needs stabilization and upon stabilization he will be discharged.

20

# PSYCHIATRIC ADMISSION EVALUATION

**Osawatomie State Hospital**
Osawatomie, KS 66064-0500

Name:  DUDLEY, James

Case #:  602426

Ward:  CSU

**XVI. PROGNOSIS:** Guarded.

Machado Edmond, M.D., Psychiatrist

ME/jbp/ema
dictated:      06/21/07
transcribed:   06/22/07

# DISCHARGE SUMMARY

**Osawatomie State Hospital**
Osawatomie, KS 66084-0500

Name: DUDLEY, James

Case #: 60246

Unit: CSU

## I. IDENTIFYING INFORMATION :

Date of Birth: 08-01-1988

Marital Status: never married

County of Responsibility: Douglas

Admission Date: June 21, 2007

Service: Adult Psychiatric

Admitting Legal Status: KSA 59-2954 (a)
Psychiatric Emergency

Age: 18

Social Security Number: 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

Number of Admissions: 1

Discharge Date:  June 28, 2007

Discharge Type: direct

Discharge Legal Status: Emergency
Custody Order

## II. REASON FOR ADMISSION (including Chief Complaint): As per screening, patient stated that he was losing control.

## III. PERTINENT FINDINGS AT THE TIME OF ADMISSION:

1. History of Present Illness (HPI): Patient lived with his uncle for 6 months, and he had the urge of hurting his uncle by stabbing him. Patient also had severe conflictual relationship with his mother who had nothing to do with him. Patient was heavily sedated and was unable to remain alert and provide any other information. Per record, patient had been involved in multiple fights. Patient had reported feeling angry, with poor sleeping and also presented very hostile and aggressive as per record.

2. Significant Past Psychiatric History (PPH): Patient had a history of ADHD with poor impulse control. He had been on Depakote and Ritalin, but could not recall anything else per record.

3. Substance Abuse History: Patient's primary drug was marijuana.

No information available for alcohol, tobacco or caffeine use/abuse.

4. Mental Status Examination: This was a Caucasian male observed lying down in his bed, unable to provide any additional information, but he was casually dressed with poor personal hygiene, poorly groomed and looked his stated age. He was otherwise not alert while doing the interview. He was very sleepy and he was not cooperative either. Overt behavior, psychomotor activity, speech was not assessed. As per record, he was angry and hostile. Thought content, thought process, and suicidal ideas, were not assessed. Homicidal ideas, as per record, patient felt like hurting his uncle by stabbing him. Sensorium, cognition, judgment and insight - Not assessed because patient was very sleepy and not cooperative.

22

# DISCHARGE SUMMARY

| | |
|---|---|
| Name: | DUDLEY, James |
| Case #: | 60246 |
| Unit: | CSU |

### Osawatomie State Hospital
Osawatomie, KS 66064-0500

## IV. PERTINENT MEDICAL HISTORY:

1. Allergies and Manifestations: Unknown.

2. Medical History: Patient had no seizure, no high blood pressure, no asthma, no history of head injury, and no history of surgery.

3. Physical Examination: Patient was observed lying down in his bed, very sedated, well nourished, Caucasian male, not in any respiratory distress, and vital signs were stable, Tardive Dyskinesia was not evident.

## V. DIAGNOSTIC TESTS AND PROCEDURES PERFORMED: Not ordered.

## VI. DIET ORDER: James was placed on a general diet.

## VII. COURSE OF HOSPITALIZATION: The patient is an 18-year-old male who was referred to OSH for the first time on June 21, 2007 because reportedly he was losing control with the urge to hurt others.

Upon admission the patient, who reported a long history of mood swings and past hospitalizations for these problems and who has been off of his medications for over a year, prior to this admission, was counseled and started on Tegretol and Seroquel. It may be recalled the patient has a long history of using marijuana. The patient complied with these medications and therapy and with time his condition improved and he became better organized. In the event he was able to express his feelings and needs well. He was also able to take care of his basic needs. Again with time he was able to express his understanding and appreciation of the realities of his problems, including his drug use, and also his treatment needs. On June 24, 2007 the patient was referred to the Miami County Medical Center for evaluation after he developed high temperature and was diagnosed with bronchitis and prescribed Azithromycin. With the addition of Albuterol he responded very well to treatment for these problems. In general he made good progress in his condition and therapy and eventually his condition improved and he became better organized and reality based.

## VIII. PATIENT'S CONDITION AT TIME OF DISCHARGE:

1. Mental Status: He was clear, coherent, and goal directed. He was well oriented and was also aware of the circumstances that led to his hospitalization. He had no psychotic features and understood the realities of his problems and treatment needs. He was better organized and reality based, and he denied any ideas or plans to harm himself or others at the time of his discharge.

2. Physical Condition: At the time of his discharge he had no acute medical problems and was not in any physical distress. His bronchitis had almost resolved.

## IX. DIAGNOSIS:

GEN-2.21 (November 2005)

2

Apr. 24. 2008. 1:44PM   OSH Medical Records   No. 4265   P. 4

| | |
|---|---|
| **DISCHARGE SUMMARY** | **Name:** DUDLEY, James |
| | **Case #:** 60246 |
| **Osawatomie State Hospital**<br>Osawatomie, KS 66064-0500 | **Unit:** CSU |

Axis I:      1st:  Mood Disorder, NOS
            2nd:  Marijuana Abuse
            3rd:
            Other:

Axis II:     No Diagnosis

Axis III:    Bronchitis (almost resolved)

Axis IV:     *(Specify only those that are applicable)*
            1.  Problems with primary support group:  N/A
            2.  Problems related to the social environment: History of drug use.
            3.  Educational problems:  Has 10th grade education. No diploma or GED.
            4.  Occupational problems:  Has been unemployed.
            5.  Housing problems:  N/A
            6.  Economic problems:  Has limited income.
            7.  Problems with access to health care services: No health insurance.
            8.  Problems with interaction with the legal system:  N/A
            9.  Other psychosocial environmental problems: Chronicity of his illness and drug use.

Axis V:      Current GAF: 65

**X.  PROGNOSIS:**  Fair

**XI.  EDUCATION PROVIDED:**  The patient was educated regarding the realities of his problems, his treatment needs, the benefits, as well as possible adverse effects of his medications. He was educated regarding the importance of complying with medications and therapy, and again was counseled regarding his drug use and the need for him to abstain from them.

Patient's Comprehension of Education:  Good as he was able to verbalize his appreciation of all of these issues.

**XII.  RECOMMENDATIONS:**  The patient was discharged on June 28, 2007 to, 827 Walnut, Lawrence, Kansas 66044, phone 785 749 2720 (with uncle). Followed up by the Bert Nash Mental Health Center, 200 Maine Street, Suite A, Lawrence, Kansas 66044, phone 785 843 9192. He had a medication appointment on July 18, 2007, at 10:00 a.m. with Dr. Rimando. He was provided with case management services, with Mike Sealy (Homeless Outreach) phone 785 423 0627, no set appointment, but Mike was to make contact on Thursday or Friday of that week, then Mike was to be on vacation, for a week and another case manager was to cover. Transportation was provided by the MHC, through secure transport. The patient received Medicaid, Supplemental Security Income and food stamps.

**XIII.  MEDICATION PRESCRIBED UPON DISCHARGE:**  Tegretol 300 mg twice a day, Seroquel 100 mg in the morning, 300 mg at bedtime, Azithromycin 500 mg daily (for him to complete the course),

# DISCHARGE SUMMARY

## Osawatomie State Hospital
Osawatomie, KS 66064-0500

Name:   DUDLEY, James

Case #:  60246

Unit:   CSU

Albuterol two puffs three times a day during the course of the bronchitis. Fourteen day supply and prescriptions were provided.

**XIV.  COMMENTS:**   At the time of his discharge I met with the patient, along with the treatment team, and we again educated him regarding the realities of his problems and his treatment needs. We educated him to comply with treatment needs. We educated him to comply with his therapy at the mental health center and also to abstain from drugs and alcohol in the community. We again further educated him to complete the treatment for the bronchitis. He was able to verbalize his appreciation of all of these issues and agreed to follow through.

I certify that the narrative descriptions, principal and secondary diagnosis, and the major procedures performed are accurate and complete to the best of my knowledge.

Signature:   George Wiredu, M.D.

GW/bv
dictated: 07-29-07
transcribed: 07-31-07
compiled: VK
August 3, 2007

25



**KDOC Adult Facilities**
**Hutchinson - Central**

PATIENT:                          JAMES R DUDLEY
DATE OF BIRTH:
DOC #:                            91359
DATE:                             11/30/2020 9:31 AM
VISIT TYPE:                       Onsite Consult

**General**
Facility:        Hutchinson - Central
Client Name:     JAMES R. DUDLEY
Client Number:   91359
**Date of Treatment Plan:**              **11/30/2020**

90 Day Treatment Plan (Primary BHP Use Only)
**Next Treatment Plan Review Date:**     **02/28/2021**

Assigned BHP: Robert Chichester, BHP

**Symptoms/Presenting Problems, and Strengths and Weaknesses**
Symptoms/Presenting Problems:
Impulse control issues
depression symptoms
Anxiety with few panic attacks

Describe Strengths and Weaknesses:
Medication compliance
frequent medication changes
Impulse control issues

**Goal #1 (Psychiatry)**
Goal #1:        Assess safety, mood, anxiety and any psychosis

Describe Goal Objectives/Tasks:

1.      Complies with prescribed psychotropic medications

        Target Date for Completion:   12/17/2020
        Date Completed:

2.      Identifies ability to ask for help when help is needed

        Target Date for Completion:   12/17/2020
        Date Completed:

Offender Responsibilities:
medication adherence



26

**Describe Goal Objectives/Tasks:**

1.  Able to identify at least two new coping skills

    Target Date for Completion:   10/22/2020
    Date Completed:

2.  Identifies ability to ask for help when help is needed

    Target Date for Completion:   10/22/2020
    Date Completed:

Offender Responsibilities:
Inmate will remain DR free while housed in RHU
Inmate will engage with assigned daily RHU BHP
Inmate will remain take his psychotropic medications as prescribed

**Intervention Details (6)**
Modality and Frequency of Intervention
Modality:      RHU

Modality Detail: (i.e. specific treatment methods employed; CBT, DBT, etc.)
CBT, Solution Focused

Frequency:      Weekly
Duration:        While housed in RHU

Staff Responsible:      Assigned RHU BHP
                        (name/credential/discipline)

---

**Provider: Emmanuel Okeke MD**
**Document generated by: Robert Chichester, BHP 11/30/2020 9:34 AM**

Name: DUDLEY , JAMES
Number: 91359

27



# Kansas Department of Corrections

## Formulary Exception - Medication



| KDOC #: | 91359 | Name: | DUDLEY, JAMES , R |
| DOB: | | Sex: | M |
| SSN: | 509984950 | Location: | Hutchinson - Central |
| Encounter Date: | 11/11/2020 07:55 AM | Provider: | Emmanuel Okeke MD |

**Medication Request:**

**Diagnosis**

Major depressive disorder, recurrent, mild

**Pertinent patient history**

FE application for renewal of Wellbutrin SR 200 mg PO BID. Mr. Dudley was seen and evaluated on 9/17/20, and has been and continued doing well – exhibiting stable mood and well controlled depression and anxiety while on Wellbutrin since it was started on 11/14/2012 – for over 6 years.

| Medication requested | Refill Sig | | Days |
| Wellbutrin SR 200 mg | Y   PO BID | | 120 |
| Psychotropic: DEA Number | | | |
| Y   F00221642 | | | |

**Justification**

Mr. Dudley has done well on Wellbutrin for over 6 years.  He reports no complaints / No side effects reported. Wellbutrin has been effective and yielded desired results – improved and stable mood.

**Allergies:**

| Ingredient | Reaction | Medication Name | Comment |
| DIVALPROEX SODIUM | | | DEPAKOTE |

| Document generated by: | Emmanuel Okeke, MD |
| Document generated on: | 11/11/2020 08:04 AM |

Site Provider hand signature and DEA number (Only for Controlled Substance):_____

Electronically signed by Alicia Cardona MD on 11/11/2020 04:05 PM



*28*

**VERBAL ORDER SIGN-OFF**

SITE: Hutchinson - Central
COMPLETED BY: Stephanie A. Radomski, LPN        11/12/2020 3:37 PM

Patient: JAMES  DUDLEY
ID #: 91359
Encounter:

**Medications ordered/stopped this visit**

| Medication | Start | Stop | Dose | SIG | Issu |
|---|---|---|---|---|---|
| WELLBUTRIN SR | 11/12/2020 | 03/11/2021 | 200 mg | take 1 tablet by oral route 2 times every day for 120 days | 240 |

I have reviewed and approve the orders listed above placed during encounter of 11/12/2020 03:37 PM

*Provider:*
Okeke, Emmanuel  11/12/2020 3:40 PM

Document generated by:  Stephanie A. Radomski, LPN  11/12/2020

Electronically signed by Emmanuel Okeke MD on 11/13/2020 05:49 AM

29

## Kansas Department of Corrections
### Utilization Management Progress Note

| | | | |
|---|---|---|---|
| KDOC #: | 91359 | Name: | DUDLEY, JAMES , R |
| DOB: | ▓▓▓▓▓▓ | Sex: | M |
| SSN: | 509984950 | Location: | Hutchinson ~ Central |
| Encounter Date: | 11/12/2020 03:37 PM | Provider: | Emmanuel Okeke MD |

**Subjective:**
Cardona, MD, Alicia MD 11/11/2020 4:05:17 PM
Wellbutrin SR 200mg po BID will be approved for 120 days.


**Plan:**
Order faxed to pharmacy. Medication log updated.


............................................................................................................

**Provider:** Emmanuel Okeke MD
**Document generated by: Stephanie A. Radomski, LPN 11/12/2020 3:38 PM**

Name: DUDLEY , JAMES
Number: 91359

30

Form 9
For Cellhouse Transfer
Work Assignment
Interview Requests

Dudley
Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**

#0091359
Number

**OFFENDER REQUEST TO STAFF MEMBER**

To: Director of Nursing                    Date: 12·10·19
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Who do I need to write to at Topeka Administration to get On & Strattera, Dexedrine, Adderal, Ritatlen or Deoxyen for my ADHD? I know Narcotics are usually not given out but I am aware of special circumstances in rare cases. The fact is I just act so much better when I'm on stimulant ADHD meds. Major improvements in behavior and concentration. I'm just one of those True ADHD people who needs needs to function acceptably in society. No crutch here. Just hard facts about me.

Work Assignment: Cecef                    Living Unit Assignment: B-3 111

Comment: _____        Detail or C.H. Officer: Campbell

Disposition: _____

To: _____                    Date: _____
(Name & Number)

Disposition: This is a BH issue — Please submit a sick call to discuss this with Behavioral Health — FYI there are some medications that are absolutely NOT allowed. These may be some of those meds.

Employee's Signature _____        To be returned to offender.

P-0009



**Promote a culture of safety**

## HEALTH SERVICES REQUEST FORM
(Formulario de Solicitud de Servicios de Salud)

| FOR MEDICAL USE ONLY Sólo para uso médico | Service Requested Servicio Solicitado |
|---|---|
| Date Received | ☐ Nurse  ☐ Doctor  ☐ Dental Enfermera  Doctor  Dental |
| Time Received | ☑ Mental Health  ☐ Eye Doctor Salud Mental  Médico de los ojos |

Print Name (Imprimir nombre): _James K. Dudley_

Date of Request (Fecha de solicitud): _11/10/15_

ID #: _0091359_ Date of Birth (Fecha de nacimiento): _08/11/1988_

Housing Location (Ubicación de la Vivienda): _A1 cell 104_

Nature of problem or request (Naturaleza del problema o solicitud): _I am requesting a non-prescribed Dexedrine for a ... ... problem I exist to described Adderall and ... when I ... ... I am ... I was being ... because of the ... ... ... ... ... ..._

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratado por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respecto de recibir servicios de salud no necesariamente implica que estoy de acuerdo en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de urgencia, si no se trata de una visita de seguimiento o por una derivación.)

PATIENT SIGNATURE (Paciente Firma)

**PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA** (Pon este artículo en la caja médica u otra área designada.)
**DO NOT WRITE BELOW THIS AREA** (No escriba debajo de esta área.)

(Original – Medical Record   Yellow Copy- Inmate/Patient   Pink Copy-Business Office)

---

**(THE AREA BELOW IS NOT TO BE USED FOR EDUCATION, COUNSELING, OR DOCUMENTING A CLINICAL ENCOUNTER)**

Triaged by: _KJ2_

Date: _11-11-15_   Time: _0830_   am  pm (circle one)

Called Down at: _____ (for urgent issue)

Other: _____

Response Recommendation (to be completed by Medical Staff Only)

| | | | | | |
|---|---|---|---|---|---|
| Initial | ☑ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☑ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☑ Mental Health | ☐ ARNP |
| Fee Charged | ☐ $2.00 | | | | | |

Comments: _This medication is still a narcotic, still non-formulary, & we are still not permitted to treat ADHD or ADD._

Staff Signature: _GH Ellentsch M_   Date: _11/11/15_

NA7141-KS-DOC
Issued 01/06/2013

©2013 Corizon Health, Inc.

32

# Health Services Request Form

| For Medical Use Only<br>Sólo para uso médico | |
|---|---|
| Date Received: | |
| Time Received: | |

Print Name (Imprimir nombre): Dudley, James, Ray

Date of Request: 8-24-21

ID #: 0009/359        Date of Birth (Fecha de nacimiento): 8-10-88

Housing Location (Ubicación de la vivienda): A-2-245

Nature of problem or request (Naturaleza del problema o solicitud): Mental Health. I'm going threw to much abuse right now by H&F officers and admin. I don't know what to do. I don't know whether to hurt myself or them. I need to go on crisses level. I have been driven to instability. I need a break.

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este artículo en la caja médica u otra área designada.)**
Do not write below this area. (No escribe debajo de esta área.)

(Original -- Medical Record, Yellow Copy -- Inmate/Patient, Pink Copy -- Business Office)

---

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: _____  ☐ Routine  ☐ Urgent  ☐ Emergent

Date: _____  Time: _____

Date of Face-to-Face Visit: _____

Other: _____

Response Recommendation (to be completed by Medical Staff only)

| | | | | | | |
|---|---|---|---|---|---|---|
| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |

Fee Charge  ☐ $2.00

Comments:

_____                    _____
Staff Signature                        Date

Centurion: REC-013KS
07/01/2020


centurion.



33

# Health Services Request Form

<table>
<tr><td colspan="2">For Medical Use Only<br>Sólo para uso médico</td></tr>
<tr><td>Date Received:</td><td></td></tr>
<tr><td>Time Received:</td><td></td></tr>
</table>

Print Name (Imprimir nombre): _Dudley, James Roo_

Date of Request: _7.20.21_

ID #: _(#0091359)_   Date of Birth (Fecha de nacimiento): _8.10.88_

Housing Location (Ubicación de la vivienda): _A2.245_

Nature of problem or request (Naturaleza del problema o solicitud): _Medical._
_Mental Health is refusing to treat my ADHD which is causing me extreme_
_anxiety with constant anxiety attacks. Mental Health refuses to treat my_
_anxiety unless to take psychotropic chemicals. I'm not taking psychotropics_
_can I please get a medical appointment to be treated for my anxiety?_

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presenter un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

_____
Patient Signature (Paciente/Firma)

**Place the slip in medical request box or designated area.**
**(Pon este artículo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)
Triaged by: _____   ☐ Routine   ☐ Urgent   ☐ Emergent
Date: _____   Time: _____
Date of Face-to-Face Visit: _____
Other: _____

Response Recommendation (to be completed by Medical Staff only)
Initial   ☒ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☐ Mental Health   ☐ ARNP
Appointment   ☒ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☐ Mental Health   ☐ ARNP
Fee Charge   ☐ $2.00
Comments:

_____   _7/20/21_
Staff Signature   Date

Centurion: REC-013KS
07/01/2020



34

# Health Services Request Form

*STANSBURY*

| For Medical Use Only |
|---|
| Sólo para uso médico |
| Date Received: |
| Time Received: |

Print Name (Imprimir nombre): *Dudley, James Lee* (Jr)
Date of Request: 10-21-21     Date of Birth (Fecha de nacimiento): 8-1-88
ID #: 0007359.
Housing Location (Ubicación de la vivienda): A-1-140
Nature of problem or request (Naturaleza del problema o solicitud): *Mental Health.*
*Stansbury: Is HCF security staff/officers preventing my mental health transfer*
*to ECF? Is security involved in any way? Please come and talk to me,*
*Thanks.*

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be
assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may
file a grievance with the Warden as per KAR 44-15,101 et seq. I understand that a $2.00 fee will be
assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up
visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de
acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no
estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de
conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de
salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si
no se trata de una visita de seguimiento o por una derivación.)

*[signature]*
Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
Do not write below this area. (No escribe debajo de esta área.)

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy -- Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)
Triaged by: *McPherson LLMHT*          ☑ Routine    ☐ Urgent    ☐ Emergent
Date: _____     Time: *11:00  6:00 am*
Date of Face-to-Face Visit: 10-21-71
Other: _____

| Response Recommendation (to be completed by Medical Staff only) | | | | |
|---|---|---|---|---|
| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☑ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☑ Mental Health | ☐ ARNP |

Fee Charge   ☐ $2.00
Comments: *Security is not involved. We were told you do not qualify for*
*a MH transfer or program. MH will not be transferring you.*       10-21-21

*[signature]* LMSW
Staff Signature                                    Date

Centurion: REC-013KS
07/01/2020



35

# Health Services Request Form

| For Medical Use Only |
|---|
| Sólo para uso médico |
| Date Received: |
| Time Received: |

Print Name (Imprimir nombre): Dudley, James R.

Date of Request: 10·31·21

ID #: #0091359      Date of Birth (Fecha de nacimiento): 03·10·88

Housing Location (Ubicación de la vivienda): A02.225

Nature of problem or request (Naturaleza del problema o solicitud): Medical. I am requesting for a medical provider on MH for refusing to treat my Anxiety and ADHD. This is justified and medically necessary because I am now suffering physical damage to my body. My chest is so worn out that it is inflamed to the point were my voice is affected, I am also having headaches every other day. MH will not treat

I consent to be treated by health staff for the condition described. ME because the treatment is Narcotics. They (Da su consentimiento para ser tratada por el personal de salud para la condición descrita.) Can't legally do this.

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente implica que estoy de acuerdo en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00 por cualquier visita a un enfermo o visita que no sea de urgencia al personal de atención médica si no se trata de una visita de seguimiento o por una derivación.)

_____
Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
(Pon este artículo en la caja médica u otra área designada.)
Do not write below this area. (No escribe debajo de esta área.)

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: _____   ☐ Routine   ☐ Urgent   ☐ Emergent

Date: _____   Time: _____

Date of Face-to-Face Visit: _____

Other: _____

Response Recommendation (to be completed by Medical Staff only)

Initial    ☐ Nurse  ☐ Doctor  ☐ Dentist  ☐ Eye Doctor  ☐ Mental Health  ☐ ARNP

Appointment ☐ Nurse  ☐ Doctor  ☐ Dentist  ☐ Eye Doctor  ☐ Mental Health  ☐ ARNP

Fee Charge  ☐ $2.00

Comments: (2 days Burning) Anxiety

_____            11/1/21
Staff Signature                        Date

HCP/BMH

Centurion: REC-013KS
07/01/2020

centurion.

36


HEALTH™

| FOR MEDICAL USE ONLY | | Service Requested |
| --- | --- |
| Sólo para uso médico | Servicio Solicitado |

**LTH SERVICES REQUEST FORM**
(ularlo de Solicitud de Servicios de Salud)

FOR MEDICAL USE ONLY
Sólo para uso médico
Date Received: 4-20-17
Time Received: 2:30

Service Requested
Servicio Solicitado
☐ Nurse    ☐ Doctor    ☐ Dental
Enfermera  Doctor      Dental
☒ Mental Health  ☐ Eye Doctor
Salud Mental     Médico de los ojos

Name (Imprimir nombre): Dudley, James, R.

of Request (Fecha de solicitud): 4/18/17

0091359            Date of Birth (Fecha de nacimiento): 8/1/88

ng Location (Ubicación de la Vivienda): C-1/114

e of problem or request (Naturaleza del problema o solicitud): There is a special procedure by which the
sician/psychiatrist can obtain permission to prescribe medication not in the
c Formulary. I need put in one to be subscribed Strattera and/or Dexadrine,
u I function and the further amount of time I do in prison counts on it. Please help.
ent to be treated by health staff for the condition described.)
consentimiento para ser tratada por el personal de salud para la condición descrita.)

rstand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare
es. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I
stand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to heatlh care staff if it is not a follow-up visit
rral.

ndo que mi solicitud respecto de recibir servicios de salud no necesariamente implica que estoy de acuerdo en que se me cobren cargos
chos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante
de, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel
0, por cualquier visita a un enfermo o visita que no sea de urgencia, si no se trata de una visita de seguimiento o por una derivación.)

PATIENT SIGNATURE (Paciente Firma)

**THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA (Pon este artículo en la caja médica u otra área designada.)
DO NOT WRITE BELOW THIS AREA  (No escriba debajo de esta área.)**

(Original – Medical Record   Yellow Copy- Inmate/Patient   Pink Copy-Business Office)

**AREA BELOW IS NOT TO BE USED FOR EDUCATION, COUNSELING, OR DOCUMENTING A CLINICAL ENCOUNTER)**

d by: _____ Miller

x-40-17 _____        Time: 24:45 (M) 8:30  am pm (circle one)

Down at: _____ (for urgent issue)

nse Recommendation (to be completed by Medical Staff Only)

|  | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☒ Mental Health | ☐ ARNP |
| --- | --- | --- | --- | --- | --- | --- |
| ent | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☒ Mental Health | ☐ ARNP |
| rge | ☐ $2.00 | | | | | |

ents: Questions about medication. Made referral to
Barnes.

ignature: _____ Miller _____        Date: 4-20-17

©2013 Corizon Health, Inc.

37



**HEALTH SERVICES REQUEST FORM**
(Formulario de Solicitud de Servicios de Salud)

| FOR MEDICAL USE ONLY |
|---|
| Sólo para uso médico |
| Date Received: 11/2/17 |
| Time Received: 1319 |

**Service Requested**
Servicio Solicitado

☐ Nurse    ☐ Doctor    ☐ Dental
Enfermera   Doctor      Dental

☐ Mental Health   ☐ Eye Doctor
Salud Mental       Médico de los ojos

Print Name (Imprimir nombre): James R. Dudley
Date of Request (Fecha de solicitud): 11-2-17    Date of Birth (Fecha de nacimiento): 8/1/88
ID #: 0091359
Housing Location (Ubicación de la Vivienda): C-1/1M
Nature of problem or request (Naturaleza del problema o solicitud): BHP claims they are not authorized to treat my ADHD and also claim it's against policy to treat inmates with 'severe ADHD. So my questions are; 1. Who made the authorization decision? and what and were is this policy? Is it in writing?

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to heatlh care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respecto de recibir servicios de salud no necesariamente implica que estoy de acuerdo en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante el Alcaide, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de urgencia, si no se trata de una visita de seguimiento o por una derivación.)

PATIENT SIGNATURE (Paciente Firma)

**PLACE THIS SLIP IN MEDICAL REQUEST BOX OR DESIGNATED AREA** (Pon este artículo en la caja médica u otra área designada.)
**DO NOT WRITE BELOW THIS AREA** (No escriba debajo de esta área.)

(Original – Medical Record   Yellow Copy- Inmate/Patient   Pink Copy-Business Office)

---

**(THE AREA BELOW IS NOT TO BE USED FOR EDUCATION, COUNSELING, OR DOCUMENTING A CLINICAL ENCOUNTER)**

Triaged by: BHP Adams

Date: 11/2/17          Time: 1319          am pm (circle one)

Called Down at: _____ (for urgent issue)

Other: _____

**Response Recommendation** (to be completed by Medical Staff Only)

| | | | | | |
|---|---|---|---|---|---|
| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| Fee Charge | ☐ $2.00 | | | | | |

Comments: IM seen cell-side @ C1 for sick call

_____ LMSW          Date: 11/2/17

DOC
5/2013

©2013 Corizon Health, Inc.

38

INMATE REQUEST TO STAFF MEMBER

To: _____      Date: _____

(Name and Title of Officer or Department)

_____      To be retained by Inmate

Unit Team, Detail, or Cellhouse Officer's Signature

Form 9
For Cellhouse Transfer
Work Assignment _____      *Dudley*
Interview Requests      Last Name Only

KANSAS DEPARTMENT OF CORRECTIONS

#0091359
Number

INMATE REQUEST TO STAFF MEMBER

To: BHP/Korizon _____      Date: 11 06 17

(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

You mistook my first form 9 asking what treatments, such as CBT and interpersonal therapy, groups and such are available. I was asking what treatments is available for people with ADHD-Hyperactivity-severe? And why am I not receiving meaningful treatment for my ADHD that actually helps me function normally? The treatment I am nd have been receiving is not working or is not consistant enough to be considered treatment. The meds I take are for other disorders and BHP is always understaffed and canceling groups or has extreme difficulty starting and continuing groups.

Work Assignment: _____      Living Unit Assignment: Cololl4

Comment: _____      Detail or C.H. Officer: _____

Disposition: _____

To: Dudley  91359 _____      Date: 11/15/17

(Name & Number)

Disposition: We discussed the options available to you when you handed me this form 9. While in RH you can receive packets and engage in discussion w/ BH. You can also put in a sick call request for more urgent matters. BH will work w/ you as nu needed to help you w/ your ADHD.

BHP Adams [signature] LMSW
Employee's Signature

To be returned to inmate.

P-0009

39

INMATE REQUEST TO STAFF MEMBER

To: _____     Date: _____

(Name and Title of Officer or Department)

_____

Unit Team, Detail, or Cellhouse Officer's Signature     **To be retained by Inmate**

Form 9
For Cellhouse Transfer
Work Assignment _____     _Dudley_
Interview Requests                             Last Name Only

KANSAS DEPARTMENT OF CORRECTIONS     #5091359
                                          Number

INMATE REQUEST TO STAFF MEMBER

To: _BHP/Corizon_     Date: ~~Jan 2005~~ 1/02/17

(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I have a current and persistant diagnosis of ADHD-Hyperactivity-Severe. I need to know
what Cognative Behavioral Therapies and Interpersonal therapies are avialable to
me here at LCF and do inmates get Certificates of Completion for the therapies
(groups or one on ones)?
                    Thanks

Work Assignment: _____     Living Unit Assignment: _CoColl 4_

Comment: _____     Detail or C.H. Officer: _____

Disposition: _____

To: _Dudley #91359_     Date: _11/02/17_

(Name & Number)

Disposition: While in RH, BH does daily walk-throughs and weekly rounds. You may speak to BH
as needs. RH groups are currently on hold due to no space available. While in gen pop,
special needs monitoring and sick call are available to IMs. Groups are available as well,
& IMs do receive certification for completing those groups.

_____, LMSW
Employee's Signature     **To be returned to inmate.**

P-0009

40

INMATE REQUEST TO STAFF MEMBER

To: _____     Date: _____
     (Name and Title of Officer or Department)

_____        To be retained by Inmate

     Unit Team, Detail, or Cellhouse Officer's Signature

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Form 9                                          _Dudley_
For Cellhouse Transfer                          Last Name Only
Work Assignment _____
Interview Requests

KANSAS DEPARTMENT OF CORRECTIONS

                                                #0091359
INMATE REQUEST TO STAFF MEMBER                  Number

To: _BHP/Corizon_____    Date: _1/02•17_
     (Name and Title of Officer or Department)
     State completely but briefly the problem on which you desire assistance. (Be specific.)

① Who is the Behavioral Health Director? (for LCF)?
② Who is the Behavioral Health Director/Supervisor in Topeka for all of KDOC?

                        Thanks

Work Assignment: _____   Living Unit Assignment: _Cel o/l4_
Comment: _____   Detail or C.H. Officer: _____

Disposition: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To: _Dudley #91359_____        Date: _11/02/17_
        (Name & Number)

Disposition: 1. BH Director is Dr. Nawalanic
             2. for all of KDOC is Dr. Cordona,
                    by Psychiatric Doctor

BHP  _____ LMSW
     Employee's Signature                        To be returned to Inmate

P-0009

41

Form 9
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley
Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**

**# 91359**
Number

**INMATE REQUEST TO STAFF MEMBER**

To: Heath Care Administrator - Mrs. Luck ____ Date: 1/29/17
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I am requesting Strattera or Dexedrine to treat my ADHD-Hyperactive - Severe
diagnoses. I have completed extensive CBT programs and corresponded with Mr. Barrone
and all his different prescriptions. The Wellbutrin was working for awhile but now that
it is over I believe I'm entitled to a prescription for strattera or Dexedrine now. When I
am on Ritilen I am very well behaved and can stay focused and out of trouble. The strattera
or Dexedrine should do the same. The security part about this can be solved by crushing the pill
and mixing it in a little jelley. Clinic staff already have d locked med carts.

Work Assignment: _____ Living Unit Assignment: C-1 114

Comment: _____ Detail or C.H. Officer: COl Lambert

Disposition: _____

To: Dudley   91359 ____ Date: 02/02/17
(Name & Number)

Disposition: Please see your BHP or attend sick call so you
can discuss your medications.

_____ RN
Employee's Signature

P-0009

**To be returned to inmate.**

42

Form 9
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley
Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**

#C091359
Number

**INMATE REQUEST TO STAFF MEMBER**

To: Health Care Administrator - Mrs. Luck  Date: 3/13/17
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I have done extensive CBT Classes and have been a guinie pig on the medications I have a valid professional diagnoses of ADHD-Hyper Active - Severe from Larned State Hosp. Yel. I continue to struggle with my behavior and relations with others, and still have extreme dificulty staying focused on goals. It is affecting my life and classification Majorly because even though I try hard to make the right decisions my ADHD-IID gets in my way. I am asking for a prescription of strattera or Dexidrine. These medications are appropriate for my mental illness and current circumstances.

Work Assignment: _____  Living Unit Assignment: _____

Comment: _____  Detail or C.H. Officer: _____

Disposition: _____

To: Dudley  91359
(Name & Number)

Date: 3/16/17

Disposition: Per BH, I encourage you to bring this up at your next psychiatry appt. or place a sick call if you feel the matter is urgent.

_____, RN
Employee's Signature

P-0009

To be returned to inmate.

43

INMATE REQUEST TO STAFF MEMBER

To: _____        Date: _____
    (Name and Title of Officer or Department)

_____            **To be retained by Inmate**
    Unit Team Member Signature

Form 9
For Cellhouse Transfer                       *Dudley*
Work Assignment _____         Last Name Only
Interview Requests

### KANSAS DEPARTMENT OF CORRECTIONS

#0091359
Number

### INMATE REQUEST TO STAFF MEMBER

To: BHP/Corizon _____  Date: 11-2-17
  (Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Please verify that you received my sick call request form that asks why my ADHD is not authorized to be treated and what policy is it that denies inmates treatment for ADHD.
    Thanks.

Work Assignment: _____    Living Unit Assignment: Co l o l 14

Comment: _____    Unit Team Members Signature: _____

Disposition: _____

To: Dudley #91359 _____    Date: 11/02/17
  (Name & Number)

Disposition: Your sick call has been received & is being discussed w/ appropriate personnel.

BHP A___ LMSW
Employee's Signature                    **To be returned to inmate**

P-0009b

INMATE NAME & NUMBER: DUDLEY, JAMES #91359

☒Witness(es) Sworn In/Affirmed    OPN POOLE              DR BUMGUARDNER

Witness(es) Testimony / Cross Examination  (Attach Testimony)

Closing Statement(s): (Attach Arguments)
If applicable include inmate's testimony/ arguments on restitution

Sanction(s): 44-12-320A NOT GUILTY

Reason for Sanctions:  INMATE WAS FOUND NOT GUILTY OF THE CHARGE/S

Disposition of Evidence:_____    N/A

☐  Inmate advised of right to Appeal,  Have Inmate Initial _____

HEARING OFFICER SIGNATURE  _CSI M. Simon_____    DATE  05/26/2021

FINAL ACTION BY FACILITY WARDEN:
☑ APPROVED
☐ REINSTATE DISMISSED CHARGES; REMAND NEW HEARING  ☐ REDUCE TO SUMMARY JUDGMENT
☐ AMEND THE CHARGE                                    - restriction from privileges up to 10 days
☐ DISAPPROVE/DISMISS                                  - fine not exceed $10.00
☐ REDUCE THE PENALTY                                  - extra work w/o incentive pay for no more than
☐ SUSPEND ALL OR PART OF SENTENCE                        2 hrs/day no more than 5 days
☐ REMAND NEW HEARING                                  - work w/o incentive pay not to exceed 5 days
☐ CLARIFICATION OF RECORD                             - restitution not less than $3.00
                                                         or more than $20.00
Comments: _____

_____M. Simon CSI_____        __5/7/21__
WARDEN/DESIGNEE SIGNATURE         DATE

I received a Copy of the Hearing Record and understand I have 15 days to Appeal this decision.

_____        _____
INMATE SIGNATURE                        DATE
I served a copy of the Hearing Record

_____        _____
STAFF SIGNATURE                         DATE

Technical and clerical errors in the writing and/or processing of the Disciplinary Report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to prove. Pursuit to K.A.R 44-13-707. Harmless error; Plain error.

45

## DISPOSITION OF DISCIPLINARY CASE

INMATE NAME & NO. DUDLEY, JAMES #91359          CASE NO. 21-05-147

### TESTIMONY

This is a summary of the disciplinary hearing and is not intended to be a transcript.

Inmate DUDLEY was sworn in, the DR was read into the record, there wasn't a witness slip submitted. Inmate entered a plea as follows:

44-12-320A INTERFERING WITH OFFICIAL DUTIES CLASS I - NOT GUILTY

INMATE DUDLEY STATED THAT HE DID NOT HAVE ANY QUESTIONS FOR THE REPORTING OFFICER AND REFUSED TO SIGN THE ACKNOWLEDGEMENT OF RIGHTS.

RN NINA WAS CALLED AS A WITNESS.  DUDLEY, CAN YOU MAKE A DIAGNOSIS AS A NURE. NINA-NO.

DR BUMGUARDNER WAS CALLED AS A WITNESS.  DUDLEY, WHEN WE HAD THIS ISSUE DID I ADVISE YOU THAT I WAS GOING THRU ANXIETY AND YOU PLACED ME ON MEDCATION.  CAN ANXIETY CAUSE CHEST PAINS. DR BUMGUARDNER - YES.

Inmate  DUDLEY had no further comments and did not request staff assistance.

BASED UPON THE PREPONDERANCE OF THE EVIDENCE IN WHICH THE TESTIMONY DOES NOT SUPPORT THE CHARGE, IT IS MORE LIKELY THAN NOT, IN THE HEARING OFFICERS OPINION, TRUE THE INCIDENT DID HAPPEN AND THE FOLLOWING SANCTIONS WERE IMPOSED:

44-12-320A NOT GUILTY





714 S.W. Jackson St., Suite 300
Topeka, KS 66603

# Kansas
### Department of Corrections

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@doc.ks.gov
doc.ks.gov

Jeff Zmuda, Secretary

Laura Kelly, Governor

## Non-Grievance-Response

**FACILITY:** Lansing Correctional Facility

**OFFENDER:** Dudley, James #91359

**COMPLAINT TYPE:** The offender contacted the Department

**DATE:**

**COMPLAINT:**
The concern involves wanting tests and medication for ADHD.

**FINDINGS OF FACTS BY CLINICAL REVIEWER:**
The Kansas Department of Corrections Medical Health Authorities reviewed the correspondence, supporting documents, site response, and EHR. The resident shared concerns regarding ADA accommodation requests, involving medical examinations, to be prescribed ADHD medication. Earlier this year, a grievance was received from Mr. Dudley that also included the "ADA Accommodation" language related to his perception that he suffers from ADHD. The prior grievance lacked the focus that the current grievance has, but it appears substantially similar. The review of the medical record suggests that the recommendations from the prior grievance were never consistently or thoroughly implemented by Centurion. It further suggests that Mr. Dudley is very interested in his diagnoses and in receiving treatment for his diagnoses (whether made by psychiatry or by himself), though primarily through psychopharmacological interventions. Since the prior review, Mr. Dudley has touched on perhaps suffering from post-traumatic stress disorder (PTSD) (as the outgrowth from his current diagnosis of acute stress disorder, and the additional issues associated with being in restrictive housing). Throughout the time encompassing both this and the prior review, it does not appear that behavioral health or psychiatry have worked consistently with him on his presenting symptoms, nor to relate those (through a comprehensive diagnostic work-up) to possible diagnoses (e.g., he is frequently noted to have increased "anxiety," but it does not appear that "anxiety" has ever become a focus of treatment or intervention). Because of this, the prior recommendations remain.

**CONCLUSIONS MADE BY CLINICAL REVIEWER:**
Based on the interaction with Mr. Dudley on May 6, it does appear that Mr. Dudley was willing to discuss what he perceives as his symptoms of ADHD, though there was no elaboration or specifics on what those mean to him, or on how those are negatively impacting his daily functioning. There is also no indication that the provided information was utilized by the Behavioral Health Professional (BHP) to offer/provide further interventions for the presented issues, other than to give him a section from a PTSD workbook (and the focus on PTSD is inconsistent and intermittent, with no connection back to a psychiatrically provided diagnosis). Jointly with the above, it is further recommended that a member of the psychiatric team be identified to serve as his primary psychiatrist, along with a BHP. Together, these two are recommended to work jointly in the implementation of the assessment/treatment recommendations to provide a consistent approach to his assessment, care, and treatment. Further, these two should ensure that clinical leadership is involved in the ongoing progress (or lack thereof) with the assessment and treatment process. It is further recommended that Centurion clinical operations are consulted regarding their clinical approach to handling the assessment and treatment of ADHD (including both interpersonal and pharmacological treatment approaches). Finally, it was observed that numerous entries in the medical record were recorded days after the encounter. It is recommended that staff complete their chart entries on the day of the encounter. Exceptions to this should be rare.

**ACTION TAKEN:**
Recommendations have been forwarded to Centurion's Regional Medical Director.

**Darcie Holthaus**
**Secretary of Corrections Designee**

CC:     Warden
        Centurion's Regional Medical Director
        Site H.S.A.
        Dudley, James #91359
        File
The original response was mailed to the offender by way of United States Mail on _____.

The information provided in the response above concerning the grievant's medical and/or mental health condition and treatment is confidential and private in nature, and is not intended for re-disclosure or sharing with third parties. That statement, however, does not apply to exercise of any other administrative remedies provided by the Kansas Department of Corrections, nor to pursuit of other administrative relief connected with medical and/or mental health condition and treatment, such as, for example, application for disability benefits under state or federal law, or to pursuit of litigation concerning the adequacy or propriety of medical and/or mental health care diagnosis and treatment furnished to the grievant.





**Kansas**
Department of Corrections

714 S.W. Jackson St., Suite 300
Topeka, KS 66603

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@doc.ks.gov
doc.ks.gov

Jeff Zmuda, Secretary

Laura Kelly, Governor

## Non-Grievance-Response

**FACILITY:**      Lansing Correctional Facility

**OFFENDER:**      Dudley, James #91359

**COMPLAINT TYPE:**      The offender contacted the Department

**DATE:**

**COMPLAINT:**
The concern involves wanting tests and medication for ADHD.

**FINDINGS OF FACTS BY CLINICAL REVIEWER:**
The Kansas Department of Corrections Medical Health Authorities reviewed the correspondence, supporting documents, site response, EHR, and Dr. Worley's behavioral health recommendation. The resident shared concerns regarding him having ADHD and is not being treated appropriately for this diagnosis. The resident is a 33-year-old white male with no medical diagnoses on his problem list and no mention of ADHD. He is seen in the clinic episodically for problems such as back pain, skin, rash and upset stomach. He was admitted into the system, on 4/16/08, with evaluation notes stating significant substance abuse disorder and antisocial personality disorder. Bipolar disorder was to be ruled out but appeared to have anger management issues. The last 6 months of medically related issues are as follows: On 1/27/22, Seen for skin irritation. On 2/08/22, seen for thoracic pain and received osteopathic manipulation treatment (OMT). On 4/02/22, seen for pain while urinating. On 4/21/22, he was admitted to the infirmary for self-harm but admitted he did it for attention. On 4/30/22, he was treated for an arm abrasion. The physician ordered an x-ray, but he refused. On 6/21/22, he was seen in the clinic for thoracic back pain and demanded an MRI but then left when told that he needed more evaluation before an MRI could be indicated. His Behavioral Health visits are almost daily.

**CONCLUSIONS MADE BY CLINICAL REVIEWER:**
The resident seems to be fixated on the idea that he has ADHD and is not getting appropriate treatment which includes stimulants. This demand for medication is consistent with the diagnosis of severe substance use disorder. No behavioral health evaluation while incarcerated has indicated that he had ADHD. The supporting documentation sent with his grievance, being used as evidence, are 10+ years out of date or from Wikipedia and not peer reviewed. He has no documented medical problems that could be confused with, or cause exacerbation of ADHD and review of his labs for the last 24 years show essentially normal. Review of Behavioral Health encounters reveal frequent episodes of non-cooperative behavior and frequent self-harming behavior.

**RECOMMENDATION:**
1. Continue to work with and cooperate with the Behavioral Health professionals that are trying to help. If ADHD is a possible diagnosis, they would be the professionals that would determine that.
2. Continue vigilance on the part of Behavioral Health, due to his self-harm.

This reviewer supports Dr. Worley's behavioral health recommendations.
This reviewer does not find any medical issues that could be causing or exacerbating his behavior.

**Darcie Holthaus**
**Secretary of Corrections Designee**

CC:      Warden
        Centurion's Regional Medical Director
        Site H.S.A.
        Dudley, James #91359
        File
The original response was mailed to the offender by way of United States Mail on _____.

The information provided in the response above concerning the grievant's medical and/or mental health condition and treatment is confidential and private in nature, and is not intended for re-disclosure or sharing with third parties. That statement, however, does not apply to exercise of any other administrative remedies provided by the Kansas Department of Corrections, nor to pursuit of other administrative relief connected with medical and/or mental health condition and treatment, such as, for example, application for disability benefits under state or federal law, or to pursuit of litigation concerning the adequacy or propriety of medical and/or mental health care diagnosis and treatment furnished to the grievant.





714 S.W. Jackson St., Suite 300
Topeka, KS 66603

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@doc.ks.gov
doc.ks.gov

**Department of Corrections**

Jeff Zmuda, Secretary

Laura Kelly, Governor

## Non-Grievance-Response

**FACILITY:** Lansing Correctional Facility

**OFFENDER:** DUDLEY, JAMES #91359

**COMPLAINT TYPE:** The offender contacted the Department

**DATE:** 2/7/2022

**COMPLAINT:**
The concerns regard behavioral health services.

**FINDINGS OF FACTS BY CLINICAL REVIEWER:**
The Kansas Department of Corrections Medical Health Authorities reviewed the correspondence, site response, and EHR. The offender claims he was treated with shock therapy and drugs that inhibit his functioning. At his most recent behavioral health onsite consult, he refused to talk, said that he had given back all of his KOP medication and stated that his only issue is ADHD and that no one will treat it. Per the site response, he is noncompliant with medications. At his last telehealth visit, he asked to stop his Olanzapine since he had no illness which required it. Per the chart, no evidence could be found of shock therapy. A non-comprehensive review of the medical record suggests that he has been complaining for months about suffering from ADHD. However, it is not clear that this has ever been explored by behavioral health services. That is, there was no clear indication that they have attempted to elicit what he believes to be his symptoms nor what his goals for treatment of these might be, beyond being prescribed stimulant medications. As such, there is no indication in the chart that non-pharmacological approaches have been offered to him regarding his concerns about ADHD. There are several psychiatric entries indicating that the offender has requested stimulants be prescribed but these have been denied and the offender informed that they will not be prescribed within the prison setting. Additionally, per his report and the chart, it appears he has consistently refused his prescription for Zyprexa since it was first begun in August 2021. The offender has received several diagnoses over the course of the last year. However, the only current diagnosis is that of Acute Stress Disorder, though it is not clear what the symptoms are that led to that diagnosis.

**CONCLUSIONS MADE BY CLINICAL REVIEWER:**
Recommend the behavioral health staff consider working with the offender to determine what he believes are the primary symptoms from which he is suffering and determine what approaches they may be able to assist him with to reduce those symptoms. In addition, recommend the psychiatric team consider working with behavioral health staff to more fully assess his overall functioning to determine any current psychiatric diagnoses and then to the extent that he is willing, to work collaboratively with the offender on any suggested medications or behavioral health interventions to treat the symptoms related to those diagnoses.

**ACTION TAKEN:**
Recommendations have been forwarded to Centurion's Regional Medical Director.

Darcie Holthaus
Secretary of Corrections Designee

CC:     Warden
        Centurion's Regional Medical Director
        Site H.S.A.
        Dudley, James #91359
        File
The original response was mailed to the offender by way of United States Mail on _____.

The information provided in the response above concerning the grievant's medical and/or mental health condition and treatment is confidential and private in nature, and is not intended for re-disclosure or sharing with third parties. That statement, however, does not apply to exercise of any other administrative remedies provided by the Kansas Department of Corrections, nor to pursuit of other administrative relief connected with medical and/or mental health condition and treatment, such as, for example, application for disability benefits under state or federal law, or to pursuit of litigation concerning the adequacy or propriety of medical and/or mental health care diagnosis and treatment furnished to the grievant.


49

IMPORTANT: HOW TO USE THIS INFORMATION: This is a summary and does NOT have all possible information about this product. This information does not assure that this product is safe, effective, or appropriate for you. This information is not individual medical advice and does not substitute for the advice of your health care professional. Always ask your health care professional for complete information about this product and your specific health needs.

BUPROPION SUSTAINED-RELEASE (ANTIDEPRESSANT) - ORAL (bue-PROE-pee-on)

COMMON BRAND NAME(S): Wellbutrin SR

WARNING: Bupropion is an antidepressant used for smoking cessation and to treat a variety of conditions, including depression and other mental/mood disorders. Antidepressants can help prevent suicidal thoughts/attempts and provide other important benefits. However, a small number of people (especially people younger than 25) who take antidepressants for any condition may experience new or worsening depression, other mental/mood symptoms, or suicidal thoughts/attempts. Therefore, it is very important to talk with the doctor about the risks and benefits of antidepressant medication, even if treatment is not for a mental/mood condition. Tell the doctor right away if you notice new or worsening depression/other psychiatric conditions, unusual behavior changes (including possible suicidal thoughts/attempts), or other mental/mood changes (including new/worsening anxiety, panic attacks, trouble sleeping, irritability, hostile/angry feelings, impulsive actions, severe restlessness, very rapid speech). Be especially watchful for these symptoms when a new antidepressant is started or when the dose is changed. If you are using bupropion to quit smoking and experience any of these symptoms, stop taking it and contact your doctor right away. Also, tell your doctor right away if you have any of these symptoms after stopping treatment with bupropion.

USES: This medication is used to treat depression. It can improve your mood and feelings of well-being. It may work by restoring the balance of certain natural substances (dopamine, norepinephrine) in the brain.

OTHER USES: This section contains uses of this drug that are not listed in the approved professional labeling for the drug but that may be prescribed by your health care professional. Use this drug for a condition that is listed in this section only if it has been so prescribed by your health care professional. This drug may also be used for other mental/mood disorders (such as attention deficit hyperactivity disorder-ADHD, seasonal affective disorder, depressive phase of bipolar disorder). It may be used to help people quit smoking by lessening cravings and nicotine withdrawal. It may also be used to for binge eating disorder (BED).

HOW TO USE: Read the Medication Guide provided by your pharmacist before you start using bupropion and each time you get a refill. If you have any questions, ask your doctor or pharmacist. Take this medication by mouth with or without food as directed by your doctor, usually twice a day. If you have stomach upset, you may take this medication with or after a meal or snack. Take the first dose as soon as you wake up in the morning and the second dose at least 8 hours later, or take as directed by your doctor. Taking this medication late in the day may cause trouble sleeping (insomnia). Take this medication regularly to get the most benefit from it. To help you remember, take it at the same times each day. Do not crush or chew this medication. Doing so can release all of the drug at once, increasing the risk of side effects. Also, do not split the tablets unless they have a score line and your doctor or pharmacist tells you to do so. Swallow the whole or split tablet without crushing or chewing. The dosage is based on your medical condition, liver function, and response to treatment. To reduce your risk of side effects, your doctor may direct you to start this medication at a low dose and gradually increase your dose. Do not increase your dose or use this drug more often or for longer than prescribed. Your condition will not improve any faster and your risk of side effects will increase. Do not stop taking this medication without consulting your doctor. Your dose may need to be gradually decreased. It may take 4 weeks or longer before you get the full benefit of this drug. Tell your doctor if your condition does not improve or if it worsens.

SIDE EFFECTS: See also Warning section. Dry mouth, sore throat, dizziness, nausea, vomiting, ringing in the ears, headache, decreased appetite, weight loss, constipation, trouble sleeping, increased sweating, or shaking (tremor) may occur. If any of these effects persist or worsen, tell your doctor or pharmacist promptly. An empty tablet shell may appear in your stool. This effect is harmless because your body has already absorbed the medication. Remember that your doctor has prescribed this medication because he or she has judged that the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects. This medication may raise your blood pressure. Check your blood pressure regularly and tell your doctor if the results are high. Tell your doctor right away if you have any serious side effects, including: fast/pounding/irregular heartbeat, mental/mood changes (such as anxiety, agitation, confusion, unusual behavior/thinking, memory loss), unusual weight loss or gain. Stop taking bupropion and get medical help right away if you have any very serious side effects, including: seizure, eye pain/swelling/redness, widened pupils, vision changes (such as seeing rainbows around lights at night, blurred vision). A very serious allergic reaction to this drug is rare. However, get medical help right away if you notice any symptoms of a serious allergic reaction, including: rash, itching/swelling (especially of the face/tongue/throat), painful sores in the mouth/around the eyes, severe dizziness, trouble breathing. This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist. In the US - Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088 or at www.fda.gov/medwatch. In Canada - Call your doctor for medical advice about side effects. You may report side effects to Health Canada at 1-866-234-2345.

PRECAUTIONS: Before taking bupropion, tell your doctor or pharmacist if you are allergic to it; or if you have any other allergies. This product may contain inactive ingredients, which can cause allergic reactions or other problems. Talk to your pharmacist for more details. Before using this medication, tell your doctor or pharmacist your medical history, especially of: diabetes, heart disease, high blood pressure, kidney problems, liver disease, use/abuse of drugs/alcohol, seizures or conditions that increase your risk of seizures (including brain/head injury, brain tumor, eating disorders such as bulimia/anorexia nervosa), personal or family history of glaucoma (angle-closure type). This medication should not be used if you are suddenly stopping



regular use of sedatives (including benzodiazepines such as lorazepam), drugs used to treat seizures, or alcohol. Doing so may increase your risk of seizures. This drug may make you dizzy. Alcohol or marijuana (cannabis) can make you more dizzy. Do not drive, use machinery, or do anything that needs alertness until you can do it safely. Avoid alcoholic beverages. Talk to your doctor if you are using marijuana (cannabis). Alcohol can also increase your risk of seizures. Before having surgery, tell your doctor or dentist about all the products you use (including prescription drugs, nonprescription drugs, and herbal products). Older adults may be more sensitive to the side effects of this drug, especially dizziness and memory loss. Dizziness can increase the risk of falling. During pregnancy, this medication should be used only when clearly needed. Since untreated mental/mood problems (such as depression, seasonal affective disorder, bipolar disorder) can be a serious condition, do not stop taking this medication unless directed by your doctor. If you are planning pregnancy, become pregnant, or think you may be pregnant, immediately discuss with your doctor the benefits and risks of using this medication during pregnancy. This drug passes into breast milk and may have undesirable effects on a nursing infant. Consult your doctor before breast-feeding.

DRUG INTERACTIONS:  See also Precautions section. Drug interactions may change how your medications work or increase your risk for serious side effects. This document does not contain all possible drug interactions. Keep a list of all the products you use (including prescription/nonprescription drugs and herbal products) and share it with your doctor and pharmacist. Do not start, stop, or change the dosage of any medicines without your doctor's approval. Some products that may interact with this drug include: codeine, pimozide, tamoxifen, thioridazine. Taking MAO inhibitors with this medication may cause a serious (possibly fatal) drug interaction. Avoid taking MAO inhibitors (isocarboxazid, linezolid, methylene blue, moclobemide, phenelzine, procarbazine, rasagiline, safinamide, selegiline, tranylcypromine) during treatment with this medication. Most MAO inhibitors should also not be taken for two weeks before and after treatment with this medication. Ask your doctor when to start or stop taking this medication. This medication may interfere with certain medical/laboratory tests (including brain scan for Parkinson's disease, urine screening for amphetamines), possibly causing false results. Tell laboratory personnel and all your doctors you use this drug.

OVERDOSE:  If someone has overdosed and has serious symptoms such as passing out or trouble breathing, call 911. Otherwise, call a poison control center right away. US residents can call their local poison control center at 1-800-222-1222. Canada residents can call a provincial poison control center. Symptoms of overdose may include: seizures, severe confusion, hallucinations, rapid heart rate, loss of consciousness.

NOTES:  Do not share this medication with others. Keep all regular medical and psychiatric appointments. Laboratory and/or medical tests (such as blood pressure, liver function) may be performed periodically to monitor your progress or check for side effects. Consult your doctor for more details.

MISSED DOSE:  If you miss a dose, skip the missed dose. Take your next dose at the regular time. Do not double the dose to catch up.

STORAGE:  Store at room temperature away from light and moisture. You may notice an odor from the tablets; this is normal and does not affect how they work. Do not store in the bathroom. Keep all medications away from children and pets. Do not flush medications down the toilet or pour them into a drain unless instructed to do so. Properly discard this product when it is expired or no longer needed. Consult your pharmacist or local waste disposal company.

Information last revised October 2020. Copyright(c) 2020 First Databank, Inc.

IMPORTANT: HOW TO USE THIS INFORMATION:  This is a summary and does NOT have all possible information about this product. This information does not assure that this product is safe, effective, or appropriate for you. This information is not individual medical advice and does not substitute for the advice of your health care professional. Always ask your health care professional for complete information about this product and your specific health needs.

HYDROXYZINE PAMOATE - ORAL (hye-DROX-i-zeen PAM-oh-ate)

COMMON BRAND NAME(S): Vistaril

USES:  Hydroxyzine is used to treat itching caused by allergies. It is an antihistamine and works by blocking a certain natural substance (histamine) that your body makes during an allergic reaction. Hydroxyzine may also be used short-term to treat anxiety or to help you feel sleepy/relaxed before and after surgery.

HOW TO USE:  Take this medication by mouth with or without food as directed by your doctor, usually three or four times daily. The dosage is based on your age, medical condition, and response to treatment. In children, the dosage may also be based on weight. Do not increase your dose or take this medication more often than directed. Tell your doctor if your condition does not improve or if it worsens.

SIDE EFFECTS:  Drowsiness, dizziness, blurred vision, constipation, or dry mouth may occur. If any of these effects persist or worsen, tell your doctor or pharmacist promptly. To relieve dry mouth, suck (sugarless) hard candy or ice chips, chew (sugarless) gum, drink water, or use a saliva substitute. Remember that your doctor has prescribed this medication because he or she has judged that the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects. Tell your doctor right away if you have any serious side effects, including: mental/mood changes (such as restlessness, confusion, hallucinations), shaking (tremor), difficulty urinating. Get medical help right away if you have any very serious side effects, including: seizures, fast/irregular heartbeat, severe dizziness, fainting. A very serious allergic reaction to this drug is rare. However, get medical help right away if you notice any symptoms of a serious allergic reaction, including: rash, itching/swelling (especially of the face/tongue/throat), severe dizziness, trouble breathing. This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist. In the US - Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088 or at www.fda.gov/medwatch. In Canada - Call your doctor for medical advice about side effects. You may report side effects to Health Canada at 1-866-234-2345.

PRECAUTIONS:  Before taking hydroxyzine, tell your doctor or pharmacist if you are allergic to it; or to cetirizine; or to levocetirizine; or if you have any other allergies. This product may contain inactive ingredients, which can cause allergic reactions or other problems. Talk to your pharmacist for more details. Before using this medication, tell your doctor or pharmacist your medical history, especially of: breathing problems (such as emphysema, asthma), high pressure in the eye (glaucoma), high blood pressure, kidney problems, liver problems, seizures, stomach/intestine problems (such as ulcer, blockage), overactive thyroid (hyperthyroidism), difficulty urinating (for example, due to enlarged prostate). Hydroxyzine may cause a condition that affects the heart rhythm (QT prolongation). QT prolongation can rarely cause serious (rarely fatal) fast/irregular heartbeat and other symptoms (such as severe dizziness, fainting) that need medical attention right away. The risk of QT prolongation may be increased if you have certain medical conditions or are taking other drugs that may cause QT prolongation. Before taking hydroxyzine, tell your doctor or pharmacist of all the drugs you take and if you have any of the following conditions: certain heart problems (heart failure, slow heartbeat, QT prolongation in the EKG), family history of certain heart problems (QT prolongation in the EKG, sudden cardiac death). Low levels of potassium or magnesium in the blood may also increase your risk of QT prolongation. This risk may increase if you use certain drugs (such as diuretics/"water pills") or if you have conditions such as severe sweating, diarrhea, or vomiting. Talk to your doctor about taking hydroxyzine safely. This drug may make you dizzy or drowsy or blur your vision. Alcohol or marijuana (cannabis) can make you more dizzy or drowsy. Do not drive, use machinery, or do anything that needs alertness or clear vision until you can do it safely. Avoid alcoholic beverages. Talk to your doctor if you are using marijuana (cannabis). Before having surgery, tell your doctor or dentist about all the products you use (including prescription drugs, nonprescription drugs, and herbal products). Children may be more sensitive to the side effects of this drug. This drug can often cause excitement in young children instead of drowsiness. Older adults may be more sensitive to the side effects of this drug, especially drowsiness, confusion, constipation, trouble urinating or QT prolongation (see above). Drowsiness and confusion can increase the risk of falling. During pregnancy, this medication should be used only when clearly needed. Discuss the risks and benefits with your doctor. It is unknown if this drug passes into breast milk. Consult your doctor before breast-feeding.

DRUG INTERACTIONS:  Drug interactions may change how your medications work or increase your risk for serious side effects. This document does not contain all possible drug interactions. Keep a list of all the products you use (including prescription/nonprescription drugs and herbal products) and share it with your doctor and pharmacist. Do not start, stop, or change the dosage of any medicines without your doctor's approval. Tell your doctor or pharmacist if you are taking other products that cause drowsiness such as opioid pain or cough relievers (such as codeine, hydrocodone), alcohol, marijuana (cannabis), drugs for sleep or anxiety (such as alprazolam, lorazepam, zolpidem), muscle relaxants (such as carisoprodol, cyclobenzaprine), or other antihistamines (such as diphenhydramine, promethazine). Check the labels on all your medicines (such as allergy or cough-and-cold products) because they may contain ingredients that cause drowsiness. Ask your pharmacist about using those products safely. Do not use with any other antihistamines applied to the skin (such as diphenhydramine cream, ointment, spray) because increased side effects may occur. Hydroxyzine is very similar to cetirizine and levocetirizine. Do not use these medications while using hydroxyzine. This medication may interfere with certain laboratory tests (including allergy skin testing, urine corticosteroids level), possibly causing false test results. Make sure laboratory personnel and all your

52

## BioReference LABORATORIES

| | |
|---|---|
| **DOCTOR** | 107860890-3   DUDLEY, JAMES |
| EL DORADO CF/RDU<br>1737 SE HIGHWAY 54          FX<br>EL DORADO, KS  67042<br>(316) 321-7284    (K2003-4) | DUDLEY, JAMES / DUDLEY, JAMES<br>DUDLEY, JAMES / DUDLEY, JAMES<br>-FINAL- Original Report 04/19/2008 |

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| DUDLEY, JAMES | 91359 | EL DORADO CF/RDU |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 107860890 | 04/18/2008 | 04/18/2008 03:09 | 4/19/2008 14:05 | 19 Y | M |

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|

Comment :
NONFASTING

------------------------------ * CHEMISTRY *------------------------------

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|
| Total Protein | 8.0 | | 5.9-8.4 | gm/dl |
| Albumin | 5.0 | | 3.2-5.2 | gm/dl |
| Globulin | 3.0 | | 1.7-3.7 | gm/dL |
| A/G Ratio | 1.7 | | 1.1-2.9 | |
| Glucose | 90 | | 70-99 | mg/dL |
| Sodium | 140 | | 133-145 | mmol/L |
| Potassium | 4.7 | | 3.3-5.3 | mmol/L |
| Chloride | 101 | | 96-108 | mmol/L |
| CO2 | 24 | | 21-29 | mmol/L |
| BUN | 13 | | 7-25 | mg/dl |
| * Creatinine | 0.9 | | 0.6-1.3 | mg/dl |
| BUN/Creat Ratio | 14.4 | | 10-28 | |
| Calcium | 9.8 | | 8.4-10.4 | mg/dl |
| Uric Acid | 4.2 | | 2.4-7.0 | mg/dl |
| Iron | 146 | | 30-160 | mcg/dl |
| Bilirubin, Total | 0.4 | | 0.1-1.0 | mg/dl |
| LDH | 203 | | 94-250 | u/l |
| Alk Phos | 110 | | 39-120 | u/l |
| AST (SGOT) | 26 | | < 37 | u/l |
| Phosphorous | 4.8 | HI | 2.6-4.5 | mg/dl |
| ALT (SGPT) | 43 | HI | 40 | u/L |
| G-GTP | 100 | HI | 7-51 | u/L |

******************************************************************
* GFR, Estimated = 107.88 mL/min/1.73m2

******************************************************************
GFR (Glomerular Filtration Rate) calculation utilizes the MDRD formula
(Modification of Diet in Renal Disease Study Group) and assumes a normal
adult body surface area of 1.73.  If the patient is African American
multiply result reported by 1.21. (Ref. National Kidney Disease Educa.
Program.)
     ***** Male/Female reference range: >60 mL/min/1.73 m2 *****
Note: A calculated GFR of <60 mL suggests chronic kidney disease, but
only if found consistently over at least 3 months.  A calculated
result of <15 mL is consistent with renal failure.

Continued on Next Page                                    Page: 1

James Weisberger, M.D.
LABORATORY DIRECTOR

481 EDWARD H. ROSS DR.
ELMWOOD PARK, NJ 07407

S3

**BioReference LABORATORIES**

107860890-3   DUDLEY, JAMES

| DUDLEY, JAMES | DUDLEY, JAMES |
| DUDLEY, JAMES | DUDLEY, JAMES |

DOCTOR
EL DORADO CF/RDU          FX
1737 SE HIGHWAY 54
EL DORADO, KS  67042
(316) 321-7284   (K2003-4)

PATIENT I.D. / ROOM NO.   91359

-FINAL- Original Report 04/19/2008

DOCTOR / GROUP NAME
EL DORADO CF/RDU

NAME
DUDLEY, JAMES

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 107860890 | 04/18/2008 | 04/18/2008 03:09 | 4/19/2008 14:05 | 19 Y | M |

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|

---------------------* CARDIOVASCULAR/LIPIDS *-----------------------

| Test Description | Result | | Abnormal | Reference Range | |
|---|---|---|---|---|---|
| Cholesterol | 163 | | | < 200 | mg/dl |
| Triglycerides | 128 | | | < 151 | mg/dl |
| HDL CHOL., DIRECT | 50 | | | >35 | mg/dl |
| HDL as % of Cholesterol | 31 | (> 25) | BELOW AVERAGE RISK | | % |
| Chol/HDL Ratio | 3.26 | (<4.2) | BELOW AVERAGE RISK | | |
| LDL/HDL Ratio | 1.76 | | | 0-3.55 | |
| LDL Cholesterol | 88 | | | < 100 | mg/dL |

---------------------* HEMATOLOGY *-----------------------

| | | | |
|---|---|---|---|
| WBC | 6.2 | 3.40-11.80 | x10(3) |
| RBC | 5.1 | 4.20-5.90 | x10(6) |
| HGB | 15.4 | 12.3-17.0 | gm/dl |
| HCT | 45.5 | 39.3-52.5 | % |
| MCV | 89.4 | 80.0-100.0 | FL |
| MCH | 30.3 | 25.0-34.1 | pg |
| MCHC | 33.8 | 29.0-34.0 | gm/dl |
| RDW | 12.2 | 10.9-16.9 | % |
| POLYS | 49 | 36-78 | % |
| LYMPHS | 37 | 12-48 | % |
| EOS | 5 | 0-8 | % |
| BASOS | 0 | 0-2 | % |
| MONOS | 9 | 0-13 | % |
| Platelet Count | 288 | 144-400 | x10(3) |

---------------------* MISCELLANEOUS *-----------------------

| | | | |
|---|---|---|---|
| TSH | 3.550 | 0.27-4.2 | uIU/mL |
| THYROXINE(T4) | 5.8 | 4.5-12.0 | ug/dL |
| T3 UPTAKE | 36.1 | 24.3-39.0% | |
| FREE T4 INDEX | 2.1 | 1.1-4.5 | |

Page: 2

(CIRCLE CHOICE)
Comments: 1. Insignificant Lab; Do it needed
2. Significant lab; See Progress Notes

5/5/08
Review Date/Time

Signature of Reviewer

James Weisberger, M.D.

481 EDWARD H. ROSS DF
ELMWOOD PARK, NJ 074G
1-800-229-LAB
7707 1/C

54

**BioReference**
LABORATORIES

| D O C T O R | EL DORADO CF/CENTRAL<br>1737 SE HIGHWAY 54    FX<br>EL DORADO, KS  67042<br>(316) 321-7284   (K2001-8) |
|---|---|

PLACE ON REQUISITION

104060041-1  DUDLEY, JAMES

| TUBE LABEL | TUBE LABEL |
|---|---|
| DUDLEY, JAMES | DUDLEY, JAMES |
| TUBE LABEL | TUBE LABEL |
| DUDLEY, JAMES | DUDLEY, JAMES |

FINAL - Original Report 08/06/2009

| NAME<br>DUDLEY, JAMES | PATIENT I.D. / ROOM NO.<br>91359 | DOCTOR / GROUP NAME<br>BOKOR, SUE | | |
|---|---|---|---|---|
| LAB I.D. NO.<br>104060041 | DATE COLLECTED<br>08/04/2009 | DATE RECEIVED<br>08/06/2009 10:21 | DATE OF REPORT<br>8/7/2009 09:49 | AGE<br>21 Y | SEX<br>M |

Test Description          Result        Abnormal    Reference Range

----------------------------- * CHEMISTRY *-----------------------------

| Test | Result | Reference Range | Units |
|---|---|---|---|
| Total Protein | 7.2 | 5.9-8.4 | gm/dl |
| Albumin | 4.7 | 3.2-5.2 | gm/dl |
| Globulin | 2.5 | 1.7-3.7 | gm/dL |
| A/G Ratio | 1.9 | 1.1-2.9 | |
| Glucose | 93 | 70-99 | mg/dL |
| Sodium | 139 | 133-145 | mmol/L |
| Potassium | 4.7 | 3.3-5.3 | mmol/L |
| Chloride | 104 | 96-108 | mmol/L |
| $CO_2$ | 22 | 21-29 | mmol/L |
| BUN | 12 | 7-25 | mg/dl |
| Creatinine | 1.1 | 0.6-1.3 | mg/dl |
| e-GFR | 84 | > 60 mL/min/1.73m2 | |
| BUN/Creat Ratio | 10.9 | 10-28 | |
| Calcium | 9.2 | 8.4-10.4 | mg/dl |
| Uric Acid | 4.8 | 2.4-7.0 | mg/dl |
| Iron | 73 | 30-160 | mcg/dl |
| Bilirubin, Total | 0.4 | 0.1-1.0 | mg/dl |
| LDH | 192 | 94-250 | u/l |
| Alk Phos | 93 | 39-120 | u/l |
| AST (SGOT) | 22 | < 37 | u/l |
| Phosphorous | 4.4 | 2.6-4.5 | mg/dl |
| ALT (SGPT) | 28 | < 40 | u/L |
| G-GTP | 35 | 7-51 | u/L |

*****************************************************************
GFR (Glomerular Filtration Rate) calculation utilizes the MDRD formula
(Modification of Diet in Renal Disease Study Group) and assumes a normal
adult body surface area of 1.73.  If the patient is African American
multiply result reported by 1.21. (Ref. National Kidney Disease Educa.
Program.)
     ***** Male/Female reference range: >60 mL/min/1.73 m2 *****
Note: A calculated GFR of <60 mL suggests chronic kidney disease, but
only if found consistently over at least 3 months.  A calculated
result of <15 mL is consistent with renal failure.

Continued on Next Page

Page: 1



es Weissberger, M.D.
RATORY DIRECTOR

481 EDWARD H. ROSS DR.
ELMWOOD PARK, NJ 07407
1-800-229-LABS

SS

**BioReference**
L A B O R A T O R I E S

| PLACE ON REQUISITION | | |
|---|---|---|
| 104060041-1  DUDLEY, JAMES | | |
| TUBE LABEL | | TUBE LABEL |
| DUDLEY, JAMES | | DUDLEY, JAMES |
| TUBE LABEL | | TUBE LABEL |
| DUDLEY, JAMES | | DUDLEY, JAMES |

**DOCTOR**

EL DORADO CF/CENTRAL
1737 SE HIGHWAY 54        FX
EL DORADO, KS  67042
(316) 321-7284   (K2001-8)

-FINAL- Original Report 08/06/2009

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| DUDLEY, JAMES | 91359 | BOKOR, SUE |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104060041 | 08/04/2009 | 08/06/2009 10:21 | 8/7/2009 09:49 | 21 Y | M |

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|
| ------------------------* CARDIOVASCULAR/LIPIDS *------------------------ | | | | |
| Cholesterol | 114 | | < 200 | mg/dl |
| Triglycerides | 81 | | < 151 | mg/dl |
| HDL CHOL.,DIRECT | 45 | | >40 | mg/dl |
| HDL as % of Cholesterol | 39 | (> 25) | BELOW AVERAGE RISK | % |
| Chol/HDL Ratio | 2.53 | (<4.2) | BELOW AVERAGE RISK | |
| LDL/HDL Ratio | 1.18 | | 0-3.55 | |
| LDL Cholesterol | 53 | | < 100 | |
| ------------------------* HEMATOLOGY *------------------------ | | | | |
| WBC | 7.2 | | 3.40-11.80 | x10(3) |
| RBC | 4.8 | | 4.20-5.90 | x10(6) |
| HGB | 14.3 | | 12.3-17.0 | gm/dl |
| HCT | 45.6 | | 39.3-52.5 | % |
| MCV | 94.4 | | 80.0-100.0 | FL |
| MCH | 29.6 | | 25.0-34.1 | pg |
| MCHC | 31.4 | | 29.0-35.0 | gm/dl |
| RDW | 12.8 | | 10.9-16.9 | % |
| POLYS | 47 | | 36-78 | % |
| LYMPHS | 40 | | 12-48 | % |
| EOS | 6 | | 0-8 | % |
| BASOS | 0 | | 0-2 | % |
| MONOS | 7 | | 0-13 | % |
| Platelet Count | 242 | | 144-400 | x10(3) |
| ------------------------* MISCELLANEOUS *------------------------ | | | | |
| TSH | 3.130 | | 0.27-4.2 uIU/mL | |
| THYROXINE(T4) | 7.1 | | 4.5-12.0 ug/dL | |
| T3 UPTAKE | 34.6 | | 24.3-39.0% | |
| FREE T4 INDEX | 2.5 | | 1.1-4.5 | |

(circle choice) Final Report                                   Page: 2

**Comments:** 1. Insignificant lab; NO F/U needed

2. Significant lab; See Progress Notes

8/11/09

Review Date/Time

Signature of Reviewer



RECEIVED
AUG 10 2009
By

es Weisberger, M.D.
RATORY DIRECTOR

481 EDWARD H. ROSS DR.
ELMWOOD PARK, NJ 07407
1-800-229-LABS



GE MAC1200          DUDLEY, JAMESS 0000091359, EDCF
Male, 22 Years (08/01/1988)

HR **71** bpm

Measurement Results:
QRS                    88 ms
QT/QTcB        386 /   419 ms
PR        :            140 ms
P         :            104 ms
RR/PP     :    864 /   845 ms
P/QRS/T     73/  63/  59 degrees

Interpretation:
12SL - Interpretation:
Sinus rhythm with sinus arrhythmia
Normal ECG

Unconfirmed report.

Cart# 1      Site# 1
Jun/30/2011  19:45:40    25mm/s   10mm/mU  ADS   60Hz  0.08 - 150Hz  4x2.5R1  12 Lead    U6.2 12i (2)      12SL8u231

# Welch Allyn CardioPerfect Workstation

| | | | |
|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 1/6/2011 5:36:17 PM |
| Number: | 91359 | Recorded by: | dccentral\ccs-ekg |
| Gender: | Male | Referring physician: | |
| Birthdate: | 8/1/1988     22 years | Location: | EDCF Central |
| | | Comment: | |

UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW
sinus rhythm
Normal ECG.



| | |
|---|---|
| P / PR: | 107 ms  / 143 ms |
| QRS: | 87 ms |
| QT / QTc / QTd: | 384 ms / 387 ms / - |
| P/QRS/T axis: | 73°   / 71°   / 54° |
| Heartrate: | 61 bpm |

99% O2 Sats RA

B/P 128/78
P. 73
R. 14



Welch Allyn CardioPerfect Workstation

| | | | | | |
|---|---|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 1/6/2011 5:36:17 PM | UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW | |
| Number: | 91359 | Recorded by: | dccentral\ccs-ekg | sinus rhythm | |
| Gender: | Male | Referring physician: | | | |
| Birthdate: | 8/1/1988    22 years | Location: | EDCF Central | Normal ECG | |
| | | Comment: | | | |

| | |
|---|---|
| P / PR: | 107 ms  / 143 ms |
| QRS: | 87 ms |
| QT / QTc / QTd: | 384 ms  / 387 ms / - |
| P/QRS/T axis: | 73°  / 71° / 54° |
| Heartrate: | 61 bpm |



**Welch Allyn CardioPerfect Workstation**

| | | | | | |
|---|---|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 1/6/2011 5:36:17 PM | UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW |
| Number: | 91359 | Recorded by: | dccentral\ccs-ekg | sinus rhythm |
| Gender: | Male | Referring physician: | | |
| Birthdate: | 8/1/1988    22 years | Location: | EDCF Central | Normal ECG |
| | | Comment: | | |

| | |
|---|---|
| P / PR: | 107 ms  /  143 ms |
| QRS: | 87 ms |
| QT / QTc / QTd: | 384 ms  / 387 ms  / - |
| P/QRS/T axis: | 73°   / 71°   / 54° |
| Heartrate: | 61 bpm |



# CCS CardioPerfect Workstation

| | | | |
|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 5/6/2010 5:22:21 PM |
| Number: | 91359 | Recorded by: | DCCENTRAL\edcfekg |
| Gender: | Male | Referring physician: | |
| Birthdate: | 8/1/1988     21 years | Location: | EDCF Central |
| | | Comment: | |

UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW
sinus arrhythmia

Normal variant of ECG

P / PR:              100 ms  / 130 ms
QRS:                 83 ms
QT / QTc / QTd:      373 ms  / 447 ms  / -
P/QRS/T axis:        78°  / 53°  / 66°
Heartrate:           86 bpm







Re: Dudley 91359: Stat EKG

## Brawner, Victoria LPN

**From:**      Mehmood, Farhat
**Sent:**      Saturday, September 20, 2008 4:36 PM
**To:**        Vest, Jennifer RN; EKG OVERREAD - Stat
**Cc:**        HCF Nurses
**Subject:** Re: Dudley 91359: Stat EKG

Normal sinus rhythm. Normal ECG.

----- Original Message -----
From: Vest, Jennifer RN <vestje@doc.ks.gov>
To: EKG OVERREAD - Stat <EKGOVERREAD-Stat@doc.ks.gov>
Cc: HCF Nurses <Nurses@doc.ks.gov>
Sent: Sat Sep 20 16:31:11 2008
Subject: Dudley 91359: Stat EKG

**CCS CardioPerfect Workstation**

| | | | |
|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 5/5/2010 1:22:11 PM |
| Number: | 91359 | Recorded by: | DCCENTRAL\edcfekg |
| Sender: | Male | Referring physician: | |
| Birthdate: | 8/1/1988   21 years | Location: | EDCF Central |
| | | Comment: | |

UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW
sinus arrhythmia

Normal variant of ECG

| | |
|---|---|
| P / PR: | 105 ms / 142 ms |
| QRS: | 95 ms |
| QT / QTc / QTd: | 386 ms / 437 ms / - |
| P/QRS/T axis: | 72° / 57° / 60° |
| Heartrate: | 77 bpm |





Sequential

25.0 mm/s  10.0 mm/mV                    [0.05-35] Hz ~60 Hz.



25.0 mm/s  10.0 mm/mV                    [0.05-35] Hz ~60 Hz.

# CCS CardioPerfect Workstation

| | | | | |
|---|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 1/12/2010 9:20:36 AM | UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW |
| Number: | 91359 | Recorded by: | DCCENTRAL\edcfekg | sinus rhythm |
| Gender: | Male | Referring physician: | | |
| Birthdate: | 8/1/1988    21 years | Location: | EDCF Central | Normal ECG |
| | | Comment: | | |

| | |
|---|---|
| P / PR: | 103 ms  /  135 ms |
| QRS: | 90 ms |
| QT / QTc / QTd: | 342 ms / 409 ms / - |
| P/QRS/T axis: | 66°  /  58°  /  45° |
| Heartrate: | 86 bpm |





Sequential

I   aVR   V1   V4
II   aVL   V2   V5
III   aVF   V3   V6

25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz

II

25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz

# CCS CardioPerfect Workstation

| | | | | | |
|---|---|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 9/20/2008 4:27:28 PM | UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW | |
| Number: | 91359 | Recorded by: | DCCENTRAL\hcf-ekg | sinus rhythm | |
| Gender: | Male | Referring physician: | | | |
| Birthdate: | 8/1/1988   20 years | Location: | HCF Central Clinic | Normal ECG | |
| | | Comment: | | | |

P / PR:        110 ms / 143 ms
QRS:           87 ms
QT / QTc / QTd: 357 ms / 388 ms / -
P/QRS/T axis:  71° / 55° / 68°
Heartrate:     71 bpm



25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz.

25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz.

NSR @ 68
R Durent MD
9/21/08

**CCS CardioPerfect Workstation**

| | | | |
|---|---|---|---|
| Name: | DUDLEY, JAMES | Recorded: | 8/20/2008 9:13:53 AM |
| Number: | 91359 | Recorded by: | DCCENTRAL\hcf-ekg |
| Gender: | Male | Referring physician: | |
| Birthdate: | 8/1/1988    20 years | Location: | HCF Central Clinic |
| | | Comment: | |

UNCONFIRMED INTERPRETATION - MD SHOULD REVIEW
sinus rhythm (slow)

Normal ECG

P / PR: 110 ms / 138 ms
QRS: 87 ms
QT / QTc / QTd: 377 ms / 364 ms / -
P/QRS/T axis: 70° / 64° / 66°
Heartrate: 56 bpm

*NSR 8/20/08*

quential

I    aVR    V1    V4

II    aVL    V2    V5

III    aVF    V3    V6

25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz.

II

25.0 mm/s  10.0 mm/mV                                    [0.05-35] Hz ~60 Hz.

Re: Dudley, James 91359 Routine EKG 8/20/08 0915                    Page 1 of 1

## Vargas LPN, Faye

**From:** Mehmood, Farhat
**Sent:** Wednesday, August 20, 2008 12:15 PM
**To:** Vargas LPN, Faye
**Cc:** HCF Nurses
**Subject:** Re: Dudley, James 91359 Routine EKG 8/20/08 0915

Normal sinus rhythm. Normal ECG.

----- Original Message -----
From: Vargas LPN, Faye <Vargasf@doc.ks.gov>
To: Farhat Mehmood
Cc: HCF Nurses <Nurses@doc.ks.gov>
Sent: Wed Aug 20 09:17:15 2008
Subject: Dudley, James 91359 Routine EKG 8/20/08 0915

Please respond to all

1 of 3

December 6th 2022

EXHIBIT
#3

To: STATE OF KANSAS ADA Coordinator

KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES

555 S. Kansas Avenue

Topeka, KS 66603

(785)-296-1389


From: JAMES RICHARD DUDLEY, (#0091359)

KANSAS DEPARTMENT OF CORRECTIONS

EL DORADO CORRECTIONAL FACILITY

P.O. Box 311

El Dorado, KS 67042


In re: ADA Accommodation Appeal


Coordinator,

I was informed today (December 6th, 2022 at appx. 2:12 p.m.) by the Kansas Department of Corrections through Dr. Weeper that after her evaluation of me for a determination if I had ADHD or not that I did not have ADHD and that I was delusional disorder. I have been denied my accommodation request by a refusal of the KDOC to acknowledge, evaluate, and treat those of us prisoners with ADHD. The KDOC does not treat ADHD and instead punishes us severely for our

disorder/disability.

This is my appeal of the Kansas Department of Corrections denial of my ADHD accommodations.

I am requesting the following:

1. A second Non state professional opinion/diagnosis evaluation by a psychiatrist and/or psychologist that is an expert in ADHD.

2. An Advocate contacted and consulted with in regards to my ADA Accommodation Request for treatment of my ADHD from the Department of Justice, Office of Americans with Disabilities Act, Civil Rights Division, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530, Phone: (800)514-0383 Fax: (202)307-1198    www.ada.gov

3. An explaination as to why I have been being diagnosed by the Kansas Department for Children and Families with ADHD my entire life and now (all of a sudden) when faced with a massive lawsuit I do not have ADHD and am "cured."

4. An explanation as to ~~why~~ Dr. Weeper and the KDOC will not provide me with a copy of Dr. Weeper's evaluation report and findings.

5. I am also requesting the genetic testing be done to

confirm the presence of the genes associated with playing the key role in the cause of ADHD. (Taq 1 gene)

6. A functional MRI to test Dr. Weeper's and KDOC's claim that I do not have a nervous system (cerebral cortex) consistent with that of a human with ADHD.

These test are necessary because KDOC does not treat ADHD and punishes us ADHD solely because of our ADHD and takes all my money because I am ADHD. KDOC is taking advantage of my ADHD disability by using me as a money tree, and scape goat for the other prisoners to set an example, that example being "You all lick our asses and let us bully you or your going to end up like Dudley!"

It is KDOC's word over mine and this is 2022. America requires scientific evidence for stuff like this now because it does exist and it is 100% reliable. KDOC is going to lie about everything in an effort not to be sued.

Sincerely,

James R. Dudley



**Kansas**
Department of Corrections

Date:      July 12, 2022

To:        James Dudley #0091359

From:      KDOC Civil Rights Manager Marcelle M. Chmidling

Subject:   ADA Request for Medical Treatment


The letter you sent to the State ADA Coordinator was forwarded to me for assessment and action as deemed appropriate. Your letter does not contain an ADA issue, but rather a request for medical care/treatment.

The same requests for care/treatment were appropriate addressed in response to multiple KDOC grievances you filed.

As such, I find the previous responses you received to be final. I will not revisit or address the issue again.

*Marcelle Chmidling*

mmcc/MMCC

cc:    State ADA Coordinator
       Compliance Administrator Jorgenson
       Chief Legal Counsel

in this room have ADHD," he said, waving at the roomful of Ph.D.s. "In my opinion, they're among the very best of our professors and instructors. They're constantly noticing everything in the classroom, reacting to the kids instead of just droning on at them, and they keep things interesting."

Another professor, listening to our conversation, later told me that it was her opinion that the movie *Dead Poets Society* (starring Robin Williams) was a brilliant story about an ADHD professor in an institution that couldn't adapt to creative, high-energy people. "That movie had much to teach us all," she said.

Many ADHD adults I interviewed saw their ADHD behaviors as only minor parts of their personalities. On probing, I found that, as children, they had adults (usually a single significant teacher or parent) who believed in them and patiently worked with and through their short attention spans, leaving intact their self-esteem.

Others, however, are the walking wounded, having been battered over and over by teachers, parents, peers, and even employers—who have characterized them as lazy, oppositional, misfit, or defiant. There can be a very real downside to ADHD, as the evaluation of any prison population will show (according to several experts, most people in prison have ADHD). Forgetfulness, disorganization, impulsivity, and boredom (with the substance abuse it often leads to), can all be just as bitterly destructive as constructive. Like the knife that can be a tool of sculpture and creation—or an instrument of death, the characteristics of ADHD can mold or destroy a person's life and career.

Self-knowledge, then, is the first and most important step in turning a disorder into an asset.

According to Mark Stein, M.D., director of the Hyperactivity, Attention, and Learning Problems Clinic at the University of Chicago, where he's an associate professor of psychiatry and pediatrics: "Just having the diagnosis, just realizing what ADHD is and reconciling yourself to it, is 70 percent of the therapy." He points out that this sort of self-knowledge is, in itself, a remarkable instrument of change and empowerment for ADHD individuals.

Similarly Bert Warren, M.D., a physician in New Jersey, wrote to me saying: "I'm a child psychiatrist and haven't treated many ADHD adults, but I made the diagnosis on myself a long time ago and I've made the informal diagnosis on several of my colleagues. It was a great relief to know the diagnosis for all of us, although as practicing professionals, obviously we were competent enough to deal with it. I've been helped by having ADHD in so many ways that the occasional blurting out that I do is negligible by contrast."

As we grow up, our beliefs about who we are, how we fit into the world, and what our capabilities are, are really only stories that we tell ourselves—but they are among the most powerful forces in our lives. These stories begin in childhood with the first comments by others: "What a pretty girl you are," or, "You're a bad boy."

In later chapters we'll discuss the necessity of using this new self-knowledge of our Hunter-like qualities to take control of these internal voices and turn them to positive and supportive ends. We'll rewrite our internal scripts, and learn how to go about reliving them in a practical and powerful fashion.

These are the challenges the ADHD Hunter faces in striking out in a new direction—the distractibility, the feelings of urgency, the impulsiveness and drivenness, the sense of danger. Yet, these challenges can also be tools, which successful entrepreneurs and people in business, the arts, and government have used for hundreds of years to motivate and move them to build great institutions.

# ADHD MEDICATIONS APPROVED BY THE US FDA



## STIMULANTS

1

"X" are obviously security resolved options. No reason to deny them at all.

| Class | Brand Name | Generic Name | Duration | Available Dosage Strengths |
|---|---|---|---|---|
| Methylphenidate | Adhansia XR™ | methylphenidate hydrochloride - extended-release (capsule) | 16 hours | 25mg 35mg 45mg 55mg 70mg 85mg |
| | Azstarys™ | serdexmethylphenidate and dexmethylphenidate (capsule) | 10+ hours | 26.1mg/5.2mg 39.2mg/7.8mg 52.3mg/10.4mg |
| | Aptensio XR™ | methylphenidate hydrochloride - extended-release (capsule) | 7–8 hours | 10mg 15mg 20mg 30mg 40mg 50mg 60mg |
| | Concerta® | methylphenidate hydrochloride - extended-release (tablet) | 10–12 hours | 18mg 27mg 36mg 54mg |
| | Cotempla™XR-ODT | methylphenidate extended-release (orally disintegrating tablet) | 8–12 hours | 17.3mg |
| | Daytrana® ✗ | methylphenidate (transdermal patch) | 10–12 hours | 10mg 15mg 20mg 30mg |
| | Focalin® | dexmethylphenidate hydrochloride (tablet) | 3–5 hours | 2.5mg 5mg 10mg |
| | Focalin XR® | dexmethylphenidate hydrochloride - extended-release (capsule) | 12 hours | 5mg 10mg 15m 20mg 25mg 30mg 35mg 40mg |
| | Jornay PM™ | methylphenidate hydrochloride - extended-release (capsule) | 12+ hours | 20mg 40mg 60mg 80mg 100mg |
| | Metadate CD® | methylphenidate hydrochloride - extended-release (capsule) | 8 hours | 10mg 20mg 30mg 40mg 50mg 60mg |
| | Metadate® ER | methylphenidate hydrochloride - extended-release (tablet) | 8–12 hours | 20 mg |
| | Methylin® Chewable | methylphenidate hydrochloride (chewable tablet) | 3-5 hours | 2.5mg 5mg 10mg |
| | Methylin® ER | methylphenidate hydrochloride - extended-release (tablet) | 8 hours | 10mg 20mg |
| | Methylin® Oral Solution ✗ | methylphenidate hydrochloride (liquid) | 3–5 hours | 5mg/5ml 10mg/5ml |
| | QuilliChew ER™ ✗ | methylphenidate hydrochloride - extended-release (chewable tablet) | 8–12 hours | 20mg 30mg 40mg |
| | Quillivant XR® ✗ | methylphenidate hydrochloride - extended-release (liquid) | 8, 10, and 12 hours | 25mg/5ml (5mg/ml) |
| | Ritalin® | methylphenidate hydrochloride (tablet) | 3–5 hours | 5mg 10mg 20mg |
| | Ritalin-SR® | methylphenidate hydrochloride - sustained-release (tablet) | 7–8 hours | 20mg |
| | Ritalin LA® | methylphenidate hydrochloride - extended-release (capsule) | 8 hours | 10mg 20mg 30mg 40mg 60mg |

*Please Note that these are All Stimulants. We "Genetic" ADHD Have no other options. PERIOD. We are Not drug addicts. We are Born ysctickly depadent on Stimulants.*

# ADHD MEDICATIONS APPROVED BY THE US FDA



## NON-STIMULANTS

3

| Class | Brand Name | Generic Name | Duration | Available Dosage Strengths |
|---|---|---|---|---|
| Norepinephrine reuptake inhibitor | Strattera® | atomoxetine hydrochloride (capsule) | 24 hours | 10mg 18mg 25mg 40mg 60mg 80mg 100mg |
| | Qelbree™ | viloxazine extended-release (capsule) | 24 hours | 100mg 150mg 200mg |
| Alpha agonist | Kapvay® | clonidine hydrochloride - extended-release (tablet) | 12–24 hours | 0.1mg 0.2mg |
| | Intuniv® | guanfacine hydrochloride - extended-release (tablet) | 12–24 hours | 1mg 2mg 3mg 4mg |

US Food & Drug Administration. Medication Guides

*This chart is supported by Cooperative Agreement Number NU38DD000002 from the Centers for Disease Control and Prevention (CDC). The contents are solely the responsibility of the authors and do not necessarily represent the official views of CDC.*

© July 2021 Children and Adults with Attention-Deficit/Hyperactivity Disorder (CHADD). All Rights Reserved.

# Health Services Request Form

| For Medical Use Only | |
|---|---|
| Sólo para uso médico | |
| Date Received: | 11-22-22 |
| Time Received: | 0000 |

Print Name (Imprimir nombre): _Dudley James R_
Date of Request: _November 21st 2022_
ID #: _0091884_   Date of Birth (Fecha de nacimiento): _8/01/1988_
Housing Location (Ubicación de la vivienda): _B-1/148_
Nature of problem or request (Naturaleza del problema o solicitud): _Psychiatry. I am requesting a 120 day forwarding Exception distribution approval for Wellbutrin SR._ _an increase in dose I can continue to ..._ _... medication for a ... period ... the ... that ... ... would ... them for me. I ... of LTS and d 2 ... ... is ... ... no ... Thanks._

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

_See Document generated on 11/11/2022 by ..._

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

_____
Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este artículo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)
Triaged by: _Beth Reed_   ☑ Routine   ☐ Urgent   ☐ Emergent
Date: _11-22-22_   _11:43a_   Time: _11-22-22  7:43_
Date of Face-to-Face Visit: _____
Other: _11/22/22_

Response Recommendation (to be completed by Medical Staff only)
Initial   ☐ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☐ Mental Health   ☐ ARNP
Appointment   ☐ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☐ Mental Health   ☐ ARNP
Fee Charge   ☐ $2.00
Comments:

_____   _11/22/22_
Staff Signature                 Date

Centurion: REC-013KS
07/01/2020



# Health Services Request Form

NHH

| For Medical Use Only | |
| Sólo para uso médico | |
| Date Received: | 11-1-22 |
| Time Received: | 0100 |

Print Name (Imprimir nombre): Dudley, James R.

Date of Request: November 1st, 2022

ID #: 0091359                Date of Birth (Fecha de nacimiento): 3/01/1988

Housing Location (Ubicación de la vivienda): B-1-146

Nature of problem or request (Naturaleza del problema o solicitud): Mental Health/psychiatry. I am requesting too be allowed (1) Adzenys ER (liquid) to help me with my impulsivity and Hyperactivity, and (2) Nadolol or Inderal to help control my rage outburst/violent behavior. Thank you.

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: Thomas LPN        ☑ Routine    ☐ Urgent    ☐ Emergent

Date: 11-1-22                Time: 0100

Date of Face-to-Face Visit: 11-1-22

Other:

Response Recommendation (to be completed by Medical Staff only)

| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☑ Mental Health | ☐ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☑ Mental Health | ☐ ARNP |
| Fee Charge | ☐ $2.00 | | | | | |

Comments:

C. Alcott RN                    11-1-22

Staff Signature                Date


centurion.

# Health Services Request Form

| For Medical Use Only |
|---|
| Sólo para uso médico |
| Date Received: 10/31/22 |
| Time Received: 0000 |

Print Name (Imprimir nombre): Dudley, James, R.

Date of Request: October

ID #: 0091359    Date of Birth (Fecha de nacimiento): 8/01/1988

Housing Location (Ubicación de la vivienda): B-1/116

Nature of problem or request (Naturaleza del problema o solicitud): Central office issued an order to central off to come up with treatment for ADHD (including medications) Dr. Cardona is biased towards ADHD. She goods fired, she is completely racist towards all with ADHD. Security friendly ADHD medications are as follows: Daytrana / Methylin Oral Solution / Quillichew ER / Quillivant XR / Adderall XR / Adzenys ER / Adzenys XR-ODT / Dyanavel XR / Procentra / Vyvanse / Evekeo ODT / Strattera —

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este artículo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

---

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: Thomas LPN 8th floor   ☑ Routine   ☐ Urgent   ☐ Emergent

Date: 10/31/22  11/1/22   Time: 0000  7/11

Date of Face-to-Face Visit: 11-1-22

Other:

Response Recommendation (to be completed by Medical Staff only)

Initial   ☐ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☑ Mental Health   ☐ ARNP

Appointment   ☐ Nurse   ☐ Doctor   ☐ Dentist   ☐ Eye Doctor   ☑ Mental Health   ☐ ARNP

Fee Charge   ☐ $2.00

Comments:

C. Mack RN   11-1-77

Staff Signature   Date

Centurion: REC-013KS
07/01/2020



*Vitally Important for Officers To Be Aware of.*



# NIH Public Access
## Author Manuscript



Published in final edited form as:
*J Pediatr.* 2009 May 1; 154(5): I–S43. doi:10.1016/j.jpeds.2009.01.018.

*NIH-PA Author Manuscript*

# The Emerging Neurobiology of Attention Deficit Hyperactivity Disorder: The Key Role of the Prefrontal Association Cortex

Amy F.T. Arnsten, Ph.D.
Department of Neurobiology, Yale University School of Medicine, New Haven, CT 06510,
amy.arnsten@yale.edu, PHONE: 203-785-4431, FAX: 203-785-5263

## Abstract

Attention deficit/hyperactivity disorder (ADHD) is characterized by symptoms of inattention, impulsivity, and locomotor hyperactivity. Recent advances in neurobiology, imaging, and genetics have led to a greater understanding of the etiology and treatment of ADHD. Studies have found that ADHD is associated with weaker function and structure of prefrontal cortex (PFC) circuits, especially in the right hemisphere. The prefrontal association cortex plays a crucial role in regulating attention, behavior, and emotion, with the right hemisphere specialized for behavioral inhibition. The PFC is highly dependent on the correct neurochemical environment for proper function: noradrenergic stimulation of postsynaptic alpha-2A adrenoceptors and dopaminergic stimulation of D1 receptors is necessary for optimal prefrontal function. ADHD is associated with genetic changes that weaken catecholamine signaling and, in some patients, with slowed PFC maturation. Effective pharmacologic treatments for ADHD all enhance catecholamine signaling in the PFC and strengthen its regulation of attention and behavior. Recent animal studies show that therapeutic doses of stimulant medications preferentially increase norepinephrine and, to a lesser extent, dopamine in the PFC. These doses reduce locomotor activity and improve PFC regulation of attention and behavior through enhanced catecholamine stimulation of alpha-2A and D1 receptors. These findings in animals are consistent with improved PFC function in normal human subjects and, more prominently, in patients with ADHD. Thus, a highly cohesive story is emerging regarding the etiology and treatment of ADHD.

Attention deficit/hyperactivity disorder (ADHD) is characterized by symptoms of inattention, poor impulse control, and increased motor activity.[1] In the last 20 years, advances in the fields of neuroscience and genetics have provided new insights into this common disorder. We have learned how genetic alterations can affect neural circuits and lead to the symptoms of ADHD, and how correcting these alterations can lead to rational treatments. Much of the research on ADHD has pointed to weaknesses in the prefrontal cortex (PFC), the most highly evolved of the association cortices. The PFC regulates attention and behavior through its widespread connections to sensory and motor cortices, and to subcortical structures such as the basal ganglia and cerebellum. Imaging studies have demonstrated that patients with ADHD have alterations in PFC circuits and demonstrate weaker PFC activation while trying to regulate attention and behavior. The PFC requires optimal levels of norepinephrine (NE) and dopamine

Edited by Accardo and WFB

**Publisher's Disclaimer:** This is a PDF file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

**Author Disclosure**
Amy F.T. Arnsten, PhD has received consulting fees from Shire Pharmaceuticals, Inc, has contracted research with Shire Pharmaceuticals, Inc, and has a license agreement with Marinus Pharmaceuticals, Inc and Shire Pharmaceuticals, Inc.



Arnsten                                                                                          Page 2

(DA) for proper functioning. Genetic studies have consistently noted alterations in genes involved in catecholamine transmission in patients with ADHD. All pharmacologic treatments for ADHD strengthen catecholamine signaling in the PFC and ameliorate symptoms. This article provides a brief summary of the neurobiology of ADHD.

# OVERVIEW OF THE PREFRONTAL CORTEX

The PFC is highly developed in humans and consists of the cortex anterior to the motor and premotor cortices in the frontal lobe. The functions of the PFC are specialized by region. In right-handed individuals, portions of the left hemisphere are involved with the generation of language (e.g., Broca's area), and the right hemisphere is particularly important for the regulation of attention, behavior, and emotion.[2] The dorsal and lateral portions of the PFC regulate attention and motor responses, and the ventral and medial portions regulate emotion. [2, 3] The PFC has extensive connections throughout the brain to orchestrate thoughts and responses[4] and to provide intelligent decision making, insight, and judgment.[5, 6] The PFC is essential for the so-called executive functions, allowing us to organize and plan for the future and to inhibit responses to distractions in order to achieve a goal.[3] Not surprisingly, the PFC is the brain structure that is last to mature, with full maturation occurring only in late adolescence.[7–9] The PFC is also especially sensitive to its neurochemical environment: like Goldilocks, it needs to have everything "just right" for proper function.[10] Thus, this brain region is particularly vulnerable to environmental and genetic insults.

## Regulation of Attention

The PFC mediates "top-down" attention, regulating our attention so that we devote our resources to that which is relevant to our goals and plans.[11–15] The PFC allows us to concentrate and sustain our attention, especially under "boring conditions" such as long delays between stimuli (e.g., a teacher who talks slowly).[16] The PFC helps us to focus on material that is important but not inherently salient (e.g., studying for a test, reading homework) and to inhibit internal and external distractions.[17–21] The PFC allows us to divide and shift our attention as appropriate with task demands (so-called multi-tasking)[2, 22] and to plan and organize for the future[23] As described above, many of the attentional functions of the PFC are the purview of the right hemisphere, and lesions to this hemisphere induce distractibility and poor concentration.[24] The PFC accomplishes top-down attentional regulation through its extensive connections back to the sensory cortices for gating of sensory inputs (Figure 1)[4, 25] The PFC is able to suppress processing of irrelevant stimuli and enhance the processing of relevant stimuli through these extensive connections.

Attention problems in children with ADHD are diagnosed using the Inattention scale in the *Diagnostic and Statistical Manual of Mental Disorders (DSM), Fourth Edition*.[26] These symptoms of inattention generally refer to problems with top-down attention, as exemplified in children who are easily distracted, have difficulty sustaining attention on "boring" material but are readily captivated by more salient stimuli, e.g., they are able to attend to video games but are not able to listen to their teacher. Most children with ADHD have these problems with attention *regulation*. However, there are a few children who are truly unable to *pay* attention (usually diagnosed with attention deficit disorder [ADD], rather than ADHD), and these individuals may have problems with posterior attention systems in the parietal and temporal lobes.

The parietal and temporal sensory cortices mediate "bottom-up" aspects of attention.[15, 27] These cortical systems process stimuli according to inherent salience (e.g., are the stimuli bold, loud, brightly colored, moving), rather than their relevance. Research over the last 20 years has been particularly successful in discovering how visual stimuli are processed and perceived: the ventral stream through the temporal association cortices evaluates visual features, such as

2 of 13



lines and colors, to determine *what* things are.13, 28, 29 Thus, lesions to the inferior temporal cortices cause agnosias (not knowing what something is).[11] In contrast, the dorsal stream culminating in the parietal cortices determines *where* things are, and whether they are moving. 30, 31 The parietal association cortex is essential for orienting our attention,32, 33 with the right hemisphere specialized for orienting attention to parts of visual space, and the left hemisphere marshalling our attention to a point in time, e.g., if we are expecting an important event to occur.[34] Lesions to the right parietal cortex induce a striking syndrome known as contralateral neglect, where patients have no conscious experience of stimuli in the left visual field.35, 36

Although most children with ADHD or ADD (attention problems without hyperactivity or impulsivity) have problems with attention consistent with PFC deficits, there are likely some children who have weakness in the parietal or temporal cortices, or both, and truly have difficulties paying attention, e.g., a child who is not engaged even by video games. Unfortunately, the term "inattention" does not distinguish between these scenarios, and the current DSM criteria are not helpful in this regard. It will be important that we create better evaluation scales in the future to discern PFC vs. posterior cortical weakness, as the optimal medications for treating PFC deficits may not be ideal for treating posterior cortical problems.

### Inhibition of Inappropriate Behaviors

The PFC is also essential for the regulation of behavior, for planning future actions, and for the inhibition of inappropriate responses. For example, lesions to the PFC in monkeys induce locomotor hyperactivity and impulsive responding, similar to what is observed in children with ADHD.37–39 The PFC can guide behavioral output through its massive projections to the motor and premotor cortices, to basal ganglia structures such as the caudate and subthalamic nucleus, and to the cerebellum by way of the pons (Figure 2).40, 41 Thus, lesions in areas such as the caudate or cerebellum can sometimes mimic lesions in the PFC, as they are part of a circuit needed to guide behavioral response. In humans, the right inferior PFC is specialized for behavioral inhibition.[42] Functional imaging studies have shown that the right inferior PFC is active when subjects successfully inhibit or stop movements2, 42, 43 Conversely, lesions or weakness to this area impairs the ability to inhibit inappropriate responses.44 A recent study[45] showed that manipulations that weaken the right inferior PFC in normal subjects impaired the ability to stop an ongoing motor response (this study used a technology called transmagnetic stimulation, where magnetic pulses are directed at the brain to alter the electrical activity of the cortex beneath the skull). As described below, imaging studies have often shown that the right inferior PFC is underactive in patients with ADHD.46

### Regulation of Emotion

Whereas the dorsal and lateral portions of the PFC regulate attention and behavior, the ventral and medial portions of the PFC regulate emotion.2, 47 The ventral surface of the PFC is often referred to as the orbital cortex, as it sits just above the orbits of the eyes. The ventromedial PFC monitors and inhibits emotions and emotional habits through extensive projections to the amygdala, hypothalamus, and nucleus accumbens, as well as to brainstem nuclei mediating the stress response.48–51 Weakness in ventromedial PFC function (especially in the right hemisphere) leads to emotional dysregulation, including disinhibited aggressive impulses. 52–54 Symptoms of aggression and oppositionality (e.g., conduct disorder) are often comorbid with ADHD, particularly in boys.

### Neuronal Networks Representing Goals and Rules

The PFC regulates attention, actions, and emotion through networks of PFC neurons. These networks consist of pyramidal cells that use glutamate as their neurotransmitter (schematically illustrated in Figure 3) and are able to excite each other to maintain firing even in the absence of environmental stimulation.[55] These networks are able to "keep in mind" information to help

*J Pediatr.* Author manuscript; available in PMC 2010 June 30.

NIH-PA Author Manuscript          NIH-PA Author Manuscript          NIH-PA Author Manuscript



guide attention and behavior in a thoughtful manner. For example, they can keep in mind information about where you just left a book or your reading glasses (e.g., "the book is 90° away from the couch", as illustrated by the network of 90° cells in Figure 3). Higher-order networks appear to be able to represent goals and plans for the future (e.g., "Sit in your seat!", "Do your homework now so you can play tonight"). The neurons in these networks interact with other pyramidal cells through synapses on dendritic spines.[55] These spines contain NE alpha-2A receptors56 or DA D1 receptors,57 which dynamically alter the strength of incoming network connections and are essential to PFC function.

## CATECHOLAMINE MODULATION OF PREFRONTAL CORTEX

### Optimal Catecholamine Levels Are Needed for Proper Function

NE and DA are important components of the arousal systems that arise from the brainstem and project across the entire cortical mantle, including the PFC.[58–60] The PFC requires an optimal level of NE and DA for proper function: either too little (as when we are drowsy or fatigued) or too much (as when we are stressed) markedly impairs PFC regulation of behavior and thought.[10] This is often called the inverted U dose response, as illustrated in Figure 4. Indeed, NE and DA are so critical to PFC function that depleting them is as detrimental as removing the cortex itself.[61] As described below, genetic and imaging studies suggest that many patients with ADHD have inadequate transmission of NE or DA, or both. Treatments for ADHD all enhance NE or DA function, or both. Thus, understanding catecholamine actions in the PFC is essential to our understanding of ADHD. The receptor and intracellular mechanisms by which NE and DA influence PFC networks have now been characterized and are summarized here. In brief, NE stimulation of alpha-2A receptors enhances PFC function by strengthening appropriate network connections (increasing "signals"), and DA stimulation of D1 receptors exerts its beneficial effects by weakening inappropriate connections (decreasing "noise").[10]

### Role of Norepinephrine

The beneficial effects of moderate doses of NE occur at postsynaptic alpha-2A receptors on PFC neurons.[56, 62, 63] Research on alpha-2 actions conducted in the 1970s focused on presynaptic alpha-2 receptors on NE cells and terminals that serve as negative feedback to reduce NE cell firing and NE release.[64] However, it is now known that the majority of alpha-2 receptors in the brain are actually postsynaptic to NE cells,[65] situated, for example, on the dendritic spines of PFC pyramidal cells.[56] There are 3 subtypes of alpha-2 receptors: the A, B, and C subtypes,[66] and it is the A subtype that is most important to NE's beneficial actions in the PFC.[67]

NE alpha-2A receptor stimulation improves PFC regulation of attention, behavior, and emotion by strengthening network connections between neurons with shared inputs.[56] This is illustrated in Figure 3, which shows that stimulation of alpha-2A receptors on the spines of a 90° neuron increases the strength of inputs from other neurons that respond to 90°. Thus, alpha-2A receptor stimulation increases "signals" within PFC networks. Alpha-2A receptor stimulation strengthens network connections by closing "leaky" ion channels near the synapses on dendritic spines. These hyperpolarization-activated cyclic nucleotide-gated (HCN) ion channels pass both sodium and potassium when they are opened by cyclic adenosine monophosphate (cAMP), thus shunting nearby inputs. Stimulation of alpha-2A receptors near the HCN channels stops the production of cAMP, closing the channels and increasing the strength of nearby synaptic inputs.[56]

Stimulation of alpha-2A receptors is essential to PFC function, and blockade of these receptors with yohimbine induces a profile similar to ADHD. In monkeys, infusion of yohimbine directly into the PFC increases locomotor hyperactivity[68] and impulsivity,[69] similar to lesions of the



same area (Figure 2). Infusion of yohimbine in to prefrontal cortex also weakens working regulation of memory and attention.[70] Conversely, stimulation of alpha-2A receptors with guanfacine lessens distractibility and strengthens behavioral regulation.[56, 67, 71–75] Thus, conditions that lead to inadequate NE stimulation of alpha-2A receptors (including genetic insults in ADHD, as described below) lead to marked PFC dysfunction.

In contrast to the essential effects of moderate levels of NE, high levels of NE, such as those occurring during stress or excessive stimulant doses, impair PFC function.[76] These detrimental actions occur through engagement of alpha-1 receptors (and possibly beta-1 receptors) that have lower affinity for NE.[77–79] Stimulation of alpha-1 receptors impairs PFC function by engaging the phosphotidyl inositol intracellular signaling pathway,[80] the pathway that is altered in bipolar disorder.[81, 82] Overactivation of this pathway suppresses PFC cell firing and markedly impairs PFC function.[80]

### Role of Dopamine

As with NE, DA is essential to PFC function.[83] DA acts at the D1 family of receptors (D1 and D5) and the D2 family of receptors (D2, D3, D4). Studies of DA actions at the D2 family are just emerging. D2 receptors appear to modulate response-related firing of PFC neurons,[84] and D4 receptors are concentrated on gamma aminobutyric acid (GABA)-ergic interneurons.[85] D4 receptor stimulation appears to suppress these inhibitory GABAergic interneurons and thus allow pyramidal neurons to fire.[86] Genetic weakness in the D4 receptor (e.g., the 7-repeat that is more common in ADHD) should lead to excessive GABAergic inhibition and inadequate activity of PFC pyramidal cells. It is important to note that the D4 receptor can be stimulated by both NE and DA, and that NE has higher affinity for D4 receptors than for adrenoceptors.[87] Thus, medications that increase NE availability likely influence D4 receptor transmission. However, relatively little research has been done on D4 receptor actions in PFC, and they likely have more complex actions than described here. Instead, most research has focused on the D1 family of receptors, as these are most abundant in the PFC.[88] Currently, no drugs distinguish D1 from D5 receptors; thus, it should be understood that reference to D1 in this review could apply to actions at either of these receptors.

Moderate levels of DA D1 receptor stimulation improve PFC functions by decreasing "noise".[89] D1 receptors appear to be on a different set of spines than alpha-2A receptors; the D1 receptors appear to gate incoming inputs, screening out those that are irrelevant to the present task demands.[10] This is schematically illustrated in Figure 3. D1 receptor stimulation prevents inputs from the 270° neurons from entering the 90° cell. D1 receptors weaken irrelevant inputs to the neuron by increasing the production of cAMP, opening HCN channels near the synapse and shunting the incoming information. Thus, DA and NE have complementary beneficial actions.

However, excessive D1 receptor stimulation (such as occurs during stress) impairs PFC function by weakening too many network connections. Under these conditions, network activity collapses, and responding becomes inflexible.[89] This may explain the problems with mental flexibility when children take excessive doses of stimulant medication.

## ALTERED PREFRONTAL AND CATECHOLAMINE FUNCTION IN ADHD

### ADHD and Deficits in PFC Function

Patients with ADHD have symptoms similar to those caused by lesions to the right PFC.[44, 90–92] Imaging studies have shown reduced size and reduced functional activity of the right PFC in patients with ADHD.[46, 93–97] Recent studies have also reported more disorganized white matter tracks emanating from the PFC in patients with ADHD, consistent with weaker prefrontal connectivity.[98, 99] Other brain regions connected to the PFC, e.g., the caudate and

5 of 13



NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Arnsten

cerebellum, have also been reported to be smaller in some studies of children with ADHD.[100,101] There is also evidence of slower prefrontal maturation in some patients with ADHD.[101] However, for many patients, ADHD is a lifelong disorder, as supported by results from imaging studies showing evidence of weakened PFC function and reduced right PFC volume in adults with ADHD symptoms.[102,103] Supporting the notion of ADHD as a highly heritable disorder are imaging studies showing disruptions in prefrontal white matter tracts in both parents and their children when both have ADHD.[98]

### Genetic Changes in Catecholamine Transmission

As is typical in mental illness, multiple genes contribute a small risk to ADHD symptomology.[104] Many studies report alterations in the genes encoding for molecules involved in catecholamine signaling, e.g., the DA D1 and D5 receptors,[105–108] the DA and NE transporters,[105,108–110] the D4 receptor,[106,107,111] the alpha-2A receptor,[112–114] and dopamine beta hydroxylase (the enzyme needed for the synthesis of NE).[105,115,116] There are also associations with the catabolic enzyme, monoamine oxidase, and some serotonergic genes.[104] Recent studies have begun to relate genotype to symptomology. For example, genetic variation in the gene encoding for dopamine beta hydroxylase is related to executive function and the ability to sustain attention.[117,118] Thus, patients with two copies of the Taq I polymorphism in ADHD have poorer sustained attention.[117] These studies suggest that weaker NE production may impair the PFC circuits mediating the regulation of attention and behavior.

### Imaging Studies Show Changes in Catecholamine Transmission

Neuroreceptor imaging also supports weakened catecholamine transmission in ADHD. These studies have all been done in adults with ADHD, given the necessity of using radioactive tracers in positron emission tomography or single photon emission computed tomography. The vast majority of this work has focused on DA mechanisms in the striatum, as there are currently no good tracers to image NE or DA levels in the cortex. There have been mixed results with studies of the DA transporter, with many studies showing increased levels in the striatum,[119–121] but other studies found no effect[122] or reported decreases,[123] possibly reflecting genetic heterogeneity in the DA transporter gene. Recent imaging studies have assessed DA release in the striatum and found evidence of decreased DA release in adult patients with ADHD.[124] It is likely that this reflects global reductions in DA release throughout the brain, as earlier studies have suggested reduced catecholamine levels in the PFC as well.[125] Reduced DA in the striatum is associated with slowed motor activity, as in Parkinsonism,[126] and reduced DA in the PFC produces locomotor hyperactivity in animals.[127] Such findings suggest that it is the loss of catecholamines in the PFC that is most important for ADHD symptoms.

## ADHD TREATMENTS AND THE NORMALIZATION OF CATECHOLAMINE TRANSMISSION

Therapeutic doses of either stimulant or nonstimulant medications potentiate catecholamine transmission in the PFC. Thus, these agents would normalize catecholamine transmission in patients with genetic abnormalities in these pathways.

### Stimulants

The stimulants amphetamine (Adderall® [amphetamine], Vyvanse™ [lisdexamphetamine dimesylate], Shire US Inc., Wayne, Penn.) and methylphenidate (Ritalin®[methylphenidate], Novartis Pharmaceuticals, East Hanover, NJ; Concerta® [methylphenidate extended release], McNeil Pediatrics, Ft. Washington, Penn.) block both catecholamine transporters, the transporter for DA and that for NE. Because there are low levels of DA transporters in the PFC, NE transporters thus clear both NE and DA in this brain region.[128] Previous biochemical

6 of 13



studies of amphetamine and methylphenidate in rodents used excessively high doses that increased locomotor activity, impaired PFC function, and had sensitizing effects on pathways involved with, for example, drug abuse.[129] Recently, more appropriate, lower doses have been identified which produce blood levels in rats similar to those observed in patients with ADHD who are treated with stimulant medication.[130, 131] These therapeutic doses of stimulants reduce locomotor activity and improve PFC cognitive function in rats just as they do in humans.[130–132] Biochemical analyses of these more relevant stimulant doses revealed that they substantially increase both DA and NE release in the PFC but have little effect on catecholamine levels in subcortical areas.[131] These data are consistent with those showing that therapeutic doses of stimulants incur little abuse potential when taken properly. In the rat PFC, therapeutic doses of stimulants increase NE release *more* than they increase DA release,[131] thus, it is inaccurate to refer to these agents as simply dopaminergic. Consistent with dual actions on both NE and DA, the cognitive-enhancing effects of these agents in rodents are blocked by either NE alpha-2 or DA D1 receptor antagonists.[132] However, higher doses of stimulants impair function of the PFC and induce an inflexible pattern of responding similar to that seen following uncontrollable stress.[131, 132] These findings with high doses of methylphenidate are likely relevant to the cognitive inflexibility that can occur with excessive doses of stimulant medication.[133]

Therapeutic doses of stimulants improve PFC functions and enhance the efficiency of PFC activity in normal, young adult subjects.[134, 135] A similar, but much more pronounced profile, is observed in subjects with ADHD.[136–139] Thus, stimulant actions in ADHD are not paradoxical, but simply more apparent.[134, 135]

## Nonstimulants

**Atomoxetine**—Atomoxetine (Strattera® [atomoxetine], Eli Lilly, Indianapolis, Ind.) selectively blocks the NE transporter. Administration of atomoxetine increases both NE and DA in the rat PFC,[140] indicating the importance of the NE transporter for clearing DA as well as NE in the PFC. Preliminary data indicate that moderate doses of atomoxetine, as with methylphenidate, improve PFC functions through both NE alpha-2 and DA D1 actions, and higher doses can impair PFC function in some animals (Arnsten, unpublished). Recent studies in humans have shown that therapeutic doses of atomoxetine can strengthen response inhibition in normal controls[141] as well as in patients with ADHD.[142] The therapeutic effects of atomoxetine are consistent with results of previous studies showing that desipramine, a tricyclic antidepressant with high selectivity for the NE transporter, is helpful in treating ADHD-related symptoms, although it has cardiovascular side effects.[143, 144]

**Guanfacine**—Guanfacine acts directly at postsynaptic, alpha-2 receptors in the PFC, where it mimics the beneficial effects of NE and strengthens PFC regulation of attention and behavior.[71, 56] Animal studies have shown that guanfacine improves a wide range of PFC functions.[71, 72, 74, 145–147] As described above, guanfacine improves PFC functions by inhibiting cAMP-HCN channel signaling in dendritic spines, thus strengthening synaptic inputs onto pyramidal neurons and strengthening PFC network connectivity.[56] The beneficial effects of guanfacine on PFC function are independent of the drug's sedating actions,[71, 90] which likely occur at all 3 alpha-2 receptor subtypes (the A, B, and C subtypes). For example, the thalamus is rich in alpha-2B receptors,[66] and this structure is key for regulating state of arousal,[148] The sedating actions of alpha-2 agonists also likely occur at presynaptic alpha-2A receptors on NE cell bodies and terminals; guanfacine has relatively lower affinity for these presynaptic receptors.[149] Guanfacine is currently used in both children and adults with ADHD. It has been shown to improve ratings on both the Inattention and Hyperactivity/Impulsivity scales, consistent with its widespread beneficial effects on many PFC functions.[150–152] It is especially helpful in patients who cannot take stimulant medications because of tics, aggressive impulses, or drug

7 of 13



NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

abuse liability.[150] As with the stimulants, guanfacine also can improve normal subjects.[153, 154] but it is far more effective in individuals with impaired prefrontal abilities and inadequate catecholamine function.[71, 90] In view of the fact that it works directly at the receptor to mimic NE, it can be used in subjects having marked catecholamine depletion, as an intact catecholamine system is not required for its actions.

**Clonidine**—Clonidine has a very rapid onset of action that can be helpful in treating emergent situations. However, it has significant sedative and hypotensive actions that limit its clinical utility.[155, 156] Clonidine is less selective than guanfacine for the alpha-2A receptor. It has high affinity for the alpha-2B and alpha-2C subtypes as well as the alpha-2A receptor,[157, 158] and it also has high affinity for imidazoline I1 receptors.[159] Clonidine has potent actions at presynaptic alpha-2A receptors, being 10 times more effective than guanfacine at these sites. [149] This nonselective profile and potent presynaptic actions likely contribute to clonidine's potent sedating effects. In addition, clonidine's actions at imidazoline I1 receptors in the brainstem are thought to contribute to its marked hypotensive actions.[159, 160]

In summary, successful pharmacological treatments for ADHD mimic or enhance the beneficial effects of catecholamines on PFC function.[161]

# DISCUSSION



Over the last 20 years, our understanding of higher cortical function has evolved so that we can now begin to explain the etiology and treatment of ADHD. We have learned that the PFC plays a crucial role in regulating attention, behavior, and emotion. Weaknesses in PFC structure and function, including alterations in catecholamine transmission, likely contribute to the etiology of ADHD symptoms. Effective treatments for ADHD optimize catecholamine signaling in the PFC and normalize PFC regulation of attention and behavior, thus reducing ADHD symptoms.

## Abbreviations

| | |
|---|---|
| ADD | Attention deficit disorder |
| ADHD | Attention deficit/hyperactivity disorder |
| cAMP | cyclic Adenosine MonoPhosphate |
| DA | Dopamine |
| GABA | Gamma aminobutyric acid |
| HCN | Hyperpolarization-activated Cyclic Nucleotide-gated |
| NE | Norepinephrine |
| PFC | Prefrontal cortex |

## References

1. Solanto, MV. Attention-Deficit/Hyperactivity Disorder: Clinical features. In: Solanto, MV.; Arnsten, AFT.; Castellanos, FX., editors. Stimulant Drugs and ADHD: Basic and Clinical Neuroscience. New York: Oxford University Press; 2001. p. 3-30.
2. Robbins TW. Shifting and stopping: fronto-striatal substrates, neurochemical modulation and clinical implications. Philos Trans R Soc Lond B Biol Sci 2007;362:917–932. [PubMed: 17412678]
3. Stuss, DT.; Knight, RT., editors. New York: Oxford University Press; 2002. Principles of Frontal Lobe Function.



NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript



**Figure 1.**
The PFC regulates "top-down" attention, allocating and directing attentional resources based on stimulus relevance. Top-down attention includes stimulus gating, reducing distractibility and sustaining attention on relevant information. These operations are thought to arise from PFC projections back to the sensory cortices. In contrast, the posterior sensory cortices mediate "bottom-up" attention, processing sensory characteristics based on stimulus salience. Most patients with ADHD have difficulties with top-down attention regulation.

9 of 13



NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# The Right Inferior Prefrontal Cortex Is Specialized for Behavioral Inhibition



**Figure 2.**
The PFC regulates behavior and inhibits inappropriate impulses. In humans, the right inferior PFC is specialized for behavioral inhibition. Projections from this area to the premotor and motor cortices, the basal ganglia (striatum and subthalamic nucleus), and the cerebellum (by way of the pontine nuclei) are likely involved in the inhibition of inappropriate movements and impulses. In monkeys, blockade of alpha-2A receptors in the PFC induces a pattern of impulsive responding and locomotor hyperactivity.[68,69]

10 of 13



NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Arnsten                                                                                    Page 19



**Figure 3.**
The PFC guides attention, behavior, and emotion through networks of pyramidal cells. These pyramidal cells engage in recurrent excitation to represent stimuli (e.g., the spatial positions 90° or 270°, as shown here) or to represent goals or rules. The networks interconnect through synapses on dendritic spines that contain NE alpha-2A receptors or DA D1 receptors. Network connectivity is powerfully modulated by the catecholamines: NE alpha-2A receptor stimulation strengthens network inputs from cells with shared network properties by reducing the production of cAMP, thus closing HCN channels and enhancing synaptic inputs to the spine (increasing "signals"). Conversely, optimal levels of DA D1 receptor stimulation weaken irrelevant inputs to the neuron by increasing the production of cAMP, opening HCN channels near the synapse, and shunting incoming information (decreasing "noise"). Thus, for the network representing 90°, alpha-2A receptor stimulation increases the strength of connections from other 90° neurons, and D1 receptor stimulation weakens the connections from neurons with dissimilar characteristics (e.g., 270°). Adapted with permission from Arnsten AF 2007.[10]

# The Prefrontal Cortex Requires A Proper Level of Catecholamines for Optimal Function



**Figure 4.**
The regulatory functions of the PFC are highly dependent on its neurochemical state. The catecholamines NE and DA are released based on our state of arousal. Either too little or too much catecholamine release is detrimental to PFC function: there is an inverted U dose-response relationship. Inadequate catecholamine release is associated with fatigue and ADHD, and excessive catecholamine release occurs during uncontrollable stress or very high doses of stimulant medications. NE has its highest affinity for alpha-2A receptors and has lower affinity for alpha-1 and beta-1 receptors. Thus, different receptors are engaged based on the amount of NE released in the PFC. Therapeutic doses of stimulants, atomoxetine, or guanfacine likely normalize catecholamine transmission in patients with inadequate DA or NE levels, or both, thus bringing PFC function to more optimal levels at the top of the inverted U.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

12 of 13

INMATE REQUEST TO STAFF MEMBER

EXHIBIT # 4

To: Unit Team - Howard

Date: 5·30·2022

(Name and Title of Officer or Department)

_____
Unit Team, Detail, or Cellhouse Officer's Signature

**To be retained by inmate**

Form 9
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley

**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

#0091359

**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: Unit Team - Howard        Date: 5·30·2022

(Name and Title of Officer or Department)

State completely but briefly the problem on which you desire assistance. (Be specific.)

1) I still have Not recieved my OSR Administrative Seuregation Report Stating the reasons why I am being Kept in Administratiue Segregation here at LCF. Can you please provide me with my copy.

2) I also need the OSR Admin. Seg. Report due by HCF in August 2021 Stating the reasons why I was placed in Adm., Seg. I never recieved it.

Work Assignment: _____   Living Unit Assignment: A·4·116

Comment: _____   Detail or C.H. Officer: _____

Disposition: _____
_____
_____
_____

To: _____        Date: _____

(Name & Number)

Disposition: _____
_____
_____
_____

_____
Employee's Signature

**To be returned to inmate.**

P-0009

INMATE REQUEST TO STAFF MEMBER

(★ Grievance on EAI not returning my form 9 request asking are they holding me in seg
for anything at all and if I have any pending battery charges out of Reno County, Hutchinson, KS.)

To: Unit Team                                                        Date: 4. 4. 2022
        (Name and Title of Officer or Department)

_Howard_

Unit Team, Detail, or Cellhouse Officer's Signature                **To be retained by inmate**

3 copies

**Form 9**
For Cellhouse Transfer
Work Assignment _____                    _Dudley_
Interview Requests                                              Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**                       #0091359
                                                              Number

**INMATE REQUEST TO STAFF MEMBER**

To: Unit Team                                    Date: 4. 4. 2022
        (Name and Title of Officer or Department)
        State completely but briefly the problem on which you desire assistance. (Be specific.)

Informal Resolution: EAI is refusing to return my form 9 asking them 1. Is EAI
holding me in RHU for any reason whatsoever? and 2. Do I have any pending charges in
Reno County, Hutchinson, KS for any batteries? Attached is a copy of my form 9
reciept. It does not take 20 days to respond to a form 9 this simple. I'm
requesting my form 9 response from EAI. Thank You.
                                            God Bless You.

Work Assignment: _____     Living Unit Assignment: A. 4. 100

Comment: _____            Detail or C.H. Officer: _Howard_

Disposition: _____
_____
_____
_____

To: _____                    Date: _____
        (Name & Number)

Disposition: _____
_____
_____
_____

_____                        **To be returned to inmate.**
Employee's Signature

P-0009

## INMATE REQUEST TO STAFF MEMBER

9:15-9:20 am

To: EAI

Requesting if there is any reason at all that EAI is keeping me in signet or any pending

(Name and Title of Officer or Department)

Unit Team, Detail, or Cellhouse Officer's Signature

Date: 3.7.2022

**To be retained by inmate**

Attachment B, IMPP 20-105
Effective 07-08-14

# Kansas Department of Corrections
## Administrative Segregation Report

TO: <u>Secretary of Corrections</u>                              Report Number: 82297

FROM: <u>Hutchinson Correctional Facility</u>

| | | | |
|---|---|---|---|
| Date This Report Filed: | 8/6/2021 | Time of Report: | 12:04 PM |
| Date of Segregation Placement: | 6/3/2021 | Time of Placement: | _____ am |

Offender Name: DUDELY, JAMES  #91359

Reason(s) For Segregation (Including Rule No. and Title):
IMPP 20-104 (I)(B)(13) Other Security Risk

Moved from Cell #: A1-<u>245</u> to Segregation Cell #: <u>A1-245</u>

☒   Pre-Segregation hearing conducted

☐   Pre-Segregation hearing NOT conducted (Explain) _____

Facts: <u>I/M DUDLEY #91359 was placed on DSEG status for threatening and intimidating staff. He has completed his DSEG sanctions, however he will remain in RHU on OSR status due to his continued bad behavior and for the overall safety and security of the facility.</u>

☐   This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

_____

What is the reason no alternative means of separation can be arranged?

_____

| | | | | |
|---|---|---|---|---|
| J. Hertel, UTS | Date | 8/6/2021 | Approved By: _Kenlewittm_ | Date 8/16/21 |
| Signature and Title of Reporting Officer | | | Shift Supervisor or Seg Unit Mgr. | |
| | | | _____ | Date _____ |
| | | | Warden Authorization (if needed) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date: _8-16-21_        Time: _1902_ am/pm

_RTS_ #_____                    _Wilson CII_
Offender Signature and Number            Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to:  Warden
          Offender
          PCM
          EAI

*correction: change status to OSR*

INMATE REQUEST TO STAFF MEMBER

To: _Unit Team Manager — Mrs. O_          Date: _July 18th, 2022_

(Name and Title of Officer or Department)

_____

Unit Team, Detail, or Cellhouse Officer's Signature          **To be retained by inmate**

Form 9

For Cellhouse Transfer

Work Assignment _____

Interview Requests                                    _Dudley_

**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

_#0091359_

**Number**

**INMATE REQUEST TO STAFF MEMBER**

**To:** _Unit Team Manager — Mrs. O_     Date: _July 18th, 2022_

(Name and Title of Officer or Department)

**State completely but briefly the problem on which you desire assistance. (Be specific.)**

Emergency Grievance: Informal Level: C/o Busby tried to break my arm on the food pass on July 14th, 2022, for me grabbing a extra tray off the food cart. No use of force photos have been taken and have been refused me. The Cpts and Lt's keeps saying no force was used but I have fingerprints on my arm and a big purple bruise from elbow to wrist on my left arm. Plus I've been on MRA on camera since then so there it's no way I did it to myself.

Work Assignment: _____     Living Unit Assignment: _____

Comment: _____     Detail or C.H. Officer: _MCCURRIE._

Disposition: This is being investigated. Please, allow time for it to take place.

To: _____          Date: _____

(Name & Number)

Disposition: _____

_____

_____

_____

_VOS_  _____

Employee's Signature          **To be returned to inmate.**

P-0009

INMATE REQUEST TO STAFF MEMBER

To: _____                    Date: _____
                (Name and Title of Officer or Department)

_____

                Unit Team, Detail, or Cellhouse Officer's Signature          **To be retained by inmate**

Form 9
For Cellhouse Transfer
Work Assignment _____                    Dudley
Interview Requests                                                            Last Name Only

### KANSAS DEPARTMENT OF CORRECTIONS                #009135q

### INMATE REQUEST TO STAFF MEMBER                        Number

To: UTM. Mrs. O _____  Date: September 21st, 2022
                (Name and Title of Officer or Department)
                State completely but briefly the problem on which you desire assistance. (Be specific.)

Grievance:

Martin in 121 is harassing me to support his drug habit ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Then the officers are rewarding Martin for harassing me.
Can you please move Martin away from me? This corner would be calm if you
moved him.

Work Assignment: _____   Living Unit Assignment: A-2/123
Comment: _____   Detail or C.H. Officer: = 3151 Lawrence

Disposition: _____

_____
_____
_____

To: _____                    Date: _____
            (Name & Number)

Disposition: You are in a room by yourself.
Ignore the harassment no one has access
to you. Find a roommate + I will move
you away from him

          ✗ _____ UTM 9/22/22
            Employee's Signature                    **To be returned to inmate.**

P-0009

INMATE REQUEST TO STAFF MEMBER

To: _____          Date: _____

(Name and Title of Officer or Department)

_____

Unit Team, Detail, or Cellhouse Officer's Signature

A2-123

**To be retained by inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley

**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

#0091359

**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: Warden                         Date: September 22nd, 2022

(Name and Title of Officer or Department)

State completely but briefly the problem on which you desire assistance. (Be specific.)

Emergency Grievance:
They got this dude Martin next to me harassing me and the UTM-Mrs.O and officer are letting him.
Everytime he does something like bang on the wall or call suicidal thoughts the officers
pull up on my door and wake me up out my sleep, etc... Martin is throwing
razors in the run and breaking fan motors down all in his cell and the officers are
just letting him do these things. (I through a razor on the floor in front of the shower
as is the usual practice and got in sat for it.) The Unit Teams keep putting behavior problem
Residents next door to me that are loud and disruptive. Can you please solve this? Thank you
Sir.

Work Assignment: _____     Living Unit Assignment: A2-123

Comment: _____     Detail or C.H. Officer: COI J. John

Disposition: You are in a room by yourself. You are
able to ignore his statements. If you would like
to move you can find a roommate to live
with.

To: _____          Date: _____

(Name & Number)

Disposition: _____

_____

_____

_____

UT3

**Employee's Signature**

**To be returned to inmate.**

P-0009



INMATE REQUEST TO STAFF MEMBER

To: _Unit Team Manager · Laski_

<small>(Name and Title of Officer or Department)</small>

_CSI M_

<small>Unit Team, Detail, or Cellhouse Officer's Signature</small>

Date: _5·19·2022_

**To be retained by inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

_Rudhey_

<small>Last Name Only</small>

**KANSAS DEPARTMENT OF CORRECTIONS**

**INMATE REQUEST TO STAFF MEMBER**

_#0091359_

<small>Number</small>

To: _Unit Team Manager · Laski_        Date: _5·19·2022_

<small>(Name and Title of Officer or Department)</small>

<small>State completely but briefly the problem on which you desire assistance. (Be specific.)</small>

Informal Resolution Grievance:
The Disciplinary Board is now refusing to do my DC hearings because they do not want me to present my defense of mental defect for ADHD disability plus Knox's flat out refusal to treat me for it for no reason at all. He then tried to claim it is my "behavior" is why he has not held the hearings but this does not add up because I am let out for everything else have had no altercations and he does others DC hearings at their doors, so he is lying. Please fix this.

Work Assignment: _____ Living Unit Assignment: _A-4-116_

Comment: _____ Detail or C.H. Officer: _CSI M_

Disposition: _____
_____
_____
_____

To: _____                Date: _____

<small>(Name & Number)</small>

Disposition: You have not been brought out for your hearings due to your behavior. You present a security risk to the unit with your aggressive behavior. You have the opportunity to present your defense to the officer or unit team who conducts your hearing in absentia. If you could present yourself in a more positive manner, you would be pulled out.

_S. Williams_

<small>Employee Signature</small>

**To be returned to inmate.**

P-0009

Form 9
For Cellhouse Transfer
Work Assignment
Interview Requests

Dudley
Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**

91359
Number

**INMATE REQUEST TO STAFF MEMBER**

To: Dw O Early
Date: 1-2h14

(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I am currently being denied to send any legal mail to the courts and/or my attorney due to being placed on MRA status. I would like this to be considered as I believe that it is not right.

Work Assignment: _____  Living Unit Assignment: _____
Comment: _____  Unit Team Members Signature: Cox CB___

Disposition: _____

To: Dudley
(Name & Number)
Date: 1/21/14

Disposition: This is to curb aggressive behavior and at this time does not seem to be occuring. Please work with the Seg review board

Employee's Signature

To be returned to inmate.

P-009b

INMATE REQUEST TO STAFF MEMBER

Date: 5-18-22

To: _____
(Name and Title of Officer or Department)

_____
Unit Team, Detail, or Cellhouse Officer's Signature

**To be retained by inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley
**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

#0091359
**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: UTM. Laski _____   Date: 5-17-2022
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

★ Informal Resolution,
MSG. Browning kicked around a tray in front of my door 2 times getting oatmeal all over in front of my door on purpose this happened at lunch while she was serving and at dinner while she was serving. This is on Camera. "what are you going to say... the cameras don't work?" It's totally suspicious how the cameras are always malfunctioning when us prisoners are requesting them used to report KDoC staff misconduct abuse and excessive force. Living Unit Assignment: A cell 116

Work Assignment: _____
Detail or C.H. Officer: _____

Comment: _____

Disposition: _____
_____
_____
_____

To: _____         Date: _____
(Name & Number)

Disposition: Allegations of staff misconduct are investigated and if corrective action is deemed necessary it will not be discussed with you

_____
Cathe
Employee's Signature

**To be returned to inmate.**

P-0009

INMATE REQUEST TO STAFF MEMBER

To: _____
     (Name and Title of Officer or Department)

_____
    Unit Team, Detail, or Cellhouse Officer's Signature

Date: _____

**To be retained by inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

Dudley
**Last Name Only**

**KANSAS DEPARTMENT OF CORRECTIONS**

#0091359
**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: UTM- Mrs. O _____   Date: September 19th 2022
  (Name and Title of Officer or Department)
    State completely but briefly the problem on which you desire assistance. (Be specific.)

Good morning and God Bless You.

Can you please put me on the Law Library (Tablet) list?

Thanks!

Work Assignment: _____   Living Unit Assignment: A-2/123
Comment: _____   Detail or C.H. Officer: COI Green

Disposition: _____ Request is from the officer.

To: _____   Date: _____
    (Name & Number)

Disposition: _____

UOS _____
  Employee's Signature

**To be returned to inmate.**

P-0009

INMATE REQUEST TO STAFF MEMBER

To: _____          Date: _____
(Name and Title of Officer or Department)

_____              **To be retained by Inmate**
Unit Team Member Signature

Form 9
For Cellhouse Transfer
Work Assignment _____
Interview Requests

_Dudley_
Last Name Only

KANSAS DEPARTMENT OF CORRECTIONS

#0091359
Number

INMATE REQUEST TO STAFF MEMBER

To: Centurion/Medical/HSA _____  Date: December __ 2022
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

I was informed by your staff at sick call on December 8th, 2022, to send in this Form 9 to follow up on my CAT scan request and for a follow up with provider Dr. Herrod. So I am requesting to be seen by Dr. Herrod on a follow up for my back as soon as possible as I believe I have located the exact spot cause of my back pain and in general left side body pain. Thank You. source

Work Assignment: _____  Living Unit Assignment: B-1/148

Comment: _____  Unit Team Members Signature: _____

Disposition: _____

_____

_____

_____

To: _____          Date: _____
(Name & Number)

Disposition: _____

_____

_____

_____

_____              **To be returned to inmate.**
Employee's Signature

P-0009b

El Dorado Correctional Facility
1737 SE Hwy 54
P.O. Box 311
El Dorado, KS. 67042



# Kansas
### Department of Corrections

Phone: (316) 321-7284
Fax: (316) 322-2018
www.doc.ks.gov/facilities/edcf

Jeff Zmuda, Secretary
Tommy Williams, Acting Warden

Laura Kelly, Governor

To:      **DUDLEY,JAMES,R**                    Date:    **11/22/2022**

KDOC #   **2/16/2150**                         Cell:    **B1-148**

From:    **The EDCF Chaplaincy Department**

The Chaplain's Department has received and reviewed your request for placement on the Certified Religious Diet (CRD) list. Your request has been approved.

As of this date you have been placed on the **Certified Religious Diet list.**

## **Note:** **You will continue to receive the Regular diet in the main dining room until your offender identification badge has been remarked accordingly by the A&D unit. It is up to you to work with your cell house and Unit Team staff to schedule a time to recive an updated ID.**

You must submit a Form 9 when you wish to be removed from this religious diet.

Per IMPP 10-119, offenders who choose to withdraw, switch religious diets, or are removed from a religious diet wait ninety (90) days before requesting readmission to a religious diet. Additionally, the third time an offender withdraws from a religious diet the waiting period will be six months, and the fourth or subsequent request for removal, the waiting period will be one year.

*Chaplains Office*

Received

*INF*

APR 1 9 2022

Page 1 of 2, Attachment A, IMPP 01-118D
Effective 12-21-21

## PROPERTY DAMAGE/LOSS OR PERSONAL INJURY CLAIM FORM *LUFV*

| Section I | | |
|---|---|---|

RECEIVED

MAR 2 8 2022

| Filed AT Facility No.: | O1 | Facility Initials: | LCF/Centurion |
|---|---|---|---|
| Filed AGAINST Facility No.: | O1 | Facility Initials: | LCF/Centurion |

(Refer to PLC coding manual for facility no. & initials)

| Name of Claimant (Last, First, MI): | KDOC Number |
|---|---|
| Dudley, James, R., | #0091359 |

| Type of Claim (circle one) : | Lost Property | Damaged Property | (Injury) |
|---|---|---|---|

50,000.00
Amount of Claim: Notice of Claim | Date of Loss Damage, or Injury (MO/DAY/YR): 3-14-2022 to 3-17-2022

Where Loss, Damage, or Injury Occurred:

If occurred in cellhouse, enter cellhouse/room number: _____

Otherwise, circle one of the following:

| Mailroom | R&D | Central Property |
| Laundry | Gym | Dining Room |
| (Other Location) Infimary/Clinic |

NATURE OF CLAIM (Set forth detailed facts, including date of loss, damage or injury, how it occurred, place of occurrence, how you claim institution or employee was negligent, and amount of the claim.): On 3-14-2022 I informed BHP Koster that my celly was stressing me out to much and I felt I was losing control and needed to be seperated from my celly to a different cell or my celly moved. She informed psychiatry Dur and Dur [illegible] had me placed on crises level which was approved by Dr. Barrone by his "rubber stamp" treatment methods. During crises level placement I was denied all of my constitutional rights. I was denied hygiene, showers, food, clothing or bedding, or mattress, due process, access to the courts, mail, phone visits, Medical attention (all that). I didn't hurt anyone or myself at all. Yet I was punished like this. The cell was extremely cold too. I did what I was told to do by BHP and told on my celly so we would not have any problems and I got punished severely for it. I want $50,000.00 for this.

I am aware that presenting a false claim may result in penalties (under K.S.A. 75-7501 et seq., K.A.R. 44-12-101 et seq., etc.), and I declare (or verify, certify or state) that the foregoing is true and correct to the best of my knowledge, understanding, and belief.

| Claimant Signature: *[signature]* | Date: 3-18-2022 |
|---|---|

| Received from Resident/Claimant: | Date: 3/18/22 | Time: 11:20am |
|---|---|---|
| UT Name (print): Dain Howard | UT Signature: *[signature]* UTS | Claimant Initials: *[initials]* |

| Section II. | |
|---|---|

| Received by Warden/Superintendent on (MO/DAY/YR): MAR 1 8 2022 | Facility Log No. Assigned: AA 115 339 |
|---|---|

Inquiry Report:

See Attached

| Date (MO/DAY/YR): | Investigator Name (print): | UT Member or Investigator Signature: |
|---|---|---|
| 3/18/22 | CSI Kincaid | *[signature]* CSI Kincaid |

| Section III | |
|---|---|

# MEMO



**Kansas**
Department of Corrections
*Lansing Correctional Facility*

**DATE:** 3/18/2022

**TO:** Dudley, James # 91359

**FROM:** CSI Kincaid Grievance Officer

**SUBJECT:** Property Claim # AA0115339

---

**Findings of Facts:** Dudley # 91359 is claiming that after reporting to his behavioral health professional that his Bunky was "stressing him out, he was going to lose control, and one of them needed to be moved" he was placed on crisis level and denied his constitutional rights.

**Conclusion Made:** I have investigated this property claim and found the following.

You offered no evidence on how you lost anything, anything was damaged or that an injury occurred.  Crisis level protocols were followed, and you presented some behavior that the BHP felt you and or others needed to be protected from yourself.  Since there was no evidence presented of any injury, I am recommending this claim be denied.

**Recommendation:** Based on the information I have received I am going to recommend that this claim be denied.

12/06/2022   15:12:51   **Kansas Department of Corrections**                 BUCHHOLZ
                        **Current Obligations**                              BKR0021D
--------------------------------------------------------------------------------

Inmate:   **0091359   DUDLEY,JAMES,R**               Total all obligations:   **159.00**


| Obligation | Case Number | Description | Date Incurred | Amount |
|---|---|---|---|---|
| Med Fee |  | Nurse | 11/11/2022 | 2.00 |
| Med Fee |  | Nurse | 11/29/2022 | 2.00 |
| **Subtotal** |  | **Med Fee** |  | **4.00** |
| Fine | 2022-10-00176 | Threaten or Intim Any Person | 11/15/2022 | 20.00 |
| Fine | 2022-10-00176 | Insub/Disrespect Officer/Other | 11/15/2022 | 15.00 |
| Fine | 2022-10-00176 | Noise | 11/15/2022 | 10.00 |
| Fine | 2022-11-00042 | Threaten or Intim Any Person | 11/15/2022 | 20.00 |
| Fine | 2022-11-00042 | Insub/Disrespect Officer/Other | 11/15/2022 | 15.00 |
| Fine | 2022-11-00042 | Disruptive Behavior | 11/15/2022 | 15.00 |
| Fine | 2022-11-00151 | Battery | 11/25/2022 | 20.00 |
| **Subtotal** |  | **Fine** |  | **115.00 +** |

**F3 = Exit F12 = Previous Screen**



Case 5:22-cv-03188-JWL-JPO   Document 18   Filed 12/28/22   Page 129 of 222

--------------------------------------------------------------------------------
Inmate:  **0091359  DUDLEY,JAMES,R**                    Total all obligations:    **159.00**

| Obligation | Case Number | Description | Date Incurred | Amount |
|------------|-------------|-------------|---------------|--------|
| Oth Obl | | Legal Copies | 11/21/2022 | 40.00 |
| **Subtotal** | | **Legal Copies** | | **40.00** |

**F3 = Exit F12 = Previous Screen**

Case 5:22-cv-03188-JWL-JPO   Document 18   Filed 12/28/22   Page 130 of 222

```
--------------------------------------------------------------------
Inmate                         Incentive Level   Current Location
0091359  DUDLEY,JAMES,R                D          EDCF-C  AB1148
                                   Cash    Forced Savings   Mand Savings
Beginning Balance on 11/01/2022     .01          4.82            .00
Encumbrances:                      7.39          6.74
Balance Before Obligations:       50.61          2.40            .00
Other Obligations & Fees Owed:     4.00
Legal Postage and Legal Copies:   40.00
Fines & Disciplinary Rest Owed:  115.00
State/Federal Lawsuits:
Benefits Balance:
Curr Amt Available-Garn/Fees:       .00          2.40            .00
Cur Amt Avail w/ Govt Benefits:     .00          2.40            .00
                        For      Attended    For       Holiday
                        Week     Canteen     Period    Amount
Canteen Expenditures:    .00                  .00        .00
Outgoing Funds:          .00                  .00
Handicrafts:                                  .00
Fresh Favorites:         .00                  .00
F3 = Exit F12 = Previous Screen   F4 = View Transactions F6 = View Obligations
```

Case 5:22-cv-03188-JWL-JPO   Document 18   Filed 12/28/22   Page 131 of 222

--------------------------------------------------------------------------
```
   Inmate:     0091359   DUDLEY,JAMES,R
   Time Frame:      May  1 2022 thru  December 20 2022
```
**\* Means Government Benefits Were Affected**

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 920 | ADMIN FEE PAYMEN | 5/02/22 | LCF-C | 1.00- | .00 | .00 | 0000389 |
| 600 | Non-Exempt Cante | 5/03/22 | LCF-C | 10.71- | .00 | .00 | |
| 620 | EXP | 5/09/22 | LCF-C | .00 | .00 | .00 | |
| 619 | EXP | 5/09/22 | LCF-C | .00 | .00 | .00 | |
| 620 | 2014CR000230 STA | 6/16/22 | LCF-C | 9.75- | .00 | .00 | |
| 619 | 2014CR000230 STA | 6/16/22 | LCF-C | .00 | 17.74- | .00 | |
| 210 | Murphy,Candi,K | 9/19/22 | LCF-C | 10.00 | .00 | .00 | |
| 900 | LEGAL/OFF. PST P | 9/20/22 | LCF-C | 2.36- | .00 | .00 | |
| 900 | LEGAL/OFF. PST P | 9/20/22 | LCF-C | 2.36- | .00 | .00 | |
| 900 | LEGAL/OFF. PST P | 9/20/22 | LCF-C | .81- | .00 | .00 | |
| 920 | ADM FEE PAY | 9/20/22 | LCF-C | 1.00- | .00 | .00 | 0000390 |
| 920 | ADM FEE PAY | 9/20/22 | LCF-C | 1.00- | .00 | .00 | 0000391 |

More....

**F3 = Exit   F12 = Previous Screen   F11=Display more information**

Case 5:22-cv-03188-JWL-JPO   Document 18   Filed 12/28/22   Page 132 of 222

--------------------------------------------------------------------------
    Inmate:     0091359   DUDLEY,JAMES,R
    Time Frame:       May  1 2022 thru  December 20 2022
* Means Government Benefits Were Affected

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 920 | ADM FEE PAY | 9/20/22 | LCF-C | 1.00- | .00 | .00 | 0000392 |
| 920 | ADM FEE PAY | 9/20/22 | LCF-C | 1.00- | .00 | .00 | 0000393 |
| 210 | Murphy,Candi,K | 10/14/22 | EDCF- | 100.00 | .00 | .00 | |
| 680 | EXP | 10/14/22 | EDCF- | .00 | .00 | .00 | 00001 |
| 301 | 10%SVNGS | 10/14/22 | EDCF- | 4.82- | 4.82 | .00 | |
| 900 | LEGAL/OFF. PST P | 10/17/22 | EDCF- | 8.70- | .00 | .00 | |
| 920 | ADM FEE PAY | 10/17/22 | EDCF- | 1.00- | .00 | .00 | 0000394 |
| 910 | DR FINE-2022-04- | 10/17/22 | EDCF- | 20.00- | .00 | .00 | |
| 680 | FF FEES INITIAL | 10/17/22 | EDCF- | 10.00- | .00 | .00 | |
| 606 | Exempt PPD Telep | 10/18/22 | EDCF- | 5.00- | .00 | .00 | |
| 680 | Cash Federal Fil | 10/18/22 | EDCF- | 12.06- | .00 | .00 | 00001 |
| 600 | Non-Exempt Cante | 10/19/22 | EDCF- | 31.89- | .00 | .00 | |

                                                                    More...

 F3 = Exit   F12 = Previous Screen    F11=Display more information

--------------------------------------------------------------------------------
    Inmate:      0091359    DUDLEY,JAMES,R
    Time Frame:        May  1 2022 thru  December 20 2022
* Means Government Benefits Were Affected

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 602 | Tablet Time | 10/22/22 | EDCF- | 5.00- | .00 | .00 | |
| 600 | Non-Exempt Cante | 10/26/22 | EDCF- | 1.99- | .00 | .00 | |
| 210 | Murphy,Candi,K | 11/02/22 | EDCF- | 40.00 | .00 | .00 | |
| 680 | EXP | 11/02/22 | EDCF- | .00 | .00 | .00 | 00001 |
| 301 | 10%SVNGS | 11/02/22 | EDCF- | .32- | .32 | .00 | |
| 920 | ADM FEE PAY | 11/03/22 | EDCF- | 1.00- | .00 | .00 | 0000395 |
| 910 | DR FINE-2022-10- | 11/03/22 | EDCF- | 20.00- | .00 | .00 | |
| 910 | DR FINE-2022-10- | 11/03/22 | EDCF- | 15.00- | .00 | .00 | |
| 210 | Murphy,Candi,K | 11/07/22 | EDCF- | 20.00 | .00 | .00 | |
| 680 | EXP | 11/07/22 | EDCF- | .00 | .00 | .00 | 00001 |
| 301 | 10%SVNGS | 11/07/22 | EDCF- | 1.60- | 1.60 | .00 | |
| 600 | Non-Exempt Cante | 11/09/22 | EDCF- | 9.90- | .00 | .00 | |

                                                                    **More...**

**F3 = Exit    F12 = Previous Screen    F11=Display more information**

Case 5:22-cv-03188-JWL-JPO  Document 18  Filed 12/28/22  Page 134 of 222

--------------------------------------------------------------------------------

```
   Inmate:     0091359   DUDLEY,JAMES,R
   Time Frame:      May  1 2022 thru  December 20 2022
* Means Government Benefits Were Affected
```

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 620 | EXP | 11/09/22 | EDCF- | .00 | .00 | .00 | |
| 619 | EXP | 11/09/22 | EDCF- | .00 | .00 | .00 | |
| 210 | Murphy,Candi,K | 11/14/22 | EDCF- | 30.00 | .00 | .00 | |
| 680 | EXP | 11/14/22 | EDCF- | .00 | .00 | .00 | 00001 |
| 301 | 10%SVNGS | 11/14/22 | EDCF- | 2.40- | 2.40 | .00 | |
| 680 | Cash Federal Fil | 11/15/22 | EDCF- | .80- | .00 | .00 | 00001 |
| 680 | Cash Federal Fil | 11/15/22 | EDCF- | 4.00- | .00 | .00 | 00001 |
| 680 | Cash Federal Fil | 11/15/22 | EDCF- | 6.00- | .00 | .00 | 00001 |
| 910 | DR FINE-2022-10- | 11/15/22 | EDCF- | 20.00- | .00 | .00 | |
| 619 | 2009CV000438 STA | 11/17/22 | EDCF- | .00 | .00 | .00 | |
| 240 | Cash Interest | 11/21/22 | EDCF- | .01 | .00 | .00 | |
| 920 | ADMIN FEE PAYMEN | 12/01/22 | EDCF- | 1.00- | .00 | .00 | 0000398 |

                                                                    **More...**

**F3 = Exit   F12 = Previous Screen   F11=Display more information**

Case 5:22-cv-03188-JWL-JPO Document 18 Filed 12/28/22 Page 135 of 222

--------------------------------------------------------------------------------

Inmate: **0091359 DUDLEY,JAMES,R**
Time Frame: **May 1 2022 thru December 20 2022**
**\* Means Government Benefits Were Affected**

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 210 | Murphy,Candi,K | 12/05/22 | EDCF- | 50.00 | .00 | .00 | |
| 921 | MED FEE PAY | 12/06/22 | EDCF- | 2.00- | .00 | .00 | 0000396 |
| 921 | MED FEE PAY | 12/06/22 | EDCF- | 2.00- | .00 | .00 | 0000397 |
| 910 | DR FINE-2022-10- | 12/06/22 | EDCF- | 20.00- | .00 | .00 | |
| 910 | DR FINE-2022-10- | 12/06/22 | EDCF- | 15.00- | .00 | .00 | |
| 910 | DR FINE-2022-10- | 12/06/22 | EDCF- | 10.00- | .00 | .00 | |
| 620 | 2014CR000230 STA | 12/09/22 | EDCF- | 7.39- | .00 | .00 | |
| 619 | 2014CR000230 STA | 12/09/22 | EDCF- | .00 | 6.74- | .00 | |
| 210 | Murphy,Candi,K | 12/13/22 | EDCF- | 20.00 | .00 | .00 | |
| 248 | Forced Savings I | 12/13/22 | EDCF- | .00 | .01 | .00 | |
| 240 | Cash Interest | 12/13/22 | EDCF- | .01 | .00 | .00 | |
| 921 | MED FEE PAY | 12/14/22 | EDCF- | 2.00- | .00 | .00 | 0000399 |

**More...**

**F3 = Exit   F12 = Previous Screen   F11=Display more information**

Case 5:22-cv-03188-JWL-JPO  Document 18  Filed 12/28/22  Page 136 of 222

--------------------------------------------------------------------------------

Inmate:        0091359    DUDLEY,JAMES,R
Time Frame:        May  1 2022 thru  December 20 2022
* Means Government Benefits Were Affected

| Code | Description | Date | Fac | Cash | Forced Savings | Mandatory Savings | Voucher# |
|------|-------------|------|-----|------|----------------|-------------------|----------|
| 921 | MED FEE PAY | 12/14/22 | EDCF- | 2.00- | .00 | .00 | 0000400 |
| 921 | MED FEE PAY | 12/14/22 | EDCF- | 2.00- | .00 | .00 | 0000401 |
| 910 | DR FINE-2022-11- | 12/14/22 | EDCF- | 15.00- | .00 | .00 | |

                                                            Bottom

F3 = Exit   F12 = Previous Screen    F11=Display more information

Case 5:22-cv-03188-JWL-JPO   Document 18   Filed 12/28/22   Page 137 of 222

--------------------------------------------------------------------------------

```
Inmate                        Incentive Level  Current Location
0091359  DUDLEY,JAMES,R              D          EDCF-C  AB1148
                                  Cash    Forced Savings   Mand Savings
Beginning Balance on 12/01/2022   9.00         9.14            .00
Encumbrances:
Balance Before Obligations:        .62         2.41            .00
Other Obligations & Fees Owed:
Legal Postage and Legal Copies:  40.00
Fines & Disciplinary Rest Owed:  70.00
State/Federal Lawsuits:
Benefits Balance:
Curr Amt Available-Garn/Fees:      .00         2.41            .00
Cur Amt Avail w/ Govt Benefits:    .00         2.41            .00
                           For    Attended     For      Holiday
                           Week   Canteen      Period   Amount
Canteen Expenditures:       .00                 .00        .00
Outgoing Funds:             .00                 .00
Handicrafts:                                    .00
Fresh Favorites:            .00                 .00
F3 = Exit F12 = Previous Screen  F4 = View Transactions F6 = View Obligations
```

--------------------------------------------------------------------------------

Inmate:   0091359   DUDLEY,JAMES,R                Total all obligations:      110.00

| Obligation | Case Number | Description | Date Incurred | Amount |
|---|---|---|---|---|
| Fine | 2022-11-00042 | Threaten or Intim Any Person | 11/15/2022 | 20.00 |
| Fine | 2022-11-00042 | Disruptive Behavior | 11/15/2022 | 15.00 |
| Fine | 2022-11-00151 | Battery | 11/25/2022 | 20.00 |
| Fine | 2022-11-00240 | Insub/Disrespect Officer/Other | 12/20/2022 | 15.00 |
| **Subtotal** | | **Fine** | | **70.00** |
| Oth Obl | | Legal Copies | 11/21/2022 | 40.00 |
| **Subtotal** | | **Legal Copies** | | **40.00** |

**F3 = Exit F12 = Previous Screen**

Case 5:22-cv-03188-JWL-JPO Document 18 Filed 12/28/22 Page 138 of 222

Form 9
For Cellhouse Transfer
Work Assignment _____

Dudley                    150
Last Name Only

Interview Requests

## KANSAS DEPARTMENT OF CORRECTIONS

#0091359
Number

## INMATE REQUEST TO STAFF MEMBER

To: UTM-Sapien                          Date: 03-11-2014

(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Deputy Warden Snider does not have the authority to overide the
wardens descision for my legal copies.
    I need legal copies.

                    Thank You,

Work Assignment: Admin Seg, CBB, DS        Living Unit Assignment: A-1/200

Comment: _____        Unit Team Members Signature: _____

Disposition: _____

To: _____              Date: 3/18/14
        (Name & Number)

Disposition: Yes, I do

Employee's Signature                          3

P-009b                              To be returned to inmate.

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

DUDLEY
_____
Last Name Only

## KANSAS DEPARTMENT OF CORRECTIONS

#00 91359
_____
Number

### INMATE REQUEST TO STAFF MEMBER

To: Warden James Heimgartner           Date: 11/30/15
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Can you please grant an extension on my indigent legal postage
credit? I lost my claim(s) appeal because of your current denial
of my indigent legal mail postage. I could not mail my brief to
the court or get copies of it.

Work Assignment: _____           Living Unit Assignment: A-1/cell 104

Comment: _____           Unit Team Members Signature: _____

Disposition: _____

To: Dudley # 91359  A1-104           Date: _____
(Name & Number)

Disposition: Each request is reviewed and determined on a case
by Case Basis.

_____
Employee's Signature

**To be returned to inmate.**

P-0009b

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

_Dudley_
Last Name Only

## KANSAS DEPARTMENT OF CORRECTIONS

#009﹣350
Number

## INMATE REQUEST TO STAFF MEMBER

**To:** UT-Patterson                          **Date:** 12/31/2015
(Name and Title of Officer or Department)
State completely but briefly the problem on which you desire assistance. (Be specific.)

Just to verify my belief. Question: As I am indigent and am in debt to
KDOC $3,000.00, will you provide me with 720 sheets of writing or
typing paper so that I can hand copy my 35 page brief for my criminal
appeal in case No. 15-113833-A, as I am no longer permitted by the KDOC to
receive indigent legal copies?

Work Assignment: _____   Living Unit Assignment: A.1/104

Comment: _____   Unit Team Members Signature: _____

Disposition: _____

To: _____          Date: _____
(Name & Number)

Disposition: The deadline for this appeal was Nov 18th This case is no longer
active and no copies are necessary. Further indigent copy + mail requests
will be reviewed by the Warden for approval.

_____
Employee's Signature                    **To be returned to inmate.**

P-0009b



**KANSAS**
Department of Corrections
*El Dorado Correctional Facility*

Landon State Office Building
900 SW Jackson, 4th Floor
Topeka, KS 66612

Phone:  (785) 296-3317
Fax:  (785) 296-0014
Email: kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary
James Heimgartner, Warden

Sam Brownback, Governor

---

**To:**  I/M Dudley, James
#91359  A1-200 at time grievance submitted
Trnsf to B2-101  4/1/14

**Date:**  APR 2 8 2014

**Subject:**  Grievance #19165

**From:**  James Heimgartner
Warden, EDCF

Your grievance dated April 21,  2014 was received in my office April 23, 2014.

I have reviewed your complaint along with the response provided by Unit Team, CCII St. Peter.
Based on my review, I feel no further action is necessary.

As stated in K.A.R. 44-15-102 (G)(c)(1):  "If the warden's answer is not satisfactory, the inmate may
appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is
displeased with and what action the inmate believes the secretary should take.  The inmate's appeal shall
be made within three calendar days of receipt of the warden's decision, or within three calendar days of
the deadline for that decision, whichever is earlier.

James Heimgartner, Warden
El Dorado Correctional Facility

Cc:  Inmate
UTM

*— 2 Documents Attached to this Grievance —*

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

## INMATE COMPLAINT

Inmate's Name JAMES RICHARD DUDLEY    B2-101    4-1-14    Number #0091359

Facility El Dorado Correctional Facility    Housing Unit A-1 Cell 200    Work Detail N/A - Admin. Seg.

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE. (Attach Form 9s or other correspondence and response from staff member). ☆Documents of attempt of informal resolution are attached to this grievance☆

Since the date of February 21st 2014 I have been requesting indigent legal copies. I have kept being denied by Deputy Warden Paul Snyder because I am over the $50.00 limit. I do not believe I am being denied more legal copies because I have exceeded the $50.00 limit, I believe I am being denied more legal copies because I am using them to properly pursue legal action against Deputy Warden Paul Snyder and UTM Robert Sapien. I believe this because I was being allowed more legal copies over the $50.00 limit on a documented needs basis and was only denied after I started the grievance procedure for the conditions of confinement I was subjected to when placed on MRA from January 8th, 2014 to February 19th, 2014. I have to get copies for my 60-1507 Habeas corpus appeal of my conviction in Butler County and 2 other Habeas Corpus actions here in Butler County against EDCF Officials. I also need copies of the notarized documents I submitted for the purpose of grieving the MRA status I was placed on. I was informed by UTM Sapien and Deputy Warden Snyder that I had to have some one in society make copies for me from raw on. I wrote the Warden James Heimgartner directly and Deputy Warden Paul Snyder intercepted it and denied me legal copies again. I then wrote a Form 9 to Deputy Warden Paul Snyder and asked him if I could have some carbon paper mailed in to me so I would have a way to make copies. He denied this request stating that carbon paper is not allowed. So Now I have NO way to obtain legal copies. This is not right as I will not be able to follow the court rules or have a copy of my legal motions sent back to me from the court showing they were filed. This is unlawful and should be corrected. (con't)

Date this report was given to Unit Team for informal resolution (to be completed by inmate). 03-23-2014

## UNIT TEAM RESPONSE (Complete and return to inmate within 10 calendar days.)

*Response attached*

_____    _____
Unit Team Signature    Date

## INMATE RESPONSE (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

☒ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). UTM RSapien 4/21/14

_James R. Dudley_ (See attached paper for why not satisfied)    4-20-2014
Inmate Signature    Date

## WARDEN RESPONSE (Complete, attach response and return within 10 Working days.)

Date Received **APR 23 2014**    Date of Final Answer **APR 28 2014**    Date Returned to Inmate _____

_____    _____    _____    _____
Inmate's Signature    Date    Unit Team Signature    Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

## TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number    CA000 19165 RECEIVED    UT

Type of Complaint (Item 4: Code 01-75)    34

Cause of Complaint (Item 5: Code 01-30)    03

Type of Response (Item 6a: Code 01,02,08 or 09)    08

Wardens Office



**Kansas**
Department of Corrections
*El Dorado Correctional Facility*

Landon State Office Building
900 SW Jackson, 4th Floor
Topeka, KS 66612

Phone: (785) 296-3317
Fax: (785) 296-0014
Email: kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary
James Heimgartner, Warden

Sam Brownback, Governor

**To:**     I/M Dudley, James                    **Date:**  APR 2 8 2014
           #91359  A1-200 at time grievance submitted
           Trnsf to B2-101  4/1/14

**Subject:**   Grievance #19165                **From:**   James Heimgartner
                                                          Warden, EDCF

Your grievance dated April 21, 2014 was received in my office April 23, 2014.

I have reviewed your complaint along with the response provided by Unit Team, CCII St. Peter.
Based on my review, I feel no further action is necessary.

As stated in K.A.R. 44-15-102 (G)(c)(1): "If the warden's answer is not satisfactory, the inmate may
appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is
displeased with and what action the inmate believes the secretary should take. The inmate's appeal shall
be made within three calendar days of receipt of the warden's decision, or within three calendar days of
the deadline for that decision, whichever is earlier.

James Heimgartner, Warden
El Dorado Correctional Facility

Cc: Inmate
    UTM



Landon State Office Building
900 SW Jackson, 4th Floor
Topeka, KS 66612

# Kansas

phone: (785) 296-3317
fax: (785) 296-0014
kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary of Corrections

Department of Corrections

Sam Brownback, Governor

**TO:  Dudley, James R**
     #91359

**DATE:** March 28, 2014

**FROM:  C. St. Peter**
       Corrections Counselor II

**SUBJECT:**  Grievance Response

**Complaint Presented**

On 03/23/2014 you submitted a grievance alleging that you are being denied an extension of indigent legal copy credit because you are pursuing legal action against DW P. Snyder and UTM R. Sapien.  You submitted an attach form 9 addressed to DW P. Snyder requesting an extension of indigent legal copy credit requesting that you be allowed to have carbon paper and stamps sent into the facility by family. This request was denied by DW P. Snyder since these items are not allowed at the facility or can be purchased through a facility authorized vendor.     You also attached a KDOC Account Withdrawal Request for additional postage credit which was denied by UTM R. Sapien due to having already received an extension for overage.

**Investigation**

The issue of indigent legal copy ticket credit is clearly outlined in IMPP 12-127 and GO 12-102. The Decision of thresholds and denials are at the discretion of the Warden or Designee; at El Dorado Correctional Facility these decisions are completed by Deputy Warden P. Snyder.  You were granted an extension of $16.00 on 09/24/2013 by DW P. Snyder to aid you in making legal copies and subsequently your second request for additional copies was denied.  Your current balance on legal copies is $65.40.

IMPP 12-127 States the Following:
"C.       Copy machines shall be available to inmates, and each copy requested per the Open
Records Act shall be paid for by the inmate at the appropriate rate as determined by the pertinent
provisions of IMPP 05-101, with all proceeds deposited into the facility's general fees fund. All copies
of either an inmate's or library materials not subject to copyright protections, and all printouts of
electronic legal research database search results shall be paid for by the inmate at ten [10] cents per
page to be deposited into the facility's inmate benefit fund.

1.       Credit for reasonable amounts of copying required for the inmate to have access to the
courts for criminal or non-frivolous civil litigation relating to the inmate's conviction or conditions of
confinement shall be given to insolvent inmates.  Such credit shall be deducted from the inmate's
funds when available.  In the event copying services are provided on credit, the total amount of such
copying expenses shall not exceed $50.00, unless the warden finds that special circumstances exist.

2.       In order to prevent abuse, the warden has the authority to deny credit to inmates, and may
promulgate general orders setting forth appropriate procedures related to such abuse prevention.

a.       A denial of credit due to abuse shall be determined on an individual basis.  Credit shall
always be extended when necessary to provide an inmate with access to the courts for criminal or
non-frivolous civil litigation relating to the inmate's conviction or conditions of confinement;
provided, however, that such credit shall not exceed $50.00, unless the warden finds that special
circumstances exist.

b.       Each warden may employ thresholds for various levels of review in determining whether or
not credit is to be approved dependant upon the amount of credit previously extended to, or
currently sought by, a given inmate.  However, the requested credit may only be denied to
prevent abuse.

3.       Inmates may forward their legal materials to family, friends, lawyers, etc. in the community
to have them copied.  No copying services will be provided to an inmate on credit until that inmate
establishes that he/she has tried, but is not able to have the legal materials copied by family, friends,
lawyers, etc. in the community.  If the inmate utilizes this option for obtaining copying services, the
inmate will not be limited by the "one ounce" rule set forth at K.A.R. 44-12-601."

El Dorado Correctional Facility
P O Box 311   El Dorado, Kansas   67042
316-321-7284

Reason Why I'm Not Satisfied With Unit Team Response

I am not satisfied with unit team response because I have tried with deligence since receiving this grievance response back on March 30th, 2011 to contact my family to see if I could get them to make copies of my legal materials for me. I could not do so. I could not do so as they all have jobs, go to college and/or have children to take care of.

Attorney's are not responsible for acting as a copying service provider to inmates in prison. And, for El Dorado Correctional Facility Officials and/or the Kansas Department of Corrections to make IMPP 12-127 force inmates to rely on someone else who is not involved in any way in their legal actions is unconstitutional as it causes an unecassary hardship upon the inmates who generaly have limited to no resources in society.

James R. Dudley #0091359

El Dorado Correctional Facility
1737 SE Highway 54
PO Box 311
El Dorado, KS 67042



# Kansas
Department of Corrections
*El Dorado Correctional Facility*

Phone: (316) 321-7284
Fax:  (316) 322-2018

Ray Roberts, Secretary
James Heimgartner, Warden

Sam Brownback, Governor

To:   I/M  Dudley, James R.           Date:   JUL 1 6 2014
      #91359  A2-267

Subject:   *Duplicate* Grievance #19165      From:   James Heimgartner
                                                     EDCF Warden

I have received your dated 7/10/14 grievance.  After reviewing this grievance, it is determined this is a duplicate issue, which has been previously responded to.

As stated in K.A.R. 44-15-102 (G)(c)(1):  "If the principal administrator's answer is not satisfactory, the inmate may appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is displeased with and what action the inmate believes the secretary should take.  The inmate's appeal shall be made within three calendar days of receipt of the principal administrator's decision, or within three calendar days of the deadline for that decision, whichever is earlier.

James Heimgartner, Warden
El Dorado Correctional Facility

cc:  Inmate
     UTM
     File

*Dudley*

Page 1 of 5

A-1-003(5)

## APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS

Inmate Name: JAMES RICHARD DUDLEY ___ Facility: EDCF – Central ___

Inmate Number: #0091359 ___ Grievance Serial No.: "Duplicate" 19165 ___

(Attach grievance report with Principal Administrator's response or explanation why Principal Administrator is bypassed.)

MAIL TO:   Kansas Department of Corrections
714 SW Jackson
Suite 300
Topeka, KS 66603

Date Mailed: 7-28-2014 ___

✗ Got off Crises level on 7-23-2014 and did not recieve property until 7-25-2014.

Tell the Secretary what you feel the Principal Administrator should have done, and state what action you believe the Secretary should take. (Use extra paper as needed.) This grievance is not a duplicate as I state (3) new claims in this grievance that were not in my first attempt at grieving the denial of my indigent legal copies. Those (3) new ____ claims are as follows: 1) I am not provided sufficient amounts of paper or sufficient supr. 2) I have a thumb injury that prevents me from writing alot. And 3) I do not have the financial means to pay for legal copies or my debts. I believe I am still entitled to indigent legal copies. Authorize them on a per documentia basis" or I ____

*Please see ...* Signature of Inmate ___ Thank You!!!

Back

### DECISION BY SECRETARY OF CORRECTIONS (to be completed and returned with 20 days)

If applicable – Confidential File No. _____

Date Received in Office of Secretary of Corrections: _____

Date of Final Answer: _____   Date Sent to Inmate: _____

Finding of Fact:

Conclusions Made:

Action Taken:

RECEIVED
JUL 31 2014
[illegible stamp]

_____
Signature of Secretary of Corrections

**For D.O.C. Staff Use Only**

Type of Response (Item 6b:  Code   01, 02, 08 or 09) _____

DC 090, Effective May 21, 2014



Landon State Office Building
900 SW Jackson, 4th Floor
Topeka, KS 66612

# Kansas
### Department of Corrections

phone:  (785) 296-3317
fax:  (785) 296-0014
kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary of Corrections

Sam Brownback, Governor

**TO:  Dudley, James**
    #91359

**DATE:**  June 30, 2014

**FROM:  R. Sapien**
    Unit Team Manager ACH

**SUBJECT:**  Grievance Response

**Complaint:**

On 06/29/2014 you filed a grievance regarding an extension of copy credit.  You state that you have four non frivolous actions in the courts and feel that this denial is not appropriate based on a medical limitation, and no response for form 9s. You claim that you received $60.00 and it was not applied to your legal copies debt. You think this can be fixed by an extension on legal postage credit.

**Investigation:**

This grievance is a duplicate of CA00019165 which was responded on 05/23/2014.  A copy is attached. Regarding the money that you received this money was applied to legal postage credit which also has a limit of $50.00 and administrative fees that you current owe the Kansas Department of Corrections.  Offender currently shows debts of $38.40 for legal postage credit, $58.00 for medical, $41.00 for administrative fees, $1025.00 in disciplinary fines, $1295.58 in disciplinary restitution, $7.98 in non legal postage, and $65.40 in legal copies credit for a total debt of $2531.36.  Centralized Inmate Banking makes the determination of how funds are applied to debts.

**Conclusion:**

This issue has already been addressed by the Kansas Department of Corrections at both the facility and central office levels.  Offender is encouraged to work on appropriate behaviors to be able to transition out of segregation so that he can obtain an Offender Job and apply his incentive pay to the debts he has incurred during his time in the Kansas Department of Corrections.

R. Sapien UTM ACH
El Dorado Correctional Facility

El Dorado Correctional Facility
P O Box 311  El Dorado, Kansas  67042
316-321-7284

3 of 5

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

## INMATE COMPLAINT

Inmate's Name JAMES RICHARD DUDLEY       A-2-267       Number 0091359

Facility EDCF-Central       Housing Unit A-2 cell 123       Work Detail N/A

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). On 6/12/14 I gave unit Team a form 9 request stating that I needed an extension on my indigent legal copies. I have (4) none frivolous legal actions in the courts and I am prose in all of them but one. The Courts require copies of everything. Without those copies the Clerk of the courts will not file my motions. I am being denied legal copies for no other reason than I have already used $50.00 and $17.00 more of the legal indigent copies provided. I am not provided with sufficient paper to hand write copies. I can not handle hand writing copies for (3) legal actions, (2) of which are in the court of appeals of Kansas. My right thumb is permanently injured. I cannot do a lot of writing like that. I take Naproxen for pain but it only works to a certain extent.

(Continued on back)

Date this report was given to Unit Team for informal resolution (to be completed by inmate). 6/29/14

## UNIT TEAM RESPONSE (Complete and return to inmate within 10 calendar days.)

Response attached

_[signature]_ 7/3/2014
Unit Team Signature       Date

## INMATE RESPONSE (Complete and return to Unit Team within 3 calendar days)

N/A  I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

✗  I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). 7/10/2014

_James R Dudley_ (New issues raised in this.)       7/10/2014
Inmate Signature       Date

## WARDEN RESPONSE (Complete, attach response and return within 10 Working days.)

Date Received JUL 14 2014  Date of Final Answer JUL 16 2014  Date Returned to Inmate _____

_____       _____
Inmate's Signature       Date       Unit Team Signature       Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

## TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number

Type of Complaint (Item 4: Code 01-75)

Cause of Complaint (Item 5: Code 01-30)    (31)

Type of Response (Item 6a: Code 01,02,08 or 09)

Duplicate       RECEIVED
a16       JUL 14 2014



714 SW Jackson, Suite 300
Topeka, KS 66603

**Kansas**
Department of Corrections

Phone: (785) 296-3317
Fax: (785) 296-0014
Email: kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary

Sam Brownback, Governor

July 31, 2014

TO:   0091359 DUDLEY, JAMES   A240 1

El Dorado Correctional Facility

RE:   Invalid Grievance

I received your unnumbered grievance.  Facility staff and the Secretary's Designee have determined the issues in this grievance have already been addressed and these complaints are repetitive.

*KAR 44-15-102 (d) (3) No offender shall abuse the grievance system by repeatedly filing the same complaint.*

For this reason, your repetitive grievance is being returned to you without substantive response.

Sincerely,

Douglas W. Burris
Corrections Manager, Risk Management

cc:   Correspondence
Warden Heimgartner
w/attachments

RECEIVED

SEP 1 0 2014

Wardens Office

**DEPARTMENT OF CORRECTIONS**
900 S.W. Jackson Street, 4ᵗʰ Floor ● Topeka, Kansas 66612-1284 ● Tel: (785) 296-3317 ● Fax: (785) 296-0014

**Kansas Orthopaedic Center**
7550 W. Village Circle
Suite #1
Wichita, Kansas  67205
(316)838-2020

Patient:     JAMES R. DUDLEY
             EL DORADO CORRECTIONAL          EMRN:     557521
             PO BOX 311                       Age/DOB: 08/01/1988
             EL DORADO, KS 67042

                                             Home:     (316)322-2071
Encounter Date: 01/27/2011                   Work:

2 7689 0

CCS
FEB 0 3 2011
Received in Payroll/AP

**Orthopaedic Intervention**
ONSET/INJURY:
12/19/2010--Right Thumb Fracture

SURGERY:
12/20/2010--CRPP Right Thumb Fracture--Dr Hildebrand.
**Physical Exam**
Short arm thumb spica fiberglass cast with distal phalanx visable and a K-wire visable.
Cast removed
Pins in place without complication
Mild swelling. Moderate thumb and wrist stiffness.
**Assessment**
Right Thumb Proximal Phalanx T Condylar Articular Fracture
   --5 weeks s/p surgery.
**Plan**
Incision:  K-wires are removed.
Fracture: Stack splint--while wearing the splint he should work on wrist and thumb CMC joint and MP joint motion.
He was instructed to remove the Stack splint for IP joint motion 4-5 times per day. He can remove the splint for
showering or if he is sitting and not doing any activities that risk bumping the thumb
Follow up: 3 weeks  for a check on progress.
X-rays on return:  PA, Lateral, Oblique-- right thumb centered over the IP joint
Decision based on the x ray and the exam to: release to full activity,release from care.
**Discussed**
Patient is seen with 3 security guards
The injury was explained including the involved anatomy
The x-rays were reviewed.
The treatment plan was reviewed except for the followup.  Questions were answered.
We also discussed the importance of activity modification and limitation, and motion exercises.

CC:  EL DORADO CORRECTIONAL F, -via fax
       Randall Hildebrand, MD-via fax.
**Radiology Exam**
Date of Exam:  01/27/2011
Right Thumb. X-ray
Views: PA, Lateral, Oblique
Findings: T. condylar fracture to the proximal phalanx at the IP joint. There are K wires fixing the fracture which is
in good position. There is slight rotation to the ulnar condyle looking at the articular surface. There is good callus
formation.
**Signature**

       Printed By: Shellie Scaff           1 of 2              1/28/11 8:15:56 AM

This information has been disclosed to you from records the confidentiality of which is protected by law.  You are prohibited
from making any further disclosure of it without the specific written consent of the person to whom it pertains.

Fax Server          1/13/2011 9:34:51 AM  PAGE   1/001   Fax Server

# KANSAS DEPARTMENT OF CORRECTIONS

ElDorado Correctional Facility
1737 SE Highway 54
ElDorado, Kansas 67042

 RADIOLOGY AND NUCLEAR MEDICINE **50**
Excellence in Radiology and Radiation Oncology

| | | |
|---|---|---|
| **Name:** DUDLEY, JAMES | **Age:** 22Years M | **DOB:** 8/1/1988 |
| **Date:** 1/12/2011 | **Requesting Physician:** HARROD, GORDON | |
| **MRN:** 91359 | **Accession:** 125636 | **Pt. Location:** EDCF- |

Central

**Study:** XR FINGER                                    **Laterality:** Right

**Provided Clinical History:** F/U sp repair thumb (healing process) no previous films

---

PA hand and lateral hand with attention to the right first carpal phalanx given history of status post repair.

Examination date 01/12/2011
There are no comparison images.

3 K wires traverse a comminuted fracture of the distal first proximal phalanx.  There is persistence of the fracture plane.  There is early callus formation at the margins of the fracture plane.  There is near obscuration of the intra-articular component of the fracture.  No complicating feature is shown.  There is degenerative spurring at the first metacarpophalangeal joint.

Impression:
K wires remain in place and appropriately afix persistent fracture planes with only mild marginal callus formation which is not completely bridge the fracture margins.

.. ..

Signed: 1/13/2011   9:34 AM Central Time
Miller, Kyle, MD

CONFIDENTIALITY STATEMENT
*This transmission is confidential and is intended to be a privileged communication. It is intended only for the use of the addressee. Access to this message by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken, or omitted to be taken in reliance on it is prohibited and may be unlawful. If you received this communication in error, please notify us by telephone, so that return of this document to us can be arranged.*

## Kansas Orthopaedic Center
### 7550 W. Village Circle
### Suite #1
### Wichita, Kansas 67205
### (316)838-2020

Patient:      JAMES R. DUDLEY
             EL DORADO CORRECTIONAL          EMRN:     557521
             PO BOX 311                      Age/DOB: 08/01/1988
             EL DORADO, KS 67042
                                             Home:    (316)322-2071
Encounter Date: 01/27/2011                   Work:

**Orthopaedic Intervention**
ONSET/INJURY:
12/19/2010--Right Thumb Fracture

SURGERY:
12/20/2010--CRPP Right Thumb Fracture--Dr Hildebrand.
**Physical Exam**
Short arm thumb spica fiberglass cast with distal phalanx visable and a K-wire visable.
Cast removed
Pins in place without complication
Mild swelling. Moderate thumb and wrist stiffness.
**Assessment**
Right Thumb Proximal Phalanx T Condylar Articular Fracture
  --5 weeks s/p surgery.
**Plan**
Incision: K-wires are removed.
Fracture: Stack splint--while wearing the splint he should work on wrist and thumb CMC joint and MP joint motion.
He was instructed to remove the Stack splint for IP joint motion 4-5 times per day. He can remove the splint for
showering or if he is sitting and not doing any activities that risk bumping the thumb
Follow up: 3 weeks for a check on progress.
X-rays on return: PA, Lateral, Oblique-- right thumb centered over the IP joint
Decision based on the x ray and the exam to: release to full activity,release from care.
**Discussed**
Patient is seen with 3 security guards
The injury was explained including the involved anatomy
The x-rays were reviewed.
The treatment plan was reviewed except for the followup. Questions were answered.
We also discussed the importance of activity modification and limitation, and motion exercises.

CC: EL DORADO CORRECTIONAL F, -via fax
    Randall Hildebrand, MD-via fax.
**Radiology Exam**
Date of Exam: 01/27/2011
Right Thumb. X-ray
Views: PA, Lateral, Oblique
Findings: T. condylar fracture to the proximal phalanx at the IP joint. There are K wires fixing the fracture which is
in good position. There is slight rotation to the ulnar condyle looking at the articular surface. There is good callus
formation.
Signature

Printed By: James Gluck          1 of 2          1/27/11 8:08:27 AM

This information has been disclosed to you from records the confidentiality of which is protected by law. You are prohibited
from making any further disclosure of it without the specific written consent of the person to whom it pertains.

# Kansas Orthopaedic Center
**7550 W. Village Circle**
**Suite #1**
**Wichita, Kansas  67205**
**(316)838-2020**

Patient:

JAMES R. DUDLEY
EL DORADO CORRECTIONAL
PO BOX 311
EL DORADO, KS 67042

EMRN:       557521
Age/DOB:  08/01/1988

Home:    (316)322-2071
Work:

Encounter Date: 03/07/2011

**Orthopaedic Intervention**
ONSET/INJURY:
12/19/2010--Right Thumb Fracture

SURGERY:
12/20/2010--CRPP Right Thumb Fracture--Dr Hildebrand.
**HPI**
Patient is in without significant complaint.
**Physical Exam**
Fracture site shows  no tenderness
Swelling: mild to thumb IPJ
ROM: full MPJ motion. IPJ -20/50 without pain.
**Assessment**
Right Thumb Proximal Phalanx T Condylar Articular Fracture
  --11 weeks s/p surgery--bone union with excellent result.
**Plan**
Full use and activity as tolerated.
Follow up as needed.
**Discussed**
Patient is seen with 3 security guards
X-rays were reviewed and compared to last x-rays. Time course for recovery and expectations were
reviewed.Questions were answered.

CC:  EL DORADO CORRECTIONAL F, -via fax
       Randall Hildebrand, MD-via fax.
**Radiology Exam**
Date of Exam: 03/07/2011
Right Thumb. X-ray
Views: PA, Lateral, Oblique
Findings:
Stable position of the fracture with bone union.
**Signature**
Electronically signed by : Kerry  Clark RTR ; 03/07/2011 1:48 PM CST.
Electronically signed by : James  Gluck M.D.; 03/07/2011 2:13 PM CST.

MAR 1 0 2011
Received in Payroll/AP

Printed By: Shellie Scaff            1 of 1                    3/7/11 4:59:20 PM

This information has been disclosed to you from records the confidentiality of which is protected by law.  You are prohibited
from making any further disclosure of it without the specific written consent of the person to whom it pertains.

05/28/2007  06:03    9-1-6202852461          LARNED CORRECTIONAL          PAGE  13/13
01/05/2011  12:41    6202854007                   IR EAST CIM
12/17/2010 FRI 12:04  FAX                                                 PAGE  02/02
                                                                          Ø001/001

# GREAT BEND REGIONAL HOSPITAL
## 514 CLEVELAND
## GREAT BEND, KS.
## PH: (620) 792-8833
## FAX: (620) 792-1448
### PHYSICIAN ADMITTING ORDERS

| INPATIENT | | OUTPATIENT | X |
|---|---|---|---|

**Patient:** JAMES R. DUDLEY      DOB: 8/1/88      **Check in:** 10:00

**Date:** DECEMBER 20TH, 2010                    **Start:** 12:00

**Procedure:** RIGHT THUMB PINNING

**Diagnosis:** FRACTURE

**Date of Injury/Accident:** 12/16/10

PLEASE HAVE NOTHING TO EAT/DRINK THE DAY OF SURGERY UNLESS OTHERWISE INSTRUCTED.

LAB/TESTING TO BE DONE PRIOR TO SURGERY AT PATIENT'S PLACE OF CHOICE.

PLEASE FAX PRE-OP TESTS TO GREAT BEND REGIONAL HOSPITAL AT 620-792-1448 AND TO CENTRAL KANSAS ORTHOPEDIC GROUP AT (620) 792-2058.

CBC – V72.63

PTT

Protime – V58.61

UA – C & S If Indicated -791.9

BMP – **FASTING** – V72.63

CMP – **FASTING** – V72.63

Serum Preg. Test – V72.63

Blood T & S

EKG – V72.81

CXR – V72.82

Digoxin Level

Other:

Admission Orders:

NOTHING TO EAT OR DRINK AFTER MIDNIGHT

Special Instructions:

STOP TAKING IBUPROFEN, ASPIRIN OR ALEVE.

12/20  124/84   97.5 -110 - 20      70"  191

Rec 12-17-10
Rogers APRN

*Randall Hildebrand*                          12/17/10

Dr. Randall Hildebrand                        Date

If you have any questions, please call Dr. Hildebrand's office at # 620-792-4383. Thank you.

| | | |
|---|---|---|
| Larned State Hospital<br>Larned, Kansas<br><br>**PROGRESS NOTE**<br>**CPR- 45**<br>45N8 DAR Note | 3/08 | **Name:** DUDLEY, JAMES RICHARD - 48850<br>**DOB:** 8/1/1988      **Gender:** Male<br>**Case No:** 48850   **Adm Date:** 11/22/2010<br>**Unit:** Isaac Ray - East 3 |
| Page 1 of 1 | | Document ID: 2870359 |

*Date of Observation: 12/16/2010

*Time of Observation: 18:00

*Data: Mr. Dudley was on the phone as a male peer was observed by this writer walking through the area this writer then over herd Mr. Dudley state, " Don't you disrespecting me while I'm on the phone to my momma, mother fucker!" The two men continued to curse at each other. Mr. Dudley then stated, I ain't no punk and you need to stop acting like one!" The male peer then put on his shoes and the two males then walked to eachother and began swining at eachother hands formed to a fist. Staff attemted to intervine seperating the two. Both men had visible swelling of their faces, and multiple cuts, Mr. Dudley reported to this writer he had injured his right thumb. Staff reported this to RN. Nancy Wetlg who assesed Mr. Dudley and male peer. She then contacted the doctor on call. Mr. Dudley has agreed to an early bed time.

*Action: The male peers were escorted to their rooms and given an early bed time to calm down.

*Response: Mr. Dudley curently is lying on his back eyes open.

* required field

*Georgenia Watts, MH/DD Tech*
Georgenia Watts, MH/DD Tech
Georgenia Watts, MH/DD Tech-12/16/2010 18:37 (7328846)

12/16/2010
Date

Service Date: 12/16/2010;Patient Contact: 10 minutes;Diagnosis: Diagnosis or Condition Deferred on Axis I - ;
Linked Short-Term Goal: T; Meeting Short-Term Goal (-1-5): -1;

| | | |
|---|---|---|
| Larned State Hospital<br>Larned, Kansas<br><br>**PROGRESS NOTE**<br>CPR- 45<br>45N6 DAR Note | 3/06 | **Name:** DUDLEY, JAMES RICHARD - 48850<br>**DOB:** 8/1/1988        **Gender:** Male<br>**Case No:** 48850       **Adm Date:** 11/22/2010<br>**Unit:** Isaac Ray - East 3 |
| Page 1 of 1 | | Document ID: 2871214 |

\*Date of Observation: 12-16-10

\*Time of Observation: 18:00

\*Data: Resident was involved in a physical altercation.

\*Action: To assess resident, PERL, bilateral grips equal, B/P 148?88, pulse 135, o2 sat 100%, respirations 24 even and unlabored, temp 97.8
Resident voices pain in his right thumb, swelling slight but increase, cold compress applied. A slit noticed on left corner of upper lip. Cleaned. Dr. Anunwa notified and agreed to come to unit for assessment. Orders to transfer to ER in Larned Pawnee Valley. ER nurse notified of residents pending arrival. Form A completed, Security notified, External medical transfer completed, MAR and face sheet copies made for security to take to ER. All paper work completed, E3 Staff will do incident report. Staff/Kasi MHDD arranged for extra help to escort resident to ER with security and Unit Leader notified for approval to go below core by one staff 15 minutes early.
Resident left at 18:45.
Received a call at 23:00 that Mr. Dudley was coming back. He was xrayed and it was discovered he had a fracture of proximal right thumb, he was fitted for a splint and an appt. was made for him to be seen by Dr. Hildebrand at 0900 morning of 12-17-10. Nursing from ER stressed this appt. was to be kept. East 3 staff RN Karla notified. The resident was gloven motrin 800mg at 23:00 and the ER doctor ordered it for every 8 hrs. Karla RN will notify on call Doctor of his return and the new orders.
Mr Dudley was also treated with derma Bond for his split lip verse stiches. Instuctions given to resident to keep clean.

\*Response: East 3 RN notified that he was on his way back as well as scurity notified of his pending appointment in the A.M. at 0900.

\* required field


*Nancy Wetig RN*

Nancy Wetig, RN
Nancy Wetig, RN-12/17/2010 01:57 (7329683)


12/17/2010
Date


Service Date: 12/17/2010;Patient Contact: 60 minutes;Diagnosis: Diagnosis or Condition Deferred on Axis 1 - ;
Linked Short-Term Goal: A05; Meeting Short-Term Goal (-1-5): 4;

# PAWNEE VALLEY COMMUNITY HOSPITAL PATIENT REGISTRATION REPORT

| PATIENT # | TYPE | SERVICE/LOCATION | OBSERVATION DATE | TIME | ADMIT DATE | TIME | DISCHARGE DATE | TIME | MAN |
|---|---|---|---|---|---|---|---|---|---|
| L00000083113 | ER | PCH.ED | | | 12/16/10 | 2015 | | | M170365 |

### PATIENT INFORMATION

| PATIENT NAME | BIRTHDATE | AGE | SEX | M.S. | PRIV RM | VETERAN |
|---|---|---|---|---|---|---|
| DUDLEY, JAMES RICHARD | 08/01/1988 | 22 | M | MARRIED | Y N | Y N |

| | COUNTY | SOC.SEC.NO | NEW PT | ROOM-BED | RELIGION |
|---|---|---|---|---|---|
| LARNED STATE HOSPITAL    1301 KS HWY 264    LARNED,    KS    67550 | PAWNEE (KS) | 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 | Y N | | No Preference |

| HOME PHONE | ALTERNATE PHONE | | PREVIOUS ADMIT DATE | FIN CLASS | FAM DR |
|---|---|---|---|---|---|
| (620)285-2131 | | | | OT | No Family Physician |

| ADVANCE DIRECTIVE? | PROVIDER # | CONSULTING DR | REFERRAL DR UNKNOWN |
|---|---|---|---|
| LW N    DPOA N | | | |

| ADMIT DR | ATTENDING DR | | PHONE |
|---|---|---|---|
| | Lawton, Timothy W MD | | — |

| EMPLOYER/ADDRESS |
|---|
| INMATE @ LSH |

### RESPONSIBLE PARTY

| NAME OF RESPONSIBLE PERSON | RELATION |
|---|---|
| DUDLEY, JAMES RICHARD | SELF / SAME AS PATIENT |

| ADDRESS | SOC.SEC.NO |
|---|---|
| LARNED STATE HOSPITAL    LARNED    KS    67550 | 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 |

| EMPLOYER | OCCUPATION | HOME PHONE | WORK PHONE |
|---|---|---|---|
| | INMATE @ LSH | (620)285-2131 | |

### IN CASE OF EMERGENCY

| NAME AND ADDRESS | RELATION | HOME | WORK PHONE |
|---|---|---|---|
| MURPHY, CANDICE    LAWRENCE    KS | MOTHER | (785)550-5071 | |
| NAME AND ADDRESS | RELATION | HOME | WORK PHONE |

### INSURANCE INFORMATION

| PRIMARY INS CO | POLICY HOLDER NAME |
|---|---|
| LARNED STATE HOSPITAL | DUDLEY, JAMES RICHARD |

| POLICY # | INS CO PHONE # | GROUP | GROUP # |
|---|---|---|---|
| 509984950 | (620)285-4500 | | |

| INS ADDRESS |
|---|
| ATTN: REIMBURSEMENT    LARNED    KS    67550 |

| SECONDARY INS CO | POLICY HOLDER NAME |
|---|---|
| | |

| POLICY # | INS CO PHONE # | GROUP | GROUP # |
|---|---|---|---|
| | | | |

| INS ADDRESS | |
|---|---|

| TERTIARY INS CO | POLICY HOLDER NAME |
|---|---|
| | |

| POLICY # | INS CO PHONE # | GROUP | GROUP # |
|---|---|---|---|
| | | | |

| INS ADDRESS | COMMENTS |
|---|---|

| ACCIDENT TYPE & LOCATION | ACCIDENT DATE | ACCIDENT DESCRIPTION |
|---|---|---|
| THUMB & L SIDE OF MOUTRSH IN LARNED, KS | 12/16/10 | FIGHT BETWEEN PATIENT & FELLOW INPATIENT |

| ADMIT DIAGNOSIS | PRECERT # | TRANSFERRED TO | ADMIT CLERK INIT |
|---|---|---|---|
| | | | JHARRIS |

### FOR PHYSICIAN'S USE ONLY

Codes







05/28/2007  06:03   9-1-6202852461          LARNED CORRECTIONAL          PAGE  06/13
01/05/2011  11:52   62028540F              IR EAST CIM                  PAGE  05/11
DEC-20-2010 01:19P FROM:PVCH MEDICAL RECORDS 620-285-8503       TO:9    149        P.3

| Pawnee Valley Community Hospital | Emergency Department QualChart® |
| HAND / WRIST PAIN | Circle pertinent positive findings. Backslash pertinent negative findings.   Page 1 of 1 |

**Exam Time:** 2040  a.m. / p.m.

**Mode of Arrival:** EMS / Other   # HGI INDICATOR   ▲ PGRI INDICATOR

**Vital Signs: Stable** Except: BP _____ Pulse _____ Resp. Rate _____ Temp _____
Pulse Ox: NL  Hypoxic  Not Applicable ___ % on RA or O2 @ ___ L/min
Last Tetanus: UTD  Not UTD  Unknown  Last Menstrual Period: _____ Unknown

**HISTORY:**  HX from Pt Unobtainable due to: Dementia  Altered Mental Status  Extremis  HX from: Family / Caretaker  EMS  Interpreter

**CHIEF COMPLAINT:** This is a 22 year old male / female who presents with a chief complaint of pain in   R / L  Hand / Wrist  1 2 3 4 5  Digit(s)   No Known Trauma
**MECHANISM OF INJURY** Altercation (w) ~1800 @ LSH, injured Rt. Thumb & Mouth
**ONSET/DURATION** 2 Minutes Hours Days Weeks Ago  **SEVERITY** (0-10) Mild Moderate Severe  Worse Since: _____
**AGGRAVATING** Movement    **ALLEVIATING** Nothing  Rest  Elevation  Ice  OTC Meds _____ Nothing
**RELATED HX** Dominant Hand: Right / Left  Occupational Injury

**REVIEW OF SYSTEMS:**
Motor  Negative / ROM / Swelling
Neurovascular  Negative  Weakness  Numbness / Tingling
Other Ortho Complaints: _____

**PAST MEDICAL/FAMILY/SOCIAL HISTORY:** Previously Healthy
Patient: Prior Hand or Wrist Injury
Smoking / Alcohol Use: lives @ LSH
Family Hx: N/A
Lives: Alone  With Family  At Nursing Home

**PHYSICAL EXAMINATION:** EXAM LIMITED Dementia  Altered Mental Status  Extremis  DUE TO:

| | Normal Findings: | Abnormal Findings: |
| **Appearance** | Normal  Well-Appearing  No Pain Distress  Well-Nourished | Ill-Appearing Mild Mod Severe  Pain Distress Mild Mod Severe  Obese / Thin / Cachectic |
| **Skin** | Normal  Warm & Dry  Color Normal | Pale / Diaphoretic  Bruises  Cyanosis @ _____ |
| **Neurovascular** | Normal  Pulses Normal  A&Ox3  NV Bundle Intact  Distal to Injury | Abnormal @ _____  A V P U  Disoriented  Abnormal @ _____ |
| **Musculoskeletal** | Normal  No Edema  Strength Intact  ROM Intact | Edema @ _____  Limited in @ Glanced  Limited in Flexion / Extension  Pronation / Supination  Abduction / Adduction |

Complaint-Specific Findings



Swelling / Ecchymosis
Abnormal Contour / Rotation
Ligamentous Instability
Theft's / Phalen's
Laceration / Nail Avulsion
Subungual Hematoma
Erythema / Warmth / Blisters
Foreign Body
Tenderness:
Distal Radius / Ulna
Snuff Box / Carpals
Metacarpals 1 2 3 4 5
Phalanx Prox / Mid / Distal
        1 2 3 4 5

Pain Scale (0 - 10)

**DIFFERENTIAL DIAGNOSES / MOI / PORII:** following conditions may be warranted for the presenting problem, they are not final diagnoses.
Burn / Localized      Felon           Puncture Wound
Carpal Tunnel Syndrome  Foreign Body    Sprain / Strain
Cellulitis / Infection  Gout            Subungual Hematoma
Contusion / Abrasion  Paronychia       Tendonitis / Bursitis
Dislocation          Fracture Closed / Open  Tenosynovitis
Other: _____

H PT Pregnant, Indicate: Visit Related / Unrelated to Pregnancy

**ED PHYSICIAN DIAGNOSES:**
1  Fracture of proximal phalanx of
   @ Rt. Thumb
2  _____
3  Laceration to Lt. corner of mouth

**RE-EVALUATION:**
Time: 2200  Unch. Imp. Worse  Distal N/V Status Intact  + Splint
Time: _____  Unch.  Imp. Worse

**PHYS. NOTIFICATION/CONSULTS:** Chart Copy Avail. to Add'l Care Providers
Discussed case/management/disposition of patient with:
Name: _____ at _____ a.m. / p.m.
Name: _____ at _____ a.m. / p.m.
Admit  OBS  Transfer  Consult  Follow-up: _____

**DISPOSITION:**
Discharge to: Home  Work  Nursing Home  OR  Tele  Floor  Deceased  AMA
Condition: Stable  Unstable      @ _____ a.m. / p.m.
Patient Endorsed To/Discussed With: _____
Transfer to: _____   Transfer Form Completed

After-Care Instructions Given to & Follow-Up Card Discussed w/Patient At Discharge
Chart Completed (Yes)  No

**SIGNATURE:** I have reviewed available Ancillary / Nursing Staff documentation.

**Disposition Time:** 2310  a.m. / p.m.

PA / NP / Resident _____ MD/DO
                         MD/DO
Supervising Physician attests performing pertinent History, Physical Examination, and Medical Decisions _____ (Initials)

DUDLEY JAMES RICHARD
DOB: 04/01/1988  22  M  A/Rn  12/18/10  ER PCH ED
L0000008113                        #170565

This form is to assist the physician's documentation of clinical care and treatment. It is not intended to supplant their judgement or create a standard of care.
(c) 2009 ECI PSO, LLC                              12/18/10 08:48 pm

05/28/2007  06:03   9°1-6202852461          LARNED CORRECTIONAL          PAGE  07/13
01/05/2011  11:52   6202854067              IR EAST CIM                 PAGE  06/11

DEC-20-2010 01:20P FROM:PVCH MED  AL RECORDS 620-285-8603     TO:9   4149      P.4

| Pawnee Valley Community Hospital | Emergency Department QualChart® | Page 1 of 1 |
|---|---|---|

## LACERATION / ABRASION - HEAD/FACIAL
Circle pertinent positive findings.   Backslash pertinent negative findings.

Exam Time: **2040** a.m. / p.m.

Mode of Arrival: EMS  Other  ★ HQI INDICATOR  ▲ PQRI INDICATOR

Vital Signs Stable   Except:  BP _____ / Pulse _____ Resp. Rate _____ Temp _____
Pulse Ox:  NL  Hypoxic   Not Applicable _____ % on R/A or O₂ @ _____ L/min
Last Tetanus:  UTD  Not UTD  Unknown   Last Menstrual Period: _____ Unknown

**HISTORY:**  HX Pt Unobtainable due to: Dementia  Altered Mental Status  Extreme   HX from: Family / Caretaker  EMS  Interpreter
CHIEF COMPLAINT: This is a _____ year old male / female who presents with a chief complaint of laceration / puncture / abrasion to:
Scalp  Forehead  Eyebrow  Eyelid  Face  Nose  Lip  Chin  Neck  (Circle if Appropriate)

MECHANISM OF INJURY  Sharp / Blunt Trauma  FB Potential  Describe: _____
ONSET/DURATION _____ Minutes  Hours  Days  Weeks  Ago   SEVERITY  Mild  Moderate  Severe  Worse Since: _____
AGGRAVATING  Movement _____ Nothing   ALLEVIATING  Compression _____ Nothing
RELATED HX  Occupational Injury  Headache _____  See other sheet

**REVIEW OF SYSTEMS:**

| | | | | Complaint-Specific Findings |
|---|---|---|---|---|
| Eyes | Negative | Photophobia | Blurred Vision | |
| ENT | Negative | Epistaxis | Dental Trauma | |
| Neurovascular | Negative | LOC | Vomiting | |

Level 3 - 4: 1 System
Level 4: 2 Systems

**PAST MEDICAL/FAMILY/SOCIAL HISTORY:**  Previously Healthy
Patient: Diabetes  Bleeding Disorders
Smoking / Alcohol Use: _____
Family Hx: _____
Lives:  Alone  With Family  At Nursing Home

**PHYSICAL EXAMINATION:**  EXAM LIMITED DUE TO: Dementia  Altered Mental Status  Extreme

| | Normal | Normal Findings: | Abnormal Findings: |
|---|---|---|---|
| Appearance | Normal | No Distress | Diaphoretic  Mild / Mod / Severe |
| HEENT | Normal | PERL / EOMI  Ears Normal  Oropharynx Normal | R Pupil _____ L Pupil _____  Hemotympanum  Dental Trauma |
| N/V | Normal | Sensory / Motor Intact  CN Intact  A & O x _____ | Focal Deficit @ _____  CN _____ Palsy  A V P U  Disoriented |
| Neck | Normal | Atraumatic | Tenderness @ _____  Gross Deformity @ _____ |

**Laceration #1:** Location: ① Corner of Mouth
Description: Linear  Stellate / Irregular  Joint Proximity
Size: Length ① x ② cm (After Repair) Width _____ cm  Depth _____ cm
Contamination/FB Removal: _____
Debridement: _____
Modified for Repair: _____

Anesthesia: Local / Digital  .5%  1.0%  2.0%  Lido / Marcaine  Epi / Bicarb _____ ml
Cleansing: Routine Prep  Irrigation w/Pressure Irrigation Device Y / N
Closure: Skin Adhesive  Steri-Strips / Single Layer / Multilayer / Staples #_____
Suture: Skin SQ  Muc Membrane  Muscle # _____ - 0 Nylon / Prolene / Vicryl / Chromic
Suture: Skin SQ  Muc Membrane  Muscle # _____ - 0 Nylon / Prolene / Vicryl / Chromic
Pain Scale (0-10) _____

**DIFFERENTIAL DIAGNOSES / HQI / PQRI**  Consideration of the following conditions may be warranted for the presenting problem; they are not final diagnoses.
Abrasion    Foreign Body    Puncture Wound
Avulsion    Fracture: Open / Closed
Bite Injury    Laceration
Other: _____
If PT Pregnant, indicate Visit Related / Unrelated to Pregnancy

**RE-EVALUATION:**
Time: _____ Unch.  Imp.  Worse
Time: _____ Unch.  Imp.  Worse
**PHYS. NOTIFICATION/CONSULTS:**  Chart Copy Avail. to Add'l Care Providers
Discussed case/management/disposition of patient with:
Name: _____ at _____ a.m. / p.m.
Admit  OBS  Transfer  Consult  Follow-up: _____

**DISPOSITION:**  RX: _____
Discharge to:  Home  Work  Nursing Home  OR  Tele  Floor  Deceased  AMA
Condition:  Stable  Unstable
Patient Endorsed To/Discussed With: _____ @ _____ a.m. / p.m.
Transfer to: _____  Transfer Form Completed
After Care Instructions Given to & Follow-Up Care Discussed w/Patient At Discharge

**ED PHYSICIAN DIAGNOSES:**
1. _____
2. _____  See sheet
3. _____

**SIGNATURE:** I have reviewed available Ancillary / Nursing Staff documentation:

Disposition Time: **2305** a.m. / p.m.

PA / NP / Resident _____
MD/DO _____
MD/DO _____
Supervising Physician attests performing pertinent History, Physical Examination, and Medical Decisions _____ (Initials)

Chart Completed: (Yes)  No

DUDLEY, JAMES RICHARD
DOB: 0001/1906  22  M  A/Sk: 12/16/10  FR PCH-ED
L00000063118   M/178905

This form is to assist the physician's documentation of clinical care and treatment. It is not intended to supplant that judgement or create a standard of care.
(c) 2008 ECI PSO, LLC              12/16/10 08:54 pm

S

05/28/2007  06:03   9-1-6202852461          LARNED CORRECTIONAL              PAGE  08/13
01/05/2011  11:52    62028540F              IR EAST CIM                      PAGE  07/11
                                                                            P.5
DEC-20-2010 01:21P FROM:PVCH MED. AL RECORDS 620-285-8603        TO:9    i149

| Pawnee Valley Community Hospital | Emergency Department QualChart |
|---|---|
| **PROCEDURE NOTE / ORTHOPEDIC** | Page __ of __ |

| PROCEDURE    Time Out / Site Marked Per Facility Policy | Time: | CLINICAL RESPONSE / RE-EVALUATION |
|---|---|---|
| Time: Digital Nerve Block          By: MD / DO / PA / NP / ___ | | Anesthesia Successfully Obtained / ___ |
| Location:   Right / Left | | |
| Anesthesia: Lidocaine / Marcaine / ___ | | |
| Joint Aspiration          By: MD / DO / PA / NP / ___ | | N/V intact; post aspiration assessed by Signatory ___ |
| Indication:  Effusion / Possible Infection / ___ | | Fluid Successfully Obtained / ___  ___ ml |
| Location:    Right / Left | | Clear / Bloody / Cloudy / None |
| Procedure / Technique: ___ | | |
| Injection          By: MD / DO / PA / NP / ___ | | N/V intact; post injection assessed by Signatory ___ |
| Location:    Right / Left          Tendon Sheath | | Pain Successfully Reduced / ___ |
| Tendon Origin / Insertion   Bursa ___ | | |
| Medication: ___ ml | | |
|             ___ ml | | |
|             ___ ml | | |
| Fracture Treatment          By: MD / DO / PA / NP | | N/V intact; alignment post reduction assessed by Signatory |
| Bone(s) / Specify: ___ | | Post Xray;  Reduction Acceptable / ___ |
| Proximal / Distal / Shaft / Joint (Specify): ___ | | |
| Anesthesia: Procedural Sedation / Local / Digital / None | | |
| Procedure / Technique Used: ___ | | |
| Dislocation Treatment          By: MD / DO / PA / NP ___ | | N/V intact; alignment post relocation assessed by Signatory ___ |
| Bone(s) / Specify: ___ | | Post Xray;  Relocation Acceptable / ___ |
| Proximal / Distal / Shaft / Joint (Specify): ___ | | Sedation Adequate / ___ |
| Anesthesia:  Procedural Sedation / Local / Digital / None | | |
| Procedure / Technique: ___ | | |
| | | N/V intact; alignment post splint/strapping assessed by Signatory |
| Splinting / Strapping / Stabilization Treatment | | Overwrapped c 1 3" Ace wrap |
| Location:  Right / Left   Thumb | | |
| Immobilizing Device: Velcro Splint / OCL / Orthoglas 1"x14" | | |
| Splint / Immobilizing Device Applied by:MD / DO / PA / NP / ED Tech / RN | | |
| Referral | | |
| Referred to: Orthopedic Surgeon for Casting / Surgery | | |
| Will See Patient in: ED / Office / Hospital in ___ Days / Immediately | | |
| Referred to: PCP / Orth. Surgeon / EO  for Routine Follow-Up Only | | |
| Will See Patient in: ED / Office / Hospital  in ___ Days | | |

POST PROCEDURE RE-EVALUATION:  Time: 2305  a.m. / p.m.          Pain: ___ (0-10)
N V intact          Vss except: ___
                    Appearance:  NAD / ___
                    Lungs:       Clear / ___
                    Skin:        Warm & Dry / ___
                    Neuro:       A & O x 3 / ___

SIGNATURE: All Procedures Performed/Supervised by Signatory

| Disposition Time: | PA / NP / Resident ___ MD/DO |
| 2310 | ___ MD/DO |
| a.m. / p.m. | |

DUDLEY JAMES RICHARD
DOB: 05/01/1984  22  M  ACSC  12/16/10  ER PCHLED
L00000063113          M170365

This form is to assist the physician's documentation of clinical care and treatment.
... It is not intended to supplant that judgement or create a standard of care.
(c) 2009 ECI PSO, LLC          12/16/10 11:07 pm

Pawnee Valley Community Hosp
Imaging Center
## *IMAGING CONSULTATION*

Pt Name:  DUDLEY,JAMES RICHARD                    DOB:  08/01/1988
Procedure:  Fingers-RT Thumb                       Ordering Provider:  Lawton, Timothy W
Order #:  RAD1216-0128                             MD
Location Performed:  Pawnee Valley Community Hosp   Exam Date:  12/16/10

**Signs and Symptoms: THUMB INJURY, PAIN**

Right thumb

Three views of the right thumb were obtained. No prior studies are available for comparison.

A complex comminuted fracture deformity is present involving the distal aspect of the proximal phalanx of the thumb.
There is extensive interarticular involvement with depression and angulation of the comminuted fracture fragments.

The first MCP joint is intact. The first CMC joint is intact. There is soft tissue swelling.

Impression:

Comminuted intra-articular fracture deformity involving the distal aspect of the proximal segments of the thumb as noted.

Electronically Signed By: WRIMI Michael Wright M. D.

Dictated by: Wright,Michael J MD
D:  12/18/10 1506
T:  12/18/10 1506/
E-Signed Date/Time:  12/18/10 1508
*Report Not Authenticated Until Signing Doctor Signature Is In Place*

COPY

Name:  DUDLEY,JAMES RICHARD                        MRN:  M000170365
DOB:  08/01/1988                                   Pt Acct#:  L00000083113
Physician:                                         Admit Date:
Copies to:  No Family Physician; Lawton, Timothy W MD; Wright, Michael J M.D.   Disch Date:  12/16/10
                                                   Location:  PCH.ED
                                                   Page 1 of 1

05/28/2007  06:03   9-1-6202852461     LARNED CORRECTIONAL       PAGE  11/13
01/05/2011  11:52   62028540F          IR EAST CIM            PAGE   10/11

Larned State Hospital     Rev 2/08
Larned, Kansas

**CONSULTATION ORDER AND REQUEST**
**CPR- 87**
87MS2 – Outside Medical Consultation

Page 1 of 3

**Name:** DUDLEY, JAMES RICHARD - 48850
**DOB:** 8/1/1988      **Gender:** Male
**Case No:** 48850       **Adm Date:** 11/22/2010
**Unit:** Isaac Ray - East 3

Document ID: 2870776

☐ Non-emergency        ☒ Emergency

☒ First consult for this condition      ☐ Follow-up       Next appointment (if known):

\*Type of Consultation:    General Medical

☐ Annual exam       ☐ Routine exam       ☒ Other

**Consulting provider's name:**     Dr. Lawton

Consulting provider's address:     PVCH; Larned, KS

Is another provider involved?      ☐ Yes ☒ No

If yes, provider's name, address, and telephone number:

**Rationale for referral:** Evaluation and advise on management of trauma to the right thumb and of bucal laceration that may require a stitch, during a physical altercation. The metacarpo-digital joint was dislocated and was pulled back into location by the pt. as observed by the nursing staff. Pt further complains of continuing pain, incapacitation of flexion and portential fracture of the proximal digit.
Prior related medical history (include prior injuries, accidents, etc. with dates): H/o dislocation of the thumb joint otherwise None significant
**Date** of onset of symptoms/illness (required for referrals to P.T., O.T., and Speech):     12/16/10

Condition of patient:   ☐ Non-ambulatory    ☒ Ambulatory    ☐ Cooperative     ☐ Non-cooperative

Is patient pregnant?      ☐ Yes    ☐ No    ☒ N/A

☒    Transport by state car (if checked, stop here)

       or

☐    Transport by ambulance (if checked, complete documentation below)

**REASON FOR TRANSPORT BY AMBULANCE** (check all that apply):

☐   Patient is bed-confined (unable to get out of bed without assistance)

☐   Patient can only be moved by stretcher

☐   Patient is unconscious or in shock

☐   Patient can sit in wheelchair safely, but is medically unstable

☐   Patient is unable to ambulate

☐   Patient cannot sit in wheelchair unmonitored

☐   Requires physical restraints for medical reasons (not just "security restraints" per SSP/SPTP policies)

Please send report / interpretation to the attention of the ordering physician in care of:
Larned State Hospital, 1301 KS Hwy 264, Larned, KS 67550

05/28/2007  06:03    9-1-6202852461          LARNED CORRECTIONAL          PAGE   12/13
01/05/2011  11:52    62028540F7              IR EAST CIM                  PAGE   11/11

Larned State Hospital        Rev 2/08        Name:  DUDLEY, JAMES RICHARD - 48850
Larned, Kansas                                DOB:  8/1/1988       Gender:  Male
                                            Case No:  48850     Adm Date:  11/22/2010
**CONSULTATION ORDER AND REQUEST**            Unit:  Isaac Ray - East 3
**CPR- 87**
87MS2 – Outside Medical Consultation

Page 2 of 3                                                    Document ID: 2870776

☐  Requires continuous oxygen monitoring

☐  Requires airway monitoring

☐  Other (please specify):

Patient's medical condition at time of transport:

┌──────────────────────────────────────────────────────────────────┐
│ I certify that transportation by ambulance is medically necessary: │
│                                                                    │
│   ☐  Yes                                                           │
│                                                                    │
│   ☐  No      If no, specify reason ambulance will be used:         │
└──────────────────────────────────────────────────────────────────┘

**REMINDER:** Medical-Staff-to-Medical-Staff call must be made to receiving facility.

* **required field**

_(signature)_
Anthony O Anunwa, M.D.
Anthony O Anunwa, M.D.-12/16/2010 19:38 (7329040)

<u>12/16/2010</u>
Date

_(signature)_
Anthony O Anunwa, M.D.
Anthony O Anunwa, M.D.-12/16/2010 19:39 (7329041)
<u>12/16/2010</u>

Service Date: 12/16/2010;Patient Contact: 30 minutes;Diagnosis: Diagnosis or Condition Deferred on Axis I – ;
Linked Short-Term Goal: T; Meeting Short-Term Goal (-1-5): -1;

Please send report / interpretation to the attention of the ordering physician in care of:
Larned State Hospital, 1301 KS Hwy 264, Larned, KS 67550

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS, Appellees

VS.,

JAMES R. DUDLEY, Appellant.

Appellate Case No. 15-113853-A

District Court Case No. 14CV180

MEMORANDUM IN SUPPORT OF

MOTION UNDER SUPREME COURT RULE 9.01 FOR RELIEF

COMES NOW Appellant,pro se, and hereby submits his Memorandum in Support of Motion Under Supreme Court Rule 9.01 For Relief.

## NATURE OF THE CASE

Appellant, an inmate in custody of the Kansas Department of Corrections, filed a petition for writ of habeas corpus, alleging ineffective assistance of counsel and the State violating the plea agreement in Butler County District Court case no. 2010CR466. Appellant was denied relief by the District Court and appealed the decision to this court and was required to file his brief by November 18, 2015 or his appeal would be dismissed. However Appellant was denied his right to mail his already prepared brief and it's hand written copy to the courts by the KDOC El Dorado correctional facility, the facility stating that Appellant had reached the $50.00 limit on indigent legal postage credit. Appellant has had this block of indigent legal postage ever since until just recently after he became aware that some of his $50.00 debt had been paid off and then was told by his Unit Team that there was no longer a limit on indigent legal postage credit. His Motion Under Supreme Court Rule 9.01 for relief now follows.

STATEMENT OF THE ISSUES

Issue 1:  Is Appellant's Motion Under Supreme Court Rule 9.01 for relief the appropriate action to obtain relief from the Court of Appeals mandate dismissing Appellant's appeal in this appeal?

STATEMENT OF FACTS

Appellant was required to file his brief in Appellate Case No. 15-113833-A by November 18, 2015, or his appeal would be dismissed for failure to comply with the rules of the court. Appellant attempted to mail his already prepared brief and hand written copy on the date of November 10, 2015, but was denied by KDOC/EDCF because Appellant had already reached the $50.00 indigent legal postage credit limit. Appellant on the date of 11/12/15 received the Wardens approval of the denial of his indigent legal postage credit. On November 30, 2015 Appellant wrote to the Warden of EDCF requesting an extension on his indigent legal postage credit and also informed him that I had lost my criminal appeal because of his November 13, 2015 denial. The Warden responded by stating, "Each case is reviewed and determined on a case by case basis." Appellant had already been denied to mail his brief and the extension of indigent legal postage so in essence Appellant was defeated as his request would not be considered again for the same thing.

On December 30, 2015, Appellant attempted to fax file a motion for voluntary dismissal of his appeal based on the fact that he could not fax file his brief and would not be permitted to mail it to the courts, an attempt by Appellant to preserve his appeal for another day, but was denied that too by

EDCF. Appellant on the date of December 31, 2015, Attempted to grieve the denial of his fax file and was told that the court did not accept fax file "briefs." Appellant had put clearly in the grievance that he wanted to file a "Motion for Voluntary Dismissal for case No. 15-113833-A," so correctly assumed EDCF administration was up to their old trick of playing games and would get no further with the grievance because Appellant had just went threw the same battle on the same issue of the $50.00 limit with his indigent legal copy credits so reasonably assumed nothing would be different with his legal postage or fax file.

On the date of January 11, 2016, this court dismissed Appellant's appeal and there was absolutly nothing Appellant could do without his constitutional right to proceed pro se being violated and also because Appellant could not file a petition for writ of habeas corpus pursuant to K.S.A. 60-1501 because he was being denied indigent legal postage credit solely because he had on "outstanding balance" debt. Appellant has no money to pay his debt and cannot keeps a prison job or stay in population long enough because of his struggle with his mental health diabilities and other behavioral health issues. So appellant accepted defeat and decided to try again some other time.

On February 3, 2017, Appellant tried to get an extension on his legal postage credit again to send a request for help from attorney Adam Hall #23664 to see if he could help get this appeal back in motion, but was again denied the extension and was again told I had reached the $50.00 limit.

The odd thing about this continued denial of indigent legal postage is that it was only denied to me when I was attempting to mail something concerning my criminal appeal of Case No. 15-113833-A. In my other litigations

I have been able to get some of it mailed out but this could just be me "getting lucky" and slipping threw due to employee carelessness.

When I try to mail anything big though I always get denied. (When I say "big" I mean mail of considerable weight.) Appellant has not been able to mail anything legal since 2016 because of the weight of the legal petitions. Appellant is given (4) indigent postage envelopes (not stamps) a month and is not allowed to combined them either. So Appellant was just "beat" until he could pay of his debt or policy changed. Now some of Appellant's debt has been paid and just became aware of it in May 2018 and apparently KDOC has changed policy too and now there is no limit on legal postage for indigent inmates which I found out on July 2018.

Being since Appellant is no longer being denied his access to the courts it would not be appropriate to file a petition for writ of habeas corpus pursuant to K.S.A. 60-1501 because the denial of access to courts is no longer "on going or continueing in nature" so Appellant's issue would be moot.

Appellant, after extensive law research, has determined to the best of his knowledge and ability that a motion under supreme court Rule 9.01 is his only avenue of relief in this case because it is the Court of Appeals mandate Appellant is requesting to be recalled not the District courts and Appellant is of the belief that he must first be granted permission to proceed with his Motion Under Supreme Court Rule 9.01 For Relief from the Court of Appeals. If Appellant is mistaken on this it is his respectfull request that this court construe his motion and memorandum liberaly and order it transfered to the District court because Appellant is being forced to handwrite and copy everything by hand

and this is a truely "draconian" burden upon Appellant and I would realy appreciate it if the court didn't make me write out and hand copy a whole new petition to file in the District court. See Johnson v. Parke 642 F.2d 377 at **8 1981.

Also, Appellant believes that the KDOC was not denying him an extension on his indigent legal postage credit (or indigent legal copy credit) soley because he had reached the $50.00 limit. Appellant believes he was being denied because his prior success in Appellate Case Nos. 111,806 and 111,807 (a consolidated appeal). See Dudley v. Snyder, 2015 Kan. App. Unpub. LEXIS 231, 345 P.3d 296.

## STATEMENT OF ISSUES con...

Issue 2:   ~~~~ Whether Appellant is entitled to a second chance at his appeal because he was denied access to the courts by KDOC?

## ARGUEMENTS AND AUTHORITIES

Issue 1: Is Appellant's Motion Under Supreme Court Rule 9.01 for Relief the appropriate action to obtain relief from the Court of Appeals mandate dismissing Appellant's appeal in this appeal?

Standard of review

" An appellate court ordinarily will not exercise original jurisdiction if adequate relief appears to be available in a district court. If relief is available in the district court, a petition must state — in addition to all other necessary

allegations — the reason why the action is brought in the appellate court instead of in the district court. If the appellate court finds that adequate relief is available in the district court, it may dismiss the action or oder it transferred to the appropriate district court. A dismissal under this subsection is not an adjudication on the merits." Supreme Court Rule 9.01(b).

Appellant no longer has the option of a petition for writ of habeas corpus pursuant to K.S.A. 60-1501.

Appellant has alleged that his access to the courts was effectively blocked by the KDOC denying him an extension on his indigent legal postage credit and also not offering no other adequate alternative for Appellant to mail his legal brief and petitions. Thus he has alleged sufficient facts for relief in a K.S.A. 60-1501 habeas corpus proceeding. But Appellant has also stated that he is no longer being denied more indigent legal postage credit and that there is no longer a limit on the amount of indigent legal postage credit. From Appellant's more than average and considerable knowledge and understanding of the law and his level of actual practice in litigating numerous habeas corpus proceedings, he believes that K.S.A. 60-1501 habeas corpus relief is no longer an adequate remedy. This is because "Habeas corpus is an appropriate remedy were mistreatment of a continuing nature or probably continuing nature is alleged." Levier v. State, 209 Kan. 442, 497 P.2d 265 (1972 Kan.).

Appellant can no longer claim KDOC is denying him access to the courts. ~~the courts~~ Appellant is also unaware of any other petitions that he could file in the district court to recall the mandate of dismissal

issued by the <u>Court of Appeals</u>, Appellate is under the impression that if any court should recall a mandate made by the Court of Appeals it would have to be the Court of Appeals it's self or the Supreme Court of Kansas, or a higher Federal court.

If Appellant is mistaken in any of this he is asking that this court still exercise original jurisdiction over his Motion under Supreme Court Rule 9.01 For Relief because this court has the jurisdiction to do so and it would also relieve Appellant of having to hand right and copy a whole new petition and memorandum or brief. Such would be "draconian" in nature because Appellant is being denied indigent legal copy credits because he is at the $50.00 limit.

Issue 2:  Whether Appellant is entitled to a second chance at his appeal because he was denied access to the courts by KDOC?

Standard of review

"It is well-established that a prison inmate has a constitutional right of access to the courts. However, it is equally well-settled that in order "[T]o present a viable claim for denial of access to courts, . . . an inmate must allege and prove prejudice arising from the defendants' actions." Peterson v. Shanks, 149 F.3d 1140, 1145 (10th Cir. 1998)(Citations omitted); Lewis v. Casey, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed. 2d 606 (1996) ("The requirement that an inmate . . . show actual injury derives ultimately from the doctrine of standing.")

KDOC's denial of additional credit for postage caused Appellant an actual injury and was unconstitutional.

In Appellant's appeal he was required to file his brief, (with sufficient copies), by November 18, 2015, or his appeal would be dismissed by the court for failure to comply with the court rules. Appellant was not able to mail his brief to the court because KDOC/EDCF employee's denied Appellant indigent legal postage stating that he had reached the $50.00 limit. At first glance it would appear that KDOC is allowed to do this. See Harrison v. Bent Cty. Corr. Facility, 24 F. App'x 965, 967 (10th cir. 2001)

But a closer look at the case law concerning this issue shows that it is unconstitutional for KDOC to deny Appellant indigent legal postage credit just because he had reached the $50.00 limit and no other reason than that. In fact, all the court's agree and have ruled that if Appellant cannot show that the denial of indigent postage credit caused an actual injury and that the Appellant's claim's in his legal action are not frivolous the Appellant should be denied relief.

This is not the case with Appellant because he lost his appeal do to KDOC denying him postage and there is no evidence that could show that Appellant's Appeal was a frivolous pursuit. So Appellant has suffered an actual injury and KDOC never determined if Appellant's legal pursuit was frivolous. See Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 at *825 1977 U.S. LEXIS 79; Twyman v. Crisp, 584 F.2d 352, at **22, and **24 1978 U.S. App. LEXIS 9211; Holt v. Patty, 2017 U.S. Dist. LEXIS 160710

"Since the prisoner's have a right to their day in court, they must be afforded the right to be heard either pro se or through counsel in a civil action. The right to be heard . . . does prevent the denial or undue restrictions of a prisoner's reasonable access to the courts." Tate ex rel. Stephan v.

O'Keefe, 235 Kan. 1022, 1029, 686 P.2d 171 (1984). Appellant has also pursued 11 different civil actions from 2008 to the time of the denial of indigent legal postage and copies (2015). It took 7 years for Appellant to use the alloted $50.00 for postage and $50.00 for copies. So it cannot be said that Appellant was not using his indigent legal postage responsibly. Also, none of Appellants civil actions were determined to be frivolous.

Therefore based on the facts and law presented this court recall it's mandate dismissing Appellant's appeal and allow Appellant a second chance to file his brief in the interest of justice for Appellant. It would be manifest injustice to deny Appellant this relief when Appellant only lost his appeal because of the actions of KDOC preventing him from filing his brief for no justifiable reason.

Respectfully Submitted,

James R. Dudley #0091559
KDOC
HCF
P.O. Box 1568
Hutchinson KS 67504

KANSAS DEPARTMENT OF CORRECTIONS

A2201

Therapeutic Restraint Flow Sheet

CCS
CORRECT CARE
SOLUTIONS

| ALLERGIES: | Depakote | | | | |
|---|---|---|---|---|---|

Date: 12-1-09   Time Initiated: 1400   Initial Pulse: 72   Respiration: 16   Blood Pressure: —

Place a "√" in the box if done, leave the box blank if not done or place the letter T, R, O and I in the box.

| Nurse Initials: | DN | | CWB | CWB | CW3 | | | |
|---|---|---|---|---|---|---|---|---|
| Time: | 1400 | 1700 | 2000 | 2300 | 0230 | | | |
| **ASSESSMENT** | | | | | | | | |
| Extremity restraints checked X 4 | √ | √ | √ | √ | √ | | | |
| Extremity pulses checked X 4 | √ | √ | √ | √ | √ | | | |
| Chest restraint checked | √ | √ | √ | √ | | | | |
| ROM to all extremities | √ | √ | √ | | √ | | | |
| **BEHAVIOR** | | | | | | | | |
| Cooperative | √ | √ | √ | √ | √ | | | |
| Uncooperative | | | | | | | | |
| Awake and quiet | √ | | | | | | | |
| Resting/Sleeping | | | | | | | | |
| Agitated | | | | | | | | |
| Verbal threats | | | | | | | | |
| **INTAKE AND OUTPUT** | | | | | | | | |
| % of nutrition taken | 100% | | | | | | | |
| Fluids taken = T   Refused = R | R | T | R | T | T | | | |
| Urine Toileting offered = O   Incontinent = I | O | O | O | O | O | | | |
| BM Toileting offered = O   Incontinent = I | O | O | O | O | O | | | |

**VITALS**

| Time | 1400 | 1700 | 2000 | 2300 | 0230 | | | |
|---|---|---|---|---|---|---|---|---|
| Pulse | 72 | 74 | 60 | 60 | R | | | |
| Respiration | 16 | 16 | 16 | 16 | E | | | |
| Blood Pressure | | | 6 | 6 | L | | | |
| Fluid Intake | Ø | Ø | Ø | 100 cc | A | | | |
| Output Urine | Ø | Ø | Ø | Ø | S | | | |
| Output Bowel | Ø | Ø | Ø | Ø | E | | | |

Comments (date and time each entry): 12-1-09  1400 - T/m calm, cooperative. States he didn't want anything to drink & didn't need to use the bathroom. Consumed 100% of lunch. Circulation good. Ø signs of distress.

| Nurse Signature | Initials | Nurse Signature | Initials | Nurse Signature | Initials |
|---|---|---|---|---|---|
| DNolen | DN | Chris | CWB | | |

| INMATE NAME (Last, First, Middle) | DOC # | DOB | RACE/SEX | FACILITY |
|---|---|---|---|---|
| Dudley James | 91359 | 8/1/88 | m | EDCF/c |

# REFUSAL OF MEDICATION DURING PILL PASS

Facility: HCF- CENTRAL

## DEMOGRAPHICS

Inmate Name: Dudley, James L.

Inmate Number: [#90435 9]

Date of Birth: 8/01/88

## CURRENT CONDITION

I AM REFUSING THE FOLLOWING MEDICATION(S):

Zyprexa

REASON FOR REFUSAL(S):

Don't need it. Not psychotic

I AM REFUSING FOR THE FOLLOWING PILL PASS TIME:

○ AM   ○ NOON   ○ EVENING   ○ BEDTIME   ☑ ALL FUTURE DOSES

## ACKNOWLEDGEMENT

- I acknowledge that there are possible risks, complications, and/or side effects involved in refusing medication(s).
- I am aware that by refusing a single dose during 3 pill passes in a row OR 5 times in one week that I may be referred to a healthcare provider to discuss the discontinuation of the medication(s).
- I am aware that by choosing to refuse ALL FUTURE DOSES that the medication(s) may be discontinued and/or I may be required to visit the healthcare provider for counseling.
- I am aware that the healthcare provider has discretion to either discontinue my medication(s) or counsel me to continue the medication.
- I understand that I will continue to have access to health care.

Inmate Signature _____   Date 5-29-21

Witness signature   Ros Partridge RN   Date 5-29-21

Visit forms.
2021

IMPORTANT: HOW TO USE THIS INFORMATION:  This is a summary and does NOT have all possible information about this product. This information does not assure that this product is safe, effective, or appropriate for you. This information is not individual medical advice and does not substitute for the advice of your health care professional. Always ask your health care professional for complete information about this product and your specific health needs.

OLANZAPINE - ORAL (oh-LAN-za-peen)

COMMON BRAND NAME(S): Zyprexa

WARNING:  There may be a slightly increased risk of serious, possibly fatal side effects (such as stroke, heart failure, fast/irregular heartbeat, pneumonia) when this medication is used by older adults with dementia. This medication is not approved for the treatment of dementia-related behavior problems. Discuss the risks and benefits of this medication, as well as other effective and possibly safer treatments for dementia-related behavior problems, with the doctor. If you are using olanzapine in combination with other medication to treat depression, also carefully read the drug information for the other medication.

USES:  Olanzapine is used to treat certain mental/mood conditions (such as schizophrenia, bipolar disorder). It may also be used in combination with other medication to treat depression. This medication can help to decrease hallucinations and help you to think more clearly and positively about yourself, feel less agitated, and take a more active part in everyday life. Olanzapine belongs to a class of drugs called atypical antipsychotics. It works by helping to restore the balance of certain natural substances in the brain. Talk to the doctor about the risks and benefits of treatment (especially when used by teenagers). See also Precautions section.

OTHER USES:  This section contains uses of this drug that are not listed in the approved professional labeling for the drug but that may be prescribed by your health care professional. Use this drug for a condition that is listed in this section only if it has been so prescribed by your health care professional. This drug may also be used to reduce the risk of nausea and vomiting caused by cancer drug treatment (chemotherapy).

HOW TO USE:  Read the Medication Guide provided by your pharmacist before you start taking olanzapine and each time you get a refill. If you have any questions, ask your doctor or pharmacist. Take this medication by mouth with or without food as directed by your doctor, usually once daily. The dosage is based on your medical condition and response to treatment. To reduce your risk of side effects, your doctor may direct you to start this medication at a low dose and gradually increase your dose. Follow your doctor's instructions carefully. Take this medication regularly to get the most benefit from it. To help you remember, take it at the same time each day. Keep taking this medication even if you feel well. Do not stop taking this medication without consulting your doctor. Tell your doctor if your condition persists or worsens.

SIDE EFFECTS:  Drowsiness, dizziness, lightheadedness, stomach upset, dry mouth, constipation, increased appetite, or weight gain may occur. If any of these effects persist or worsen, tell your doctor or pharmacist promptly. Dizziness and lightheadedness can increase the risk of falling. Get up slowly when rising from a sitting or lying position. Remember that your doctor has prescribed this medication because he or she has judged that the benefit to you is greater than the risk of side effects. Many people using this medication do not have serious side effects. Tell your doctor right away if you have any serious side effects, including: difficulty swallowing, shaking (tremor), slow heartbeat, fainting, mental/mood changes (such as confusion, restlessness), numbness/tingling of arms/legs, yellowing eyes/skin, severe stomach/abdominal pain, trouble urinating, interrupted breathing during sleep. This drug may rarely make your blood sugar rise, which can cause or worsen diabetes. Tell your doctor right away if you have symptoms of high blood sugar such as increased thirst/urination. If you already have diabetes, check your blood sugar regularly as directed and share the results with your doctor. Your doctor may need to adjust your diabetes medication, exercise program, or diet. This drug may also cause significant weight gain and a rise in your blood cholesterol (or triglyceride) levels, especially in teenagers. These effects, along with diabetes, may increase your risk for developing heart disease. Discuss the risks and benefits of treatment with your doctor. (See also Notes section.) Olanzapine may rarely cause a condition known as tardive dyskinesia. In some cases, this condition may be permanent. Tell your doctor right away if you develop any unusual/uncontrolled movements (especially of the face, lips, mouth, tongue, arms or legs). This medication may increase a certain natural substance (prolactin) made by your body. For females, this increase in prolactin may result in unwanted breast milk, missed/stopped periods, or difficulty becoming pregnant. For males, it may result in decreased sexual ability, inability to produce sperm, or enlarged breasts. If you develop any of these symptoms, tell your doctor right away. Get medical help right away if you have any very serious side effects, including: seizures. This medication may rarely cause a very serious condition called neuroleptic malignant syndrome (NMS). Get medical help right away if you have any of the following symptoms: fever, muscle stiffness/pain/tenderness/weakness, severe tiredness, severe confusion, sweating, fast/irregular heartbeat, dark urine, signs of kidney problems (such as change in the amount of urine). A very serious allergic reaction to this drug is rare. However, get medical help right away if you notice any symptoms of a serious allergic reaction, including: fever, swollen lymph nodes, rash, itching/swelling (especially of the face/tongue/throat), severe dizziness, trouble breathing. This is not a complete list of possible side effects. If you notice other effects not listed above, contact your doctor or pharmacist. In the US - Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088 or at www.fda.gov/medwatch. In Canada - Call your doctor for medical advice about side effects. You may report side effects to Health Canada at 1-866-234-2345.

PRECAUTIONS:  Before taking olanzapine, tell your doctor or pharmacist if you are allergic to it; or if you have any other allergies. This product may contain inactive ingredients, which can cause allergic reactions or other problems. Talk to your pharmacist for more details. Before using this medication, tell your doctor or pharmacist your medical history, especially of: liver problems, seizures, difficulty swallowing, low white blood cell count, dementia, difficulty urinating (for example, due to enlarged

Lexis® |

Document:                O'Connor v. Huard, 117 F.3d 12                

---

 Go to ⌄  Page  `Page #`  ⌃ ⌄  Search Document 🔍

 **O'Connor v. Huard, 117 F.3d 12**

**Copy Citation**

United States Court of Appeals for the First Circuit

June 27, 1997, Decided

No. 96-1823, No. 96-1824

**Reporter**
**117 F.3d 12** * | <u>1997 U.S. App. LEXIS 16006</u> **

ERNEST P. O'CONNOR, JR., Plaintiff - Appellee, v. DEBORAH HUARD, Defendant - Appellant.
ERNEST P. O'CONNOR, JR., Plaintiff - Appellant, v. DEBORAH HUARD, Defendant - Appellee.

**Subsequent History:** As Corrected.

**Prior History:** [**1] APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE Hon. Eugene W. Beaulieu, U.S. Magistrate Judge.

## Core Terms

damages, attorney's fees, district court, rights, pretrial detainee, restrictions, conditions,
compensatory, instructions, directed verdict motion, motion for judgment, qualified immunity,
punitive damages, detainees, detention facility, discipline, detention, pretrial, nominal, punish

## Case Summary

### Procedural Posture
Appellant guard sought review of a judgment of the United States District Court of Maine,
that awarded appellant pretrial detainee nominal damages in his <u>42 U.S.C.S. § 1983</u> action

Constitutional Law > Equal Protection ▾ > Disability ▾

Governments > State & Territorial Governments ▾ > General Overview ▾

View more legal topics

**_HN3_ Protection of Rights, Section 1983 Actions**

The government may detain one accused of a crime prior to trial in order to ensure his presence at trial. Prior to an adjudication of guilt, a state government may not punish a pretrial detainee without contravening the Due Process Clause of U.S. Const. amend. XIV. The government may impose administrative restrictions and conditions upon a pretrial detainee that effectuate his detention and that maintain security and order in the detention facility. When confronted with a charge by a pretrial detainee alleging punishment without due process, the court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. 🔍 More like this Headnote

_Shepardize®_ - Narrow by this Headnote (19)   ◆ 4

Civil Rights Law > Protection of Rights ▾ > Section 1983 Actions ▾ > Scope ▾

Constitutional Law > Substantive Due Process ▾ > Scope ▾

**_HN4_ Protection of Rights, Section 1983 Actions**

If a particular condition or restriction of pretrial detention is reasonably related to a legitimate government objective, it does not, without more, amount to "punishment." If a restriction or condition is not reasonably related to a legitimate goal, if it is arbitrary or purposeless, a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. 🔍 More like this Headnote

_Shepardize®_ - Narrow by this Headnote (8)    3

Civil Rights Law > Protection of Rights ▾ > Section 1983 Actions ▾ > Scope ▾

Constitutional Law > Substantive Due Process ▾ > Scope ▾

**_HN5_ Protection of Rights, Section 1983 Actions**

The government has a valid interest in managing the detention facility and, toward that end, may employ administrative measures that may be discomforting or are of a nature that the detainee would not experience if he were released while awaiting trial. Barring "substantial evidence" that an administrative measure is an exaggerated response to these considerations, courts should ordinarily defer to their expert judgment in such matters. 🔍 More like this Headnote

_Shepardize®_ - Narrow by this Headnote (2)

Civil Procedure > Trials ▾ > Judgment as Matter of Law ▾ > Directed Verdicts ▾

View more legal topics

**_HN6_ Judgment as Matter of Law, Directed Verdicts**

Fed. R. Civ. P. 50(b) specifies that a party, having submitted a motion for a directed verdict may, after the verdict and entry of judgment, move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his

times relevant to the case, brought this Section 1983 suit for compensatory and punitive damages and declaratory relief against Alfred Cichon ("Cichon"), a physician's assistant at the Jail, and Catherine Mesaric ("Mesaric") and Appellant-Cross-Appellee Deborah Huard ("Huard"), Corrections Sergeants at the Jail. O'Connor contended that, while he was being held as a pretrial detainee, Cichon deprived him of medical attention, which amounted to cruel and unusual punishment, and that he was punished in violation [**2] of his due process rights under the Fourteenth Amendment. On January 20, 1996, summary judgment was granted in Cichon's favor. Prior to trial, Mesaric was dismissed from the suit.

The case against Huard was tried before a jury in June 1996. At the close of O'Connor's case, Huard moved for a directed verdict. The district court took the motion under advisement. At the close of all evidence, Huard renewed her motion, which the district court denied. The jury returned a verdict in O'Connor's favor, finding that Huard had violated his Fourteenth Amendment due process rights, and awarding him one dollar in compensatory damages. The court then instructed the jury on punitive damages, which the jury, after deliberating, declined to award. Huard filed a motion for judgment notwithstanding the verdict and a motion for a new trial, which the district court denied. Huard appeals the district court's jury instructions, the denial of her motion for judgment notwithstanding the verdict, and the award of attorney's fees to O'Connor. O'Connor cross-appeals the jury's refusal to grant him actual compensatory and punitive damages. We affirm.

## BACKGROUND

**HN1** On review of a jury verdict, we recite [**3] the facts in the light most favorable to that verdict. **[*15]** See Ferragamo v. Chubb Life Ins. Co., 94 F.3d 26, 27 n.1 (1st Cir. 1996). Huard was a Corrections Sergeant at the Jail during all times relevant to this case. O'Connor was initially incarcerated in the Jail for a brief period in January 1993. On January 18, 1993, O'Connor told Huard that "he needed his medication." She instructed him to fill out a Medical Request form, and when he did so, she forwarded the form to the Medical Department. Pursuant to his request, O'Connor met with the Jail's physician's assistant, Cichon, for a medical evaluation. O'Connor asked Cichon for Xanax or Valium to treat anxiety. Cichon diagnosed O'Connor as suffering from "anxiety disorder," for which he prescribed Xanax. Soon thereafter, O'Connor was released from the Jail.

On October 30, 1993, O'Connor was placed in pretrial detention at the Jail, where he remained for approximately six months. O'Connor again submitted a request for medication, which Cichon now denied, because he could not verify O'Connor's medical history, believed that O'Connor did not suffer from an anxiety disorder, and was concerned about O'Connor's history of drug abuse.

During [**4] this detention, an animosity developed between Huard and O'Connor, eventually leading to daily verbal confrontations. O'Connor called Huard names that evidenced O'Connor's disdain for what he believed was Huard's sexual orientation. Huard, in turn, called O'Connor "a scumbag, a low-life, a dirtbag, a drug addict, creep." Huard taunted O'Connor about his failure to get the medication he desired and his inability to cope without it. O'Connor would react to these taunts by kicking doors and banging the bars of his cell and by hurling verbal abuse at Huard. As a result of these actions, O'Connor would be removed from his cell and placed in administrative lockdown. Frequently, during these administrative lockdowns, the other inmates on the cell block would be restricted to their cells.

_Wolfish_, 441 U.S. 520, 536, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). Prior to an adjudication of guilt, however, a state government may not punish a pretrial detainee without contravening the Fourteenth Amendment's Due Process Clause. _See id._ at 535. The government may, however, impose administrative restrictions and conditions upon a pretrial detainee that effectuate his detention, _see id._ at 537, and that maintain security and order in the detention facility, _see id._ at 536. When confronted with a charge by a pretrial detainee alleging punishment without due process, the "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." _Id._ at 538.

> **_HN4_**⚓ Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate government objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted [**8] upon detainees qua detainees.

_Id._ at 538-39. **_HN5_**⚓ The government has a valid interest in managing the detention facility and, toward that end, may employ administrative measures that may be discomforting or are of a nature that the detainee would not experience if he were released while awaiting trial. _See id._ at 540. Barring "substantial evidence" that an administrative measure is an exaggerated response to these considerations, "courts should ordinarily defer to their expert judgment in such matters." _Id._ at 540 n.23.

Huard's claim of error addresses a conceptually different issue. Huard argues that the magistrate's instructions were erroneous because they failed to incorporate the appropriate standard, which she contends is the Eighth Amendment "deliberate indifference" standard applied when a pretrial detainee alleges a denial of appropriate medical care. Huard's contention misconceives the claim at issue in this case. O'Connor's allegation as it related to Huard was that she intentionally provoked or incited him into "rage attacks" by relentlessly taunting him. O'Connor claimed that Huard engaged in such actions so that she could subsequently discipline him by [**9] imposing "administrative lock down." Given the nature of O'Connor's claim, the magistrate was correct in denying Huard's request to incorporate "deliberate indifference" instructions into the jury charge.

We emphasize that nothing in the resolution of this case or in this opinion is meant to suggest that a detention facility may not discipline a pretrial detainee who violates the facility's administrative regulations employed to maintain order and security. O'Connor's challenge was not that the Kennebec County Jail's system of allowing a pretrial detainee's discipline following a violation of its administrative regulations was suspect, but rather that Huard's intention was to punish O'Connor and her provocative or instigative actions were directed toward this end. Thus, the ability of a detention facility to reasonably discipline detainees who violate rules is not implicated by the issues presented in this case, in which a jury found that Huard's acts were tantamount to arbitrary and unreasonable punishment.

**II.**

### Qualified immunity

In her motions for directed verdict, both at the close of O'Connor's case and at the close of all the evidence, Huard argued [**10] [*17] that she was entitled to judgment as a matter of

461 U.S. 424, 438, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)); *see also Wilcox v. City of Reno, 42 F.3d 550, 554 (9th Cir. 1994)* (noting that "*Farrar* establishes that a district court should give primary consideration to the degree of success achieved when it decides whether to award attorney's fees," and affirming a grant of **[*18]** $ 66,535 in fees on award of one dollar in nominal damages), *cited with approval in Krewson v. Town of Quincy, 74 F.3d 15, 17 (1st Cir. 1996).*

Here, the district court recognized several important factors warranting the grant of attorney's fees. First, the district court's order recognized the importance of providing an incentive to attorneys to represent litigants, such as O'Connor, who seek to vindicate constitutional rights but whose claim may not result in substantial monetary compensation. Second -- and worth noting in light **[**14]** of the *Farrar* Court's emphasis on the fact that Farrar sought only compensatory damages in the amount of $ 17 million and ultimately received one dollar from each defendant -the most basic remedy O'Connor sought in this case was relief from Huard's infliction of punishment without due process of law. Third, the court underscored the deterrent impact of this litigation, which will prevent "future abuses of the rights of pretrial detainees." Fourth, the court deducted from the requested amount for fees hours related solely to the two defendants who were not part of the trial, hours spent in excess of that reasonably required of a task, hours spent researching inapplicable areas of law, and hours inadequately explained or detailed. Based on the appropriateness of all of these considerations, we find that the district court's grant of attorney's fees was within its discretion.

## IV.

### O'Connor's claim regarding damages

On cross-appeal, O'Connor appears to argue, for the first time, that the jury's failure to award him punitive and compensatory, rather than only nominal, damages was unreasonable. The short answer to O'Connor's contention is that the issue should **[**15]** have been raised before the district court in a motion for a judgment notwithstanding the verdict or a motion for new trial. **HN9** We generally will not review a party's contention that the damages award is excessive or insufficient where the party has failed to allow the district court to rule on the matter. *See Carlton v. H.C. Price Co., 640 F.2d 573, 577 (5th Cir. 1981)* (no appellate review of allegedly excessive or inadequate damages was available where trial court was not given the opportunity to exercise its discretion on the matter), *cited with approval in Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 811 (1st Cir. 1988); Braunstein v. Massachusetts Bank & Trust Co., 443 F.2d 1281, 1285 (1st Cir. 1971)* (denying review of claim that award was excessive because appellant failed to raise the issue before the district court).

More importantly, however, we find that the jury was not unreasonable in failing to award O'Connor compensatory or punitive damages. O'Connor put forward evidence of damages related to his mental and emotional suffering endured as a result of Huard's actions, and did not present any evidence of economic damages. **[**16]** Assuming the jury was properly instructed on the issue of damages, and O'Connor does not challenge the instructions on appeal, the jury could reasonably have believed that O'Connor did not suffer a compensable harm. *See Davet v. Maccarone, 973 F.2d 22, 27-28 (1st Cir. 1992).*

Additionally, O'Connor appears to argue that Huard's actions registered such malicious intent, reckless disregard, or callous indifference to O'Connor's constitutional rights that the jury was unreasonable in failing to award him punitive damages. Our review of the record indicates "that the evidence does not 'point so strongly and overwhelmingly in favor of the movant [plaintiff]



HCF CENTRAL LIBRARY

INDEPENDENT APPOINTMENTS SCHEDULED

Name/DOC# Dudley 91352

Living Assignment B1-215

You are scheduled at the following times. Please keep this confirmation – it is your responsibility to know when your appointments are. If you miss two appointments, the remainder of your schedule will be cancelled.

| Date | Time | Research | Language/Type Only |
|------|------|----------|--------------------|
| 5/19 | 7:30 | ✓ | |
| 5/20 | 7:30 | ✓ | |
| 5/25 | 8:45 | ✓ | |
| 5/26 | 7:30 | ✓ | |

Employee's signature and date   Abbey 5/12/21

| Date | Time | Research | Language/Type Only |
|------|------|----------|--------------------|
| 5/12 | 7:30 | ✓ | |
| 6/1 | 7:30 | ✓ | |
| 6/2 | 8:45 | ✓ | |
| 6/3 | 8:45 | ✓ | |

Attachment B, IMPP 20-105
Effective 07-08-14

# Kansas Department of Corrections
# Administrative Segregation Report

TO: _Secretary of Corrections_                          Report Number: __82032__
FROM: _Hutchinson Correctional Facility_

Date This Report Filed:           __6/2/2021__      Time of Report:        __08:10 AM__
Date of Segregation              __6/2/2021__      Time of Placement:     __08:00 AM__
Placement:

Offender Name: Dudley, James #__91359__    *ISO*    Reason(s) For Segregation (Including Rule No. and Title):
Moved from Cell #: __B1-215__ to Segregation Cell #: __A2-Z19__    IMPP 20-104 (I)(B)(4) Pre-Hearing Detention

☒    Pre-Segregation hearing conducted

☐    Pre-Segregation hearing NOT conducted (Explain) _____

Facts: Inmate Dudley was laid in from recreation yard for a disciplinary hearing.  He began yelling and screaming to
such a degree that he could be heard in the Rotunda.  SST was sent to escort him to RHU but he refused directives
to submit to restraints.  An extraction team was being assembled to move him but he did finally submit to being
restrained. He is receiving multiple disciplinary reports for this incident. The inmate was cleared by medical staff.
Inmate was not present for the inventory of his property.

☐    This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

_____

What is the reason no alternative means of separation can be arranged?

_____

_J. Kipp CSIII_                Date  _6/2/2021_      _J. Kipp CSIII_                    Date   _6/2/2021_
Signature and Title of Reporting Officer              Shift Supervisor or Seg Unit Mgr.

                                                                         Date _____
                                         Warden Authorization (if needed)

*****************************************************************************************************************

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date: _6/2/21_      Time: _1047_ (am) pm
_unable to sign_         # _91359_              _R Smith C SI_
Offender Signature and Number                    Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden
          Offender
          PCM
          EAI

Attachment B, IMPP 20-105A
Effective 05-13-22

# Kansas Department of Corrections
## Administrative Restrictive Housing Report

TO: _Secretary of Corrections_                 Report Number: **01-23-0281**

FROM: _Lansing Correctional Facility_

Date This Report Filed _08/03/2022_   Time of Report _0740_ ☒ a.m. ☐ p.m.

Date of Restrictive Housing Placement _08/03/2022_   Time of Placement _0740_ ☒ a.m. ☐ p.m.

Reason(s) for Restrictive Housing
(including Rule No. and Title)

Resident Name: **Dudley, James**   **#91359**

Moved from Cell: _A2 105_  to Restrictive Housing Cell #: _A2 105_

| | |
|---|---|
| IMPP 20-104A ; III. C. Pre-Hearing Detention | |

☐ Pre-Restrictive Housing hearing conducted

☒ Pre-Restrictive hearing NOT conducted (Explain

| |
|---|
| IMPP 20-105A; VII. More Restricted Area |

I/M Dudley refused to move into cell assigned. I/M Dudley was to be moved from A2 105 to A2 121 on 8/03/22 and refused. I/M Dudley remained in same MRA cell.

Facts:

07/27/22 I/M Dudley #91359 refused to move from A2 105 to A2 121. A2 105 is a MRA cell. Disciplinarly Report written; case#0352

☐ This placement is an Involuntary Protective Custody due to PREA Concerns (respond to next two (2) sections)

What is the basis for the facility's concern for the resident's safety?

What is the reason no alternative means of separation can be arranged?

Kim Opliger, UTM _____   8/03/22

Signature and Title of Reporting Officer   Date

Approved By: _____   8/3/22

Shift Supervisor or Restrictive Housing Unit Mgr.   Date

_____   _____

Warden Authorization (if needed)   Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ACKNOWLEDGMENT:

I received a copy of this report on:   Date _8/3/22_   Time _1240_ ☐ a.m. ☒ p.m.

unable to sign due to MRA.
copy given.

Resident Signature and Number #   Lt. B____   Staff Witness and Title

Record this Document in Imaging

Original to Master File

Copy to: Warden
        Resident
        PCM

Attachment B, IMPP 20-105
Effective 04-09-2021

# Kansas Department of Corrections |NM
## Administrative Restricted Housing Report

TO: <u>Secretary of Corrections</u>                                    Report Number: __01-22-2018__
FROM: <u>Lansing Correctional Facility</u>

Date This Report Filed                    <u>April 19, 2022</u>        Time of Report:    <u>0422  hrs.</u>
Date of Restrictive housing placement     <u>April 19, 2022</u>        Time of Placement: <u>0407  hrs.</u>

Resident Name: Dudley James R 91359

Reason(S) For Restrictive housing (Including Rule No. and Title)   <u>IMPP 20-105A, VI. More Restricted Area</u>

Moved from Cell # **A4-100** to Restrictive housing Cell #: <u>**A4-109**</u> INF

☒   Pre-Restrictive housing hearing conducted: **Room A4-100**

☐   Pre-Restrictive housing hearing NOT conducted (*Explain*)

Facts:  <u>Offender Dudley 91359 is being placed MRA for battery on COI Baidoo and Lieutenant Hartley while</u>
<u>attempting to close the food port of his assigned cell A4-100.  Offender was not present in the room while staff</u>
<u>gathered his property for MRA status, was seen by the clinic nurse Jennifer Hernandez prior to replacement in his</u>
<u>assigned room.</u>

☐   This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

What is the reason no alternative means of separation can be arranged?

_____ Date <u>4/19/2022</u>        Approved By: _____ Date <u>4/19/2022</u>
Signature and Title of Reporting Officer                          Shift Supervisor or Seg Unit Mgr.

_____ Date__/__/____
Warden Authorization (If Needed)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date <u>4/19/2022</u>        Time: <u>0433 hrs.</u>

<u>Due To Behavior Read And Left Copy # 91359</u>        _____
Offender Signature and Number                            Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden

KANSAS DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE SEGREGATION REVIEW (Pursuant to IMPP 20-105/106)
LCF-100

☒ Monthly Review

Name: DUDLEY,JAMES                 Number: 91359          Date: 3/11/2022

Date placed in Segregation: 2/9/2022          Recommended date of release: N/A

Did inmate appear before board?  ☐ Yes    ☒ No

1. Present Status: IMPP 20-104 (13) Other Security Risk

2. Return to General Population?
   ☐ Yes  ☒ No

3. Transfer to another Kansas facility or another State or Federal facility?
   ☐ Yes  ☒ No

4. Medical or Psychological intervention?
   ☐ Yes  ☒ No

   a. Continue ☒     Modify ☐ program or treatment status?

5. Inmate informed of right to submit written request for release to board?
   ☒ Yes  ☐ No

6. While in segregation inmate's behavior has been satisfactory?
   ☒ Yes  ☐ No

7. The placement was legal and proper?
   ☒ Yes  ☐ No

8. A pre-segregation placement hearing was held?
   ☒ Yes  ☐ No

Board Comments: Inmate is currently in restrictive housing on OSR status due to his continued negative behavior.   The Board agreed he will remain in restrictive housing at this time.

Approved: X          Disapproved: _____

                                                EAI Staff

Approved: X          Disapproved: _____

                                                Clinical Staff

Approved: ✓          Disapproved: _____

                                                Security Staff

Approved: ✓          Disapproved: _____

                                                Chairperson

Approved: _____      Disapproved: _____

                                                Warden

Inmate acknowledgement:
I received a copy of this review on: _____  20_____  At _____

_____
Inmate Signature and Number

_____
Signature and Title of Staff

Attachment B, IMPP 20-105A
Effective 04-09-21

Kansas Department of Corrections
# Administrative Restrictive Housing Report

To: **Secretary of Corrections**

Report Number: 04-22-2082

From: **Lansing Correctional Facility**

Date This Report Filed:**4/26/22**

Time Filed: **2:08 PM**

Date of restrictive Housing placement: **4/26/22**

Time of Placement: **2:08 PM**

Resident Name:  **DUDLEY, JAMES**      #  **91359**

Moved from Cell #:  **A4-100**  to Restrictive Housing Cell #:  **DC-02**

Reason(s) For restrictive Housing
(Including Rule No. and Title)

**IMPP 20-104A Mental/Emotional Problems**
_____

☐      Pre-Restrictive Housing hearing conducted

☐      Pre-Restrictive Housing hearing NOT conducted (Explain):

Facts: Client reported suicidal thoughts to officers. Upon assessment of bhp and psychiatry, client reported that he was suicidal, had an active plan of intent but stated he would refuse to communicate further. Per psychiatry, APRN Darr, client placed on CL2 with property of smock, toilet paper as needed, finger foods.

☐      This placement is an involuntary Protective Custody due to PREA Concerns (Respond to next two (2) sections)

What is the basis for the facility's concern for the resident's safety?

What is the reason no alternative means of separation can be arranged?

_____ Date: **4/26/22**
Signature and Title of Reporting Officer

Approved By
_____ Date: **4/26/22**
Shift Supervisor or Seg. Unit Mgr.

_____ Date: **4/26/22**
Warden Authorization (If Needed)

*********************************************************************************************************

RESIDENT ACKNOWLEDGEMENT:

I received a copy of this report on: Date: **4/26/22**          Time: **2:08 PM**

_____
Resident Signature and Number

_____
Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden
          Resident
          PCM

Attachment B, IMPP 20-105
Effective 04-09-2021

# Kansas Department of Corrections
# Administrative Restricted Housing Report

TO: <u>Secretary of Corrections</u>          Report Number: __01-22-2049__
FROM: <u>Lansing Correctional Facility</u>

Date This Report Filed          <u>April 21, 2022</u>     Time of Report:   <u>19:02 hrs.</u>
Date of Restrictive housing placement   <u>April 21, 2022</u>     Time of Placement:  <u>hrs.</u>

Resident Name: <u>91359 Dudley</u>

Reason(S) For Restrictive housing (Including Rule No. and Title)   <u>IMPP 20-104A, -Mental/Emotional Problems</u>

Moved from Cell # <u>A4-100</u>   to Restrictive housing Cell #: <u>DC-08</u>

☒     Pre-Restrictive housing hearing conducted (***Capt. Office***)

☐     Pre-Restrictive housing hearing NOT conducted (***Explain***)

Facts: <u>BHP met with Client in MAX Clinic after Client self-harmed. Per Client he was being neglected by MH and CO all day and felt cutting was the only way to get attention. Client's cuts to his left arm were treated by Nursing; who determined there was no need for hospitalization. BHP communicated with psychiatry, Dr. Nelson and Client is placed on Crisis Level 3. Property to include gown or smock, toilet paper upon request, and finger foods.</u>

☐     This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

What is the reason no alternative means of separation can be arranged?

Approved By:

*Chauncey D. Hester, Sr. LMSW*     Date <u>4/21/2022</u>          _____   Date <u>4/21/2022</u>
Signature and Title of Reporting Officer                Shift Supervisor or Seg Unit Mgr.

                                    _____   Date__/__/____
                                    Warden Authorization (If Needed)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date <u>4/21/2022</u>     Time: <u>1905</u> <u>hrs.</u>

UNABLE TO SIGN DUE TO STATUS
Offender Signature and Number *VM COPY TO*          Staff Witness and Title

Record this Document in Imaging *WTM*
Original to Master File

Attachment B, IMPP 20-105
Effective 07-08-14

# Kansas Department of Corrections
## Administrative Segregation Report

TO: <u>Secretary of Corrections</u>                    Report Number: <u>79869</u>

FROM: <u>Hutchinson Correctional Facility</u>

Date This Report Filed:    <u>10-30-19</u>        Time of Report:      <u>1830</u>
Date of Segregation        <u>10-30-19</u>        Time of Placement:   <u>1815</u>
Placement:

Offender Name: <u>Dudley, James</u> #<u>91359</u>     Reason(s) For Segregation (Including Rule No. and Title):

Moved from Cell #: <u>B2-125</u> to Segregation Cell #: <u>A2-215</u>     IMPP 20-105 (V) More Restricted Area (MRA)

☒     Pre-Segregation hearing conducted

☐     Pre-Segregation hearing NOT conducted (Explain) _____

Facts: <u>Dudley was placed in RHU for interfering with official duties during a medical emergency with another inmate.</u>
<u>While in RHU he swung and hit an officer through the bars. He was then placed on MRA status</u>
<u>The inmate was cleared by Corizon staff.  Inmate was not present for the inventory of his property.</u>

☐     This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

_____

What is the reason no alternative means of separation can be arranged?

_____

Widener CS II _____ Date  <u>10-30-19</u>       Approved By: _____ Date  <u>10-30-19</u>
Signature and Title of Reporting Officer        Foster CS III          Shift Supervisor or Seg Unit Mgr.

_____  Date  _____
Warden Authorization (if needed)

***************************************************************************************************

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date: <u>11/1/19</u>       Time: <u>0627</u> (am / pm

_____  # _____       _____
Offender Signature and Number              Staff-Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden
        Offender
        PCM
        EAI

Attachment B, IMPP 20-105
Effective 04-09-21

# Kansas Department of Corrections
## Administrative Segregation Report

TO: <u>Secretary of Corrections</u>                                                     Report Number: <u>83687</u>

FROM: <u>Hutchinson Correctional Facility</u>

Date This Report Filed:        <u>1/24/2022</u>              Time of Report:              <u>8:20 am</u>
Date of Segregation            <u>1/24/2022</u>              Time of Placement:        <u>8:10 am</u>
Placement:

Offender Name: <u>Dudley, James</u> #<u>91359</u>          Reason(s) For Segregation (Including Rule No. and Title):
                                                                     IMPP 20-105 (VI) More Restricted Area (MRA)

Moved from Cell #: <u>A2-215</u> to Segregation Cell #: <u>A1-136</u>

☐        Pre-Segregation hearing conducted

☐        Pre-Segregation hearing NOT conducted (Explain)

Facts: <u>Dudle y#91359 physically battered  the officer escorting him from a medical appointment to his cell.</u>
<u>Physical force was necessary to gain control of the inmate. No injuries reported to inmate and no serious injury to the</u>
<u>officer. The inmate was cleared by medical staff.  Inmate was not present for the inventory of his property.</u>

☐        This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

_____

What is the reason no alternative means of separation can be arranged?

_____

G. S. Kilmer CSII _____ Date  <u>1/24/2022</u>          Approved By:
Signature and Title of Reporting Officer                  C. Price CSIII _____ Date  <u>1/24/2022</u>
                                                                     Shift Supervisor or Seg Unit Mgr.

                                                                     _____ Date _____
                                                                     Warden Authorization (if needed)

******************************************************************************************************************
OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:  Date: <u>1·24·22</u>          Time: <u>1010</u>  am / pm
_____ # <u>0091359</u>                              _____
Offender Signature and Number                               Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden
            Offender
            PCM
            EAI

EXHIBIT #2

Attachment B, IMPP 20-105
Effective 07-08-14

# Kansas Department of Corrections
## Administrative Segregation Report

TO: <u>Secretary of Corrections</u>                     Report Number: <u>81694</u>

*FROM:* <u>Hutchinson Correctional Facility</u>

| | | | |
|---|---|---|---|
| Date This Report Filed: | <u>3-8-2021</u> | Time of Report: | <u>6:35am</u> |
| Date of Segregation Placement: | <u>3-8-2021</u> | Time of Placement: | <u>6:15am</u> |

Offender Name: <u>Dudley, James #91359</u>          Reason(s) For Segregation (Including Rule No. and Title):

*Moved from Cell #:* <u>B2-205</u> to Segregation Cell #: <u>A̶1̶-̶1̶1̶0̶</u>   *IMPP 20-104 (I)(B)(4) Pre-Hearing Detention*
                              B'-236

☒  Pre-Segregation hearing conducted

☐  Pre-Segregation hearing NOT conducted (Explain) _____

Facts: <u>Inmate Dudley 91359 was involved in a physical altercation with inmate Whitfield in B2 cell house.</u>
<u>The inmate was cleared by medical staff.  Inmate was not present for the inventory of his property.</u>

☐  This placement is an Involuntary Protective Custody due to PREA Concerns (Respond to next two sections)

What is the basis for the facility's concern for the offender's safety?

_____

What is the reason no alternative means of separation can be arranged?

_____

Approved By:

| | | | | |
|---|---|---|---|---|
| C. Price CSIII | Date <u>3-8-2021</u> | C. Price CSIII | Date <u>3-8-2021</u> |
| Signature and Title of Reporting Officer | | Shift Supervisor or Seg Unit Mgr. | |

                                               Date _____
                              Warden Authorization (if needed)

*********************************************************************************************

OFFENDER ACKNOWLEDGMENT:
I received a copy of this report on:   Date: <u>3-8-2021</u>      Time: <u>0700</u>   am / pm

*Refused to Sign*      # <u>91359</u>       *N. McCammon CQT*
Offender Signature and Number                     Staff Witness and Title

Record this Document in Imaging
Original to Master File
Copy to: Warden
         Offender
         PCM
         EAI



01/16/2014



01/16/2014



01/16/2014



01/16/2014

01/16/2014







Note: Plaintiff does challenge the
constitutionality of <u>All</u> of the charges
in this exhibit. Plaintiff also challenges
the KDOC / Attorney general for prosecution
on all of these..

Attachment B, IMPP 11-119
Effective: 12-11-13
P-1528

Sun/Mon
C-150

# DISCIPLINARY REPORT

HCF-CU
(FACILITY)

| Case No. 21-06-025 | Date of Alleged Violation: 6/2/21 | Time: 1045 A.M. / P.M. |
|---|---|---|
| Date This Report Written: 6/2/21 | | Time: 1348 A.M. / P.M. |

Name of Inmate: Dudley    James    MI    No. 91359    Cell No: 150
LAST    FIRST    Adm Clinic

Duty Assignment: N/A    A2-233

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-304 Disobeying Orders Class 1, 44-12-306 Threatening and Intimidating. Class 1

FACTS: On the above date at the allotted time, Cpl. Vargas and myself were escorting I/M Dudley to the 150 cells, where I instructed him to remove his clothes. He refused and said he was allowed them. I told him that MH said he would only be allowed a smock. I then said "I am giving you a direct order to remove your clothes and hand them over." He then said no and said "Y'all are going to have to come and fuck me up! And I'm going to fuck y'all up plenty first!" I then called the Captain's office who got SST Jackson & Beardsley to retrieve the clothes.

(Attach Additional Sheet(s) if necessary)    7737

Staff Witnesses: Cpl. Vargas    (Signature)
Cpl. Lopa    Cpl B S Jackson
Printed Name and Title of Employee Writing Report

Approved by: _____
(Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on 6/2/21    Signature _____

I received a copy of this report on 06/03/21   804   Crisis Level/no you allowed witness
(Date)    (Time)    (Inmate Signature & No)

I served a copy of this report 06/03/21   804   ACZ----GII
(Date)    (Time)    (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

6/19

Attachment B, IMPP 11-119
Effective: 12-11-13
P-1528


11-7
T/F

# DISCIPLINARY REPORT

HCF - CENTRAL
(FACILITY)

| Case No. 21-08-817 | Date of Alleged Violation: 28 AUG. 21 | Time: 0315 A.M / P.M. |
| --- | --- | --- |
| Date This Report Written: 28 AUG 2021 | | Time: 0320 A.M / P.M. |

Name of Inmate: DUDLEY    JAMES          No. 91359 / 91390    Cell No: ISO-6
                 LAST     FIRST      MI

Duty Assignment: L/I

Alleged Violation of Law or Rule *(Identify by Code No., Short Title, and Class)* 44-12-324 : BATTERY
CLASS I OFFENSE

FACTS: AT 0314AM, MED TECH HURST AND I (TRAMMELL COII) WERE
STANDING IN FRONT OF ISO-6'S OPEN FOOD PORT ATTEMPTING
TO GIVE DUDLEY HIS A.M. MEDS. THE INMATE KNELT DOWN AND
SPAT UPON HURST AND I SAYING "I AIN'T TAKIN' NO MEDS." FOR

Staff Witnesses: HURST, J. - MED/TECH    (Signature) _____ COII
(Attach Additional Sheet(s) if necessary)
TRAMMELL COII
Printed Name and Title of Employee Writing Report

7131
Approved by: _____ COII
(Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.
Executed on 28 AUG. 21      Signature _____

I received a copy of this report on 08/30/21, 09:47    X I'm in Crisis Level
                                    (Date)    (Time)     (Inmate Signature & No)    I'm Read

I served a copy of this report  08/30/21  09:47 _____ CSI
                                (Date)    (Time)    (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

918

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

HUTCHINSON CORRECTIONAL FACILITY
(FACILITY)

| Case No. 21-09-126 | Date of Alleged Violation: 15SEPT2021 | Time: 1000 |
| | Date This Report Written: 16SEPT2021 | Time: 1000 |

Name of Inmate: Dudley        James        R.        No: 91359    Cell No: MRA
                LAST          FIRST        MI                              A1-140

Duty Assignment:    R.H.U.

**Alleged Violation of Law or Rule** (Identify by Code No., Short Title, and Class) **44-12-324, Battery, Class I // 44-12-901, Dangerous Contraband, Class I // 44-12-320a, Interfering with official duties, Class I // 44-12-304, Disobeying orders, Class I //**

FACTS:  On the above date at approximately 1000hrs Myself and several members of the S.S.T. team went to A2-229 place Inmate Dudley #91359 into restraints and move him into an M.R.A. cell for battering a staff member. I gave I/M Dudley several orders to submit to restraints all were ignored. The decision was made to go and start extraction protocol, as I reached to the back of my belt to get keys to lock the food pass door, I/M Dudley slammed his food pass door down and with something in his hand thrust an object towards my abdomen. I pulled away in reaction and saw what I thought was an ink pen hit my stomach right below my vest. CPL. Towers was nearby, I told him I was just stabbed by a pen. He approached the cell door and kicked the food pass door shut and I was able to lock it at that time. I/M Dudley was subsequently moved to an M.R.A. cell by other staff without further incident. I went to seek outside medical treatment and returned to work with out incident.

****E.O.R.****

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: _Cpl. Towers_                (Signature) _[signature]_ CPL
                                                CPL. Beardsley, J
                                        Printed Name and Title of Employee Writing Report

                        7586        Approved by: _[signature]_ CS1
                                        (Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on _16 SEPT 21_        Signature _[signature]_ CPL.

I received a copy of this report on _9/17/21_   _0729_   X  RTS
                                    (Date)     (Time)      (Inmate Signature & No)
I served a copy of this report _9/17/21_   _0729_   _[signature]_ CS1
                                    (Date)     (Time)   (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment B, IMPP 11-119
Effective: 12-11-13
P-1528

# DISCIPLINARY REPORT

HCF Central
(FACILITY)

J-3
55
C-20

| | | | |
|---|---|---|---|
| Case No. 21-09-165 | Date of Alleged Violation: 9/15/21 | | Time: ̶0̶1̶5̶ 949 (A.M.) / P.M. |
| Date This Report Written: | | 9/15/21 | Time: 1320 A.M. / P.M. |

Name of Inmate: Dudley   James        No. 91359   Cell No: A1/144
                 LAST     FIRST     MI                         A1-140

Duty Assignment: MRA

**Alleged Violation of Law or Rule** (Identify by Code No., Short Title, and Class)

44-12-324 Battery CL I

FACTS: On 9/15/21 I/M Dudley # 91359 A2-229 claimed suicidal thoughts. I, Msgt R. Smith was called to his cell by my staff. When I arrived I ask I/M Dudley #91359 what was going on. He Refused to Answer me. I instructed Cpl Vargas, who was watching him, to go ahead and leave.

Cpl Vargas walked away and I again ask I/M Dudley # 91359 what was going on. He motioned for me to come to the food port. When I did he spit on my face. I then walked away to Report the battery to UTM Agnew.

Staff Witnesses:_____

(Attach Additional Sheet(s) if necessary)
(Signature)   R. Smith CSI

9853
Printed Name and Title of Employee Writing Report
R. Smith CSI

Approved by:_____

(Shift Supervisor, Unit Team Manager & Title)

---

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on   9/15/21                Signature   R. Smith CSI

---

I received a copy of this report on  9/16/21, 0851      X  RTS
                                     (Date)   (Time)       (Inmate Signature & No)   CSI

I served a copy of this report   9/16/21  0851   _____
                                 (Date)   (Time)   (Signature of Officer or Unit Team Manager & Title)

---

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error: Plain error.*

9/24

c2
6.2

# DISCIPLINARY REPORT

HCF - Central
(FACILITY)

| Case No. 21-09-215 | Date of Alleged Violation: 09.25.2021 | Time: 0844   A.M. / P.M. |
|---|---|---|
| Date This Report Written: | 09.25.2021 | Time: 1102   A.M. / P.M. |

Name of Inmate: Dudley , James                MI          No. 91359     Cell No. 150#3 CIII
                    LAST        FIRST                                              A-136

Duty Assignment: N/A

Alleged Violation of Law or Rule *(Identify by Code No., Short Title, and Class)* 44·12·304 Disobeying
Orders CL1 #3 ; Battery 44·12·324 CL1

FACTS: On the above date and time, Inmate Dudley #91359, was given an order
to give staff the pants and boxers he had as they were, not on his allowable proper
list. He was placed on crisis level by MH. A cell extraction team was suited and
prior to entering the cell multiple orders were given to give the pants or boxers
to officers. The inmate refused. OC was used, afterwards orders to give the
items and/or cuff up were given. The inmate still refused. The cell extraction
team had to enter the cell and the said items were removed by staff.

During the cell extraction process inmate Dudley made several attempts to
grab me. At 0844 inmate grabbed my wrist thru the food port of the door.

*(Attach Additional Sheet(s) if necessary)*

Staff Witnesses: M/Sgt. Abbott, Sgt.        (Signature) [signature]
Thimesch, Cpl. Stage, Cpl. C. Breed,                        I.J. Flores
Cpl. Reynolds, Camera - Milestone         Printed Name and Title of Employee Writing Report
Crisis Hall West Side @ 0844
                                          Approved by: S. Foster CSII
                    9413                   (Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on 09 / 25 / 2021          Signature [signature]

| I received a copy of this report on 9/07/21   070   X   F/M on Cris's Lv. | |
|---|---|
| (Date)   (Time)   (Inmate Signature & No) | |
| I served a copy of this report   9/07/21   073 [signature] (81) | |
| (Date)   (Time)   (Signature of Officer or Unit Team Manager & Title) | |

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

10/4

Attachment B, IMPP 11-119
Effective: 12-11-13
P-1528

# DISCIPLINARY REPORT

HCF Central
(FACILITY)

| | | |
|---|---|---|
| Case No. 21.10.106 | Date of Alleged Violation: 10-9-21 | Time: 0820 (A.M.) / P.M. |
| Date This Report Written: 10-9-21 | | Time: 0845 (A.M.) / P.M. |

Name of Inmate: Dudley, James R    No. 91359    Cell No: A1-156
　　　　　　　　LAST　　FIRST　　MI    　　　　　　　A2-225    A1-140

Duty Assignment: Disc Seg

**Alleged Violation of Law or Rule** (Identify by Code No., Short Title, and Class) 44-12-324, Battery, Class 1

FACTS: On 10-9-21 I, CPL Strange, was taking seg yard out to yard. Inmate Neloms #85627 was in yard cage #5 and Inmate Dudley #91359 was in yard cage 6. At approx 0820 hours Inmate Dudley asked to change cages because he and inmate Neloms were going to have problems. I cuffed Inmate Dudley up and while opening his cage door he spit at Inmate Neloms, hitting him in the face. EOR

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: CPL Moore

(Signature) _____ CPL Strange
　　　　　　　　CPL Strange
Printed Name and Title of Employee Writing Report

Approved by: _____ CSII
(Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on 10-9-21　　　　　Signature _____

| | | | | |
|---|---|---|---|---|
| I received a copy of this report on | 10-21-21 | 944 | MRA | WITNESS CPL 9 ____ |
| | (Date) | (Time) | (Inmate Signature & No) | |
| I served a copy of this report | 10-11-21 | 944 | ac | |
| | (Date) | (Time) | (Signature of Officer or Unit Team Manager & Title) | |

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

HUTCHINSON CORRECTIONAL FACILITY - ___CENTRAL_____
( FACILITY)

| Case No. 21-11-049   Date of Alleged Violation:11-7-2021 | Time:1540 P.M. |
|---|---|
| Date This Report Written:11-7-2021 | Time:1730 P.M. |

Name of Inmate: Dudley     James     R                         No. 91359     Cell No: A1 130
           LAST       FIRST     MI                     A2-215 ~~K 148~~

Duty Assignment:DSEG

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) _____ Battery 44-12-324 Class I, Unsanitary Practices 44-12-105 Class III, Improper use of prepared or served food 44-12-308 Class III, Disobeying orders 44-12-304 Class I, Interfering with official duties 44-12-320a Class I

FACTS:On the above date and approximate time inmate Dudley #91359 was given a tray by myself, the inmate asked for a second tray but when he was told no he got increasingly mad. The inmate asked for a second tray again after saying no he couldn't have another tray the inmate took the tray I had been trying to give him and threw the tray at me hitting me in the chest. The food had covered the front of my vest, arms, pants, and boots the inmate then reached out of the food service port and started to knock the other trays off the cart. The inmate was told to stop, the inmate ignored the orders given to him and proceeded to knock the trays off the cart. Once the inmate had went back into the cell I closed the food port and took the cart down the A2-200 run to inform M/Sgt. Wilson of the incident. The inmate had destroyed 8 regular trays, 1 cardio tray, 1 vegetarian tray, 1 low-fiber tray, 1 CRD tray, and 1 CRD/Allergy tray. I am requesting restitution for the destroyed meals. FOR

(Attach Additional Sheet(s) if necessary)

Staff Witnesses:_____ (Signature)
Cpl. Nevarez_____

1585

Sgt. Sanders
Printed Name and Title of Employee Writing Report

Approved by: _____ 611
(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct*

*Executed on* 11-7-2021 _____     Signature _____ Cpl

I received a copy of this report on 11/8/21   08²⁰     X RTS (Inmate Signature & No)
                   (Date)    (Time)
I served a copy of this report 11/8/21   08²⁰     Willis  c61
                   (Date)    (Time)       (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*



C-34

A2-215

# DISCIPLINARY REPORT

HUTCHINSON CORRECTIONAL FACILITY -   CENTRAL
( FACILITY)

| | |
|---|---|
| Case No. 21-11-052  Date of Alleged Violation:11-07-2021 | Time:1734 P.M. |
| Date This Report Written:11-07-2021 | Time:1755  P.M. |

Name of Inmate: Dudley        James        R.                            No. 91359    Cell No: A1-130
　　　　　　　　LAST　　　　FIRST　　　MI

A2-215

Duty Assignment:Administrative Segregation MRA/PHD

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*)       44-12-324 Battery, Class 1
      44-12-306 Threatening or intimidating any person, Class 1

FACTS:On the above date and approximate time, I (CSI Wilson) was conducting a security round in A1. I/M Dudley began banging on his door as I passed by A1-130. I turned around and lifted the cover to the outer door of A1-130 to speak to the I/M. I/M Dudley demanded that I give him razors. Due to his behavior on this day he was denied razors. I/M Dudley then demanded to speak to the Captain and made the statement "I'm going to start battering you guys every day." I denied his request to speak to the Captain. Immediately following being told no, I/M Dudley spit in my face through the the grating of the outer door. The fluid hit my mask and the bridge of my nose. Striking a staff member with bodily fluids is a violation of 44-12-324 Battery. The above statement threatening to batter staff on a daily basis is a violation of 44-12-306 Threatening of intimidating and person. EOR

(Attach Additional Sheet(s) if necessary)
(Signature)

Staff Witnesses:
N/A                                                           Wilson CSI
　　　　　　　　　　　　　　　　　　　　Printed Name and Title of Employee Writing Report

1357   Approved by: _____ CSI
　　　　　　　　　　(Shift Supervisor, Unit Team Manager & Title)

| |
|---|
| *I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.* <br><br> *Executed on* 11/67 /2021                    *Signature* _____ Wilson CSI |

| | |
|---|---|
| I received a copy of this report on 11/8/21 , 08 18        X   RTS <br> 　　　　　　　　(Date)　　(Time)　　　　(Inmate Signature & No) | |
| I served a copy of this report 11/8/21 , 08 18 ,        _____ CSI <br> 　　　　　　　　(Date)　　(Time)　　　　(Signature of Officer or Unit Team Manager & Title) | |

| |
|---|
| *Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.* |

 HHA6 11/22

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

A2-218

HUTCHINSON CORRECTIONAL FACILITY - ___CENTRAL_____
        ( FACILITY)

| | |
|---|---|
| Case No. _81-11-053_  Date of Alleged Violation:11-07-2021 | Time:0713 P.M. |
| Date This Report Written:11-07-2021 | Time:0950 P.M. |

Name of Inmate: Dudley        James        R.                    No. 91359.   Cell No: A1-130
              LAST          FIRST        MI                         A2-215   A1-118

Duty Assignment: Administrative Segregation MRA/PHD

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*)    44-12-324 Battery, Class 1

_____

FACTS: On 11/7/2021 at approximately 7:13pm I (CMA Mercado) came to Dudley's cell to offer him his bedtime medication. He motioned to me by waving his hand toward himself indicating that he wanted his medication. I entered the outer area of the MRA cell to attempt to give Dudley his medication. Dudley looked down and into his hands to bring the cup up to the open area of the bars. Dudley presented the cup that he had and it was full of an unkown liquid. Dudley squeezed the cup and the liquid splashed onto my face as well as down my shirt and into the basket that held the rest of the supplies for finishing segregation med pass. Dudley then reached through the bars and struck me in the face a minimum of three times.

(Attach Additional Sheet(s) if necessary)

Staff Witnesses:_____ (Signature) _____ CMA
COI Skeen                           Mercado CMA
_____ 7873        Printed Name and Title of employee Writing Report
CSI Wilson                          Approved by: _____
                                    (Shift Supervisor, Unit Team Manager & Title)

| |
|---|
| *I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.* <br><br> Executed on  11/7/21 _____          Signature _____ CMA |

| |
|---|
| I received a copy of this report on _11/8/21_, _0816_   X   RTS <br> (Date)    (Time)          (Inmate Signature & No) <br> I served a copy of this report _11/8/21_   _0816_   _____ CSI <br> (Date)    (Time)          (Signature of Officer or Unit Team Manager & Title) |

| |
|---|
| *Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.* |

11/22

# DISCIPLINARY REPORT

HUTCHINSON CORRECTIONAL FACILITY -   CENTRAL
( FACILITY)

| Case No. 22-01-170   Date of Alleged Violation:01/24/2022 | Time:0805 P.M. A.M. |
| Date This Report Written:01/24/2022 | Time:0900 A.M. |

Name of Inmate: Dudley   James _____   No. 91359   Cell No: A2 Cell 215/ A1 136
LAST   FIRST   MI

Duty Assignment:RHU

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) _____ 44-12-324 Battery Class 1  44-12-304 Disobeying orders Class 1 _____

FACTS: On 1/24/2022 I Cpl Hoffman was escorting I/M Dudley to his cell from sick call, while going up the stairs he stops to look at the books. I tell him to start walking, he says "give me a minute" I then give him a second order to start walking, I/M Dudley says again "im looking give me minute". I start to lift up on his arm to help him up the stairs. He then says don't get aggressive with me, then throws his shoulder in to the right side of my jaw. I reached around his shoulder to gain control and we then fell down the stairs. Cpl Strange came around the corner and called a Level A. I maintained control of I/M Dudley until response arrived and took control and escorted him to MRA Cell 136.

Staff Witnesses: Cpl Strange   (Attach Additional Sheet(s) if necessary)
(Signature)  Cpl C. Hoffman
Cpl C. Hoffman
Cpl_2   Printed Name and Title of Employee Writing Report

Approved by: _____ CSⅡ
(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*
*Executed on* 1/24/22   *Signature* _____

I received a copy of this report on 1/25/22   0700   X James Dudley #91359
(Date)   (Time)   (Inmate Signature & No.)

I served a copy of this report 1/25/22   0700   William   Cpl
(Date)   (Time)   (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

370   1/31

Attachment B, IMPP 11-119
Effective: 12-11-13

# DISCIPLINARY REPORT

_____LCF-C_____
(FACILITY)

| | | | |
|---|---|---|---|
| Case No. 3697 | Date of Alleged Violation: 04-19-2022 | Time: | 0837   A.M. / P.M. |
| Date This Report Written: | 04-19-2022 | Time: | 0910   A.M. / P.M. |

Name of Inmate: Dudley_____ James_____ R_ No._91359___ Cell No.: _INF-DC07__
　　　　　　　　　LAST　　　　　　　FIRST　　　　　　MI

Duty Assignment: _____Crisis level_____

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*)____44-12-324 Battery Class 1.

FACTS:  On April 19, 2022 @ approx. 0837 I COI Kohl and CSI Snodgrass were conducting a strip search of offender Dudley 91359 in INF-DC07. While taking the restraints off the offender he struck me with a closed fist with his left hand. The offender then punched me in the head approxamitlly 2 more times until he was secured against the wall and restrained. Due to the above offender's actions I COI Kohl charge offender Dudley 91359 with 44-12-324 Battery class 1. E.O.R.

　　　　　　　　　　　　　　　　(Attach Additional Sheet(s) if necessary)　　　　　　_COI Kowl_____

Staff Witnesses: CSI Snodgrass_____　　　(Signature)
_COI Towell._____　　　　　　　　　　　　_COI Kohl. Fri - Sat._
　　　　　　　　　　　　　　　　　　　　　　　　　Printed Name, Title and ID # of Employee Writing Report
_____　　　Approved by: _Lt. Preston_____
　　　　　　　　　　　　　　　　　　　　　(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

*Executed on* _04-19-2022_____　　Signature___COI Kowl._____

| | |
|---|---|
| I received a copy of this report on 4-19-22, 1957, I'm unable to sign due to crisis level Copy given | |
| (Date)　(Time)　(Inmate Signature & No) | to UTM |
| I served a copy of this report 4-19-22, 1957  COI Sloan | |
| ___ (Date)　(Time)　(Signature of Officer or Unit Team Manager & Title) | |

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

Lansing Correctional Facility
( FACILITY)

| Case No. 3695 | Date of Alleged Violation:04-19-2022 | Time: 0345   A.M. / P.M. |
|---|---|---|
| Date This Report Written:   04-19-2022 | | Time: 0405   A.M. / P.M. |

Name of Inmate: Dudley        James         R   No.91359      Cell No: A4-109
                LAST          FIRST         MI

Duty Assignment:MRA

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-324 Battery Class 1

FACTS:On the above date and approx time I Lt. Hartley and Col Baidoo was attempting to close the food port on A4-100, and inmate Dudley struck myself Lt. Hartley and Col Baidoo in the hands with his hands while we were trying to close the food port. He was given an order to move and he then attempted to grab my (Lt. Hartley) Letherman while I was attempting to clean out the lock. Inmate Dudley is in violation of 44-12-324 Battery Class 1. END OF REPORT

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: Col Baidoo        (Signature)
Col Potts

Report

Printed Name and Title of Employee Writing

Approved by: _____

(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on 04.19.2022 _____        Signature _____

I received a copy of this report on _____, _____        Unable to sign due to Chris's level
                                    (Date)    (Time)        (Inmate Signature & No)

I served a copy of this report 4/19/22   930 am   Col Jimenez
                               (Date)    (Time)        (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707, Harmless error; Plain error.*

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

Lansing Correctional Facility
   ( FACILITY)

| Case No. 3825 | Date of Alleged Violation:04/27/2022 | Time: 0515   A.M. / P.M. |
|---|---|---|
| Date This Report Written:   04/27/2022 | | Time: 0545   A.M. / P.M. |

Name of Inmate: Dudley          James          R   No.119609   91359   Cell No: DC02
                 LAST            FIRST          MI

Duty Assignment:Crisis level

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-324 Battery (Class 1)
44-12-304 Disobeying orders (Class 1)

FACTS:On the above date and approximate time I, CSI Krivenko, was serving breakfast in the Infirmary. When the meal was placed on the food port of DC02 where Dudley 91359 resided on a Crisis level. He complained that the juice was only half a portion. I looked into the cup and it was more than half a portion. I asked inmate Dudley if he was going to take the juice or not. He said he wanted his whole portion. I told him that is the portion that was given to us and all the other cups were the same. He continued to complain about the portion so I removed the cup of juice from the food port and attempted to close the food port. As I attempted this Inmate Dudley slammed his hand through, hitting the door which caused it to hit my hand and knock juice out of the cup on my pants. I told him to removed his arm as I attpemted to close the food port again and he refused leaving it in the port. This is in violation of 44-12-324 Battery class 1 and 44-12-304 Disobeying orders class 1.   End of Report.

Staff Witnesses:                    (Attach Additional Sheet(s) if necessary)
                                    (Signature) *CSI K* *CpCa SMT*
_____                        *CSI Krivenko*
                                    Printed Name and Title of Employee Writing
_____
Report                              Approved by:_____
                                    (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on **4-28-22**                    Signature *CSI K*

I received a copy of this report on 1/28/22, 1610   *UNABLE TO SIGN DUE TO CRISIS*
                                    (Date)      (Time)        (Inmate Signature & No)
I served a copy of this report 1/28/22   1610   *COY CACON*
                                    (Date)      (Time)        (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment B, IMPP 11-119
Effective: 12-11-13
P-1528

# DISCIPLINARY REPORT

__LCF - C__
(FACILITY)

| | | |
|---|---|---|
| Case No. __4158__ | Date of Alleged Violation: __5-24-22__ | Time: __1635__ A.M. / **P.M.** |
| Date This Report Written: __May 25, 2022__ | | Time: __1335__ A.M. / **P.M.** |

Name of Inmate: __Dudley__  __James__  __R.__  No. __91359__  Cell No: __A4-116__
LAST          FIRST          MI

Duty Assignment: _____

Alleged Violation of Law or Rule (Identify by Code No., Short Title, and Class) __44-12 - 324__
__Battery__  __Class 1__

FACTS: On above date one apprx time, I CSI Browning was passing out dinner trays in A4-(Segregation). At cell A4-116, R0 was trying to close the food port after giving Inmate Dudley #91359 his dinner tray. Inmate Dudley put his hand in the food port and was keeping R0 from trying to close it. I/m Dudley used force on pushing the food port open, while doing so the food port hit R0's I hand extremely hard causing the food port to scrape the inside of R0's fingers and hand and hit my upper leg causing R0's pants to rip. Dudley is in violation of 44-12 - Battery on Staff.

(Attach Additional Sheet(s) If necessary)

Staff Witnesses: ~~_____~~         (Signature) __CSI D. Browning__
                                                              CSI BROWNING
                                       Printed Name and Title of Employee Writing Report

                        Approved by: _____
                                     (Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.

Executed on __5-25-22__          Signature __CSI D. Browning__

I received a copy of this report on __5-25-22__, __1957__, Inmate refused to sign copy given
                                   (Date)    (Time)        (Inmate Signature & No)

I served a copy of this report __5-25-22__  __1957__, _____
                                 (Date)    (Time)     (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuant to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment B, IMPP 11-119
Effective:  12-11-13

# DISCIPLINARY REPORT

LCF Central
(FACILITY)

| Case No. | 0143 | Date of Alleged Violation: | 07/142022 | Time: | 1650 | A.M. / P.M. |
|---|---|---|---|---|---|---|
| Date This Report Written: | | | 07/14/2022 | Time: | 1836 | A.M. / P.M. |

Name of Inmate: Dudley          James          R          No.          91359          Cell No: A2 Cell #105
                LAST          FIRST          MI

Duty Assignment:  MRA

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-324 Battery  Class 1

FACTS:  On July 14, 2022 at approximately 1650 while passing chow Inmate Dudley # 91359 began reaching through the tray pass attempting to grab trays off of the food cart , I COI Busby pushed the food cart away from his tray pass when Inmate Dudley # 91359  first made an attempt to grab me , Thats when CSI McCurrie rushed over to assist me , I COI Busby placed my right hand on his left wrist to assist his arm back through the tray pass , while assisting his arm back into the tray pass Inmate dudley  began utilizing his right arm through the tray pass attempting to strike CSI McCurrie , Thats when I COI Busby let go of his left wrist to place both my left and right hands on Inmate Dudley's # 91359 right arm to assist it back through the tray pass , At this time inmate Dudley # 91359 began swinging his left arm through the tray pass striking me in the groin region of my body. After Inmate Dudley # 91359 struck me in the groin CSI McCurrie was able to secure his tray pass. By stricking my in the groin area this places Inmate Dudley # 91359 in violation of K.A.R 44-12-324

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: CSI McCurrie          (Signature)          *[signature]*

                    COI Busby Fri/Sat/Sun
                Printed Name and Title of Employee Writing Report

Approved by:  *[signature]* CSII

(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on ____07/14/2022____          Signature ____*[signature]*____

I received a copy of this report on 7-14-22      1955   Unable to Sign or MRA
   (Date)          (Time)          (Inmate Signature & No)

I served a copy of this report 7-14-22   1955   *[signature]* CSII
   (Date)          (Time)          (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Copy Given by CSI Hunt on 7/18/22 @ 0853

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

Lansing Correctional Facility-MAX
( FACILITY)

| Case No. *0352* | Date of Alleged Violation:08/03/2022 | Time:  0700   A.M. / P.M. |
|---|---|---|
| Date This Report Written:        08/03/2022 | | Time:  1103   A.M. / P.M. |

Name of Inmate: Dudley          James          R   No.91359      Cell No: A2 105
LAST                FIRST              MI

Duty Assignment:Pre-Hearing/MRA

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-304 Disobeying Orders Class I

FACTS:On 08.02.22 at approximately 1730 I/M Dudley informed me, CSI McCurrie that he will not take a cell mate and wants to go PC because he doesn't want a cell mate and is going to make "Mrs. O" give him his property.  On 08/03/2022 I/M Dudley again refused to move to 121.  I/M Dudley is in violation of 44-12-304 Disobeying Orders; Class I.  EOR

Staff Witnesses: *COI BUSBY*        (Attach Additional Sheet(s) if necessary)
(Signature) *CSI A. McCURRIE F/S/S*
*CSI A. McCURRIE F/S/S*
Printed Name and Title of Employee Writing

Report

Approved by *[signature]* *UTM*
(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on *08/03/22*          Signature *CSI McCURRIE*

I received a copy of this report on *08/04/22  0105* , *Could not sign due to MRB Copy given*
(Date)       (Time)                    (Inmate Signature & No)
I served a copy of this report *08/04/22   0105* , *col Colin*
(Date)        (Time)                    (Signature of Officer or Unit Team Manager &
Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

<u>Lansing Correctional Facility</u>
    ( FACILITY)

| Case No. 4311 | Date of Alleged Violation:6-6-2022 | Time:  0824   A.M. / P.M. |
|---|---|---|
| Date This Report Written:      6-6-2022 | | Time:  1712   A.M. / P.M. |

| Name of Inmate: Dudley<br>    LAST | James<br>FIRST | R   No.91359<br>MI | Cell No: A4-116 |
|---|---|---|---|
| Duty Assignment:OSR | | | |

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class)* 44-12-304 Disobeying orders Class I
and 44-12-320a Interfering with official duties Class II

FACTS:On the above date and approximate time CSI Dudley, CSI Gardner, and COI Dibbern were escorting
segregation yards in as their allotted hour of time was up. CSI Dudley went to escort the resident above off the yard
and he replied "I'm not coming off. I am peacefully protesting and want to speak to the warden". CSI Dudley again
asked the resident above to which he replied the same in a respectful manor. This is a violation of 44-12-304
disobeying orders as he did not leave the yard as instructed at the required time. The resident above also interfered
with officer's official duties as there were other residents that needed yard and one of the two officers had to stay out
on the yard until they came off the yard.  EOR

(Attach Additional Sheet(s) if necessary)

Staff Witnesses:_____   (Signature) *R Dudley*

_____   *CSI Dudley R Aug*
                    Printed Name and Title of Employee Writing

Report

_____

              Approved by: _____

                  (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on *6-6-22* _____   Signature *R Dudley*_____

I received a copy of this report on *6-7-22*_____   *Refused to sign copy given*
      (Date)     (Time)           (Inmate Signature & No)

I served a copy of this report *6-7-22* , *1448* , *CSI Hutchison*
      (Date)     (Time)         (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is
substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

Attachment G, IMPP 11-119
Effective: 10-15-07

# DISCIPLINARY REPORT

Lansing Correctional Facility
( FACILITY)

| Case No.  ⊘\⊘\ | Date of Alleged Violation:07-10-2022 | Time:  2040   A.M. / P.M. |
|---|---|---|
| Date This Report Written:      07-10-2022 | | Time:  2115   A.M. / P.M. |

| Name of Inmate: Dudley        James          R  No.91359     Cell No: A2-101 |
|---|
|      LAST                 FIRST               MI |
| Duty Assignment:Crisis Level 1 |

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) 44-12-304 Disobeying orders class 1

FACTS:On the above date and approx. time, I Lt. Hartley gave inmate Dudley #91359 an order to turn around and allow staff to place him in restrains to be placed on Crisis Level. Dudley refused to comply with directives give to him and force was used to gain compliance. Dudley #91359 is in violation of 44-12-304 Disobeying Orders Class 1. END OF REPORT

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: _L. Lunsford_ _____ (Signature) _G. Hartley_

_____   _KDO - 0600   T.S.S_

Report                                           Printed Name and Title of Employee Writing

_____

Approved by: _____

(Shift Supervisor, Unit Team Manager & Title)

| *I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.* |
|---|
| *Executed on* _____      *Signature* _____ |

I received a copy of this report on _7-11-22_ , _1710_ , _Unable to Sign due to MHA. Copy Given_
         (Date)     (Time)       (Inmate Signature & No)

I served a copy of this report  _7-11-22_  ,  _1710_  , _(S) A. Ham_
         (Date)     (Time)      (Signature of Officer or Unit Team Manager & Title)

| *Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.* |
|---|

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

EDCF-RDU
( FACILITY)

B1 128

| Case No. 09-01- 110 | Date of Alleged Violation: 1/14/2009 | Time: 07:00 | A.M. / P.M. |
|---|---|---|---|
| Date This Report Written: 1/15/2009 | | Time: 13:30 | A.M. / P.M. |

Name of Inmate: _____ Dudley, James _____ No. __91359__ Cell No: ____ B1-218
LAST                    FIRST                    MI                                      B1-128

Duty Assignment: _____ Segregation

**Alleged Violation of Law or Rule** (*Identify by Code No., Short Title, and Class*) _____ 44-12-306 THREATENING
OR INTIMIDATING ANY PERSON CLASS 1 OFFENSE.

FACTS: On 1/14/2009 I received the following information from inmate Dudley: When ever I have court again I am refusing to go (IF) I got to stay at the county jail again. It is a proven fact that a county jail environment is not good or healthy for me or other/guards. I am informing you now so that I can make you aware of my safety and **the safety of the officers at Reno County Jail.**

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: _____          (Signature)          CCILA. AUSTIN S/S     9-3
_____                                   _____
_____                    Printed Name and Title of Employee Writing Report
_____      Approved by: _____
                                         (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on __1-15-09__                    Signature _____

I received a copy of this report on __31-16-2009__ . _____
                    (Date)          (Time)          (Inmate Signature & No)
I served a copy of this report __1-16-09__  __0730__ . _____
                    (Date)          (Time)          (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

**DISCIPLINARY REPORT**

Attachment B, IMPP 11-119
Effective: 12-11-13

**El Dorado Correctional Facility**
 (FACILITY)

| Case No. 20-11-151 | Date of Alleged Violation: 11/14/2022 | Time: 0429 | ☒A.M. ☐P.M. |
|---|---|---|---|
| Date This Report Written: 11/14/2022 | | Time: 0600 | ☒A.M. ☐P.M. |

| Name of Inmate: | **DUDLEY** LAST | **James** FIRST | **R.** MI | No.: **91359** |
|---|---|---|---|---|
| Duty Assignment: | N/A | | | Cell No.: B-1 #146 |

**Alleged Violation of Law or Rule** *(Identify by Code No., Short Title, and Class)*  44-12-324 Battery (Class-1)

**FACTS:** While I COI Barker, M. was passing meals, I came to offender Dudley #91359 in B-1 cell#146. Dudley sat up on his bed and said "put it in my cell" (referring to Dudley's finger food sack). I Cpl. Barker then proceeded to drop the finger food sack in cell #146. Inmate Dudley abruptly rushed toward the cell door before I could secure the food pass. Due to the food pass being difficult to manipulate, two hands are needed to secure it; This being said, my center of gravity was lowered which enabled my face to be within striking distance of Inmate Dudley's closed fist as he violently thrust the food pass open with the intent to do harm. Inmate Dudley's closed fist contacted the front of my face striking my nose, left cheek and eye causing my glasses to fly off my face and my hat to fly off my head. At this point Inmate Dudley then began trying to grab me through the open food pass. CS-1 Hutchins called an officer needs assistance for "staff battery in B-1 cell house" at 0429hrs. Once CS-1 Hutchins arrived at cell#146 he instructed myself Cpl. Barker and Cpl. Miller, A. to move away from the cell door. Once away from the cell door CS-1 Hutchins then cleared the emergency signal at 0430hrs. Cpl. Hackler who was on compound came to B-1 where photographs were taken of my face where I had been struck. E.O.R.

*(Attach Additional Sheet(s) if necessary)*

Staff Witness:

*CO1 Barker (Signature)*

CS-1 Hutchins

Cpl. Miller, A.

Cpl. Barker, M.   1800-0600   L/T/F
Printed Name and Title of Employee Writing Report

*Lt C*
Approved by: (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify, or state) under penalty of perjury under the laws of the State of Kansas that the foregoing is true and correct.*

Executed on   11/14/2022     Signature *CO1 Barker*

| I received a copy of this report on | NOV 1 5 2022 | , | | |
|---|---|---|---|---|
| | Date | | Time | (Inmate Signature & No.) |
| I served a copy of this report on | NOV 1 5 2022 | , | 0634 | |
| | Date | | Time | (Signature of Officer or Unit Team Manager & Title) |

*Technical and clerical errors in the writing and/or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*

# DISCIPLINARY REPORT

*EDCF – C*

Attachment B, IMPP 11-119
Effective: 12-11-13

Choose an item.
(FACILITY)

| Case No. 22-11-258 | Date of Alleged Violation: 11/26/2022 | Time: 0400 | ☒A.M. ☐P.M. |
|---|---|---|---|
| Date This Report Written: 11/26/2022 | | Time: 0415 | ☒A.M. ☐P.M. |

| Name of Inmate: | **DUDLEY** | **James** | | No.: **91359** |
|---|---|---|---|---|
| | LAST | FIRST | MI | |
| Duty Assignment: | RHU | | Cell No.: B1-148 | |

**Alleged Violation of Law or Rule** *(Identify by Code No., Short Title, and Class)* 44-12-306 Threatening or int imidat ing any person, Class I.

**FACTS:** On 11/26/2022, at approx 0325, I, CSI Stevenson, was conducting breakfast pass in B1CH. I gave resident Dudley #91359 his tray in B1-148. He asked to trade it out but would not tell me what was wrong with it. I had him place it in the food pass box so I could inspect it. His tray appeared to be missing butter, but every other item was present and in proper portions. I offered an apple in place because that was what I had available in house, and I also offered to order some butter for him from the kitchen. Dudley refused both options and his tray. At approx. 0400, while picking up trays, I collected Dudleys refused tray and dumped it at which point he began yelling at me out his door. He escalated to a point that he began telling me that I work seg because in GP he would slap me for the way I disrespected him. I told him it wasn't cool to hit women. This did not deter him and he told me many more times that given the chance he would slap me or beat me. EOR.

(Attach Additional Sheet(s) if necessary)

Staff Witness:

(Signature)

CSI Stevenson 1800-0600

Printed Name and Title of Employee Writing Report

Approved by: (Shift Supervisor, Unit Team Manager & Title)

I declare (or verify, certify, or state) under penalty of perjury under the laws of the State of Kansas that the foregoing is true and correct.

Executed on   11/26/2022                    Signature

I received a copy of this report on   NOV 2 8 2022   ,  _____
                                        Date          Time          (Inmate Signature & No.)

I served a copy of this report on   NOV 2 8 2022   ,  _____
                                      Date            Time       (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and/or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*